# Exhibit A

**Volume 2**

**Pages 164 - 414**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

```
GENENTECH, INC.,              )
                              )
          Plaintiff,          )
                              )
  VS.                         )   NO. 4:23-cv-00909 YGR
                              )
BIOGEN MA INC.,               )
                              )
          Defendant.          )
_____)
```

Oakland, California
Monday, June 30, 2025

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

                    WILLIAMS & CONNOLLY LLP
                    680 Maine Avenue, S.W.
                    Washington, D.C. 20024
                BY: **PAUL B. GAFFNEY, ATTORNEY AT LAW**
                    **C. LUKE McCLOUD, ATTORNEY AT LAW**
                    **RICARDO LEYVA, ATTORNEY AT LAW**


                    SKAGGS FAUCETTE LLP
                    505 Montgomery Street, 11th Floor
                    San Francisco, California 94111
                BY: **JEFFREY E. FAUCETTE, ATTORNEY AT LAW**


**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

1  **APPEARANCES**:   (CONTINUED)

2  For Defendant:

3                         DECHERT LLP
                          Cira Centre

4                         2929 Arch Street
                          Philadelphia, Pennsylvania 19104-2808

5                    BY:  **MARTIN J. BLACK, ATTORNEY AT LAW**

6                         DECHERT LLP
                          45 Fremont Street, 26th Floor

7                         San Francisco, California 94105

8                    BY:  **CHARLES HSU, ATTORNEY AT LAW**
                         **MICHAEL H. JOSHI, ATTORNEY AT LAW**

9                         DECHERT LLP
                          US Bank Tower

10                        633 West 5th Street, Suite 4900
                          Los Angeles, California 90071-2032

11                   BY:  **NISHA PATEL, ATTORNEY AT LAW**

12

13  Also Present:        **Hannah Yuen**

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            I N D E X

 2

 3    Monday, June 30, 2025 - Volume 2

 4

 5                                              PAGE   VOL.

 6    Preliminary Jury Instructions              180    2
      Opening Statement by Mr. Gaffney           190    2
 7    Opening Statement by Mr. Black             206    2

 8

 9    PLAINTIFF'S WITNESSES                      PAGE   VOL.

10    JOHNSTON, SEAN
      (SWORN)                                    221    2
11    Direct Examination by Mr. Gaffney          221    2
      Cross-Examination by Mr. Black             281    2
12    Redirect Examination by Mr. Gaffney        307    2
      Recross-Examination by Mr. Black           324    2

13

14    SCHWARTZ, TIMOTHY
      (SWORN)                                    327    2
15    Direct Examination by Mr. Gaffney          327    2
      Cross-Examination by Mr. Black             351    2
16    Redirect Examination by Mr. Gaffney        362    2

17

18    BATTLE, CARL
      By Video Deposition (not reported)         364    2

19

20    WONG, FELIX
      (SWORN)                                    364    2
21    Direct Examination by Mr. McCloud          364    2
      Cross-Examination by Ms. Patel             377    2
      Redirect Examination by Mr. McCloud        383    2
22    Recross-Examination by Ms. Patel           386    2

23

24    DICKERSON, KRISTINA
      By Video Deposition (not reported)         388    2

25
```

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1 | | 224 | 2 |
| 2 | | 231 | 2 |
| 5 | | 239 | 2 |
| 7 | | 253 | 2 |
| 10 | | 302 | 2 |
| 11 | | 302 | 2 |
| 15 | | 264 | 2 |
| 20 | | 303 | 2 |
| 31 | | 235 | 2 |
| 32 | | 235 | 2 |
| 37 | | 235 | 2 |
| 39 | | 235 | 2 |
| 53 | | 277 | 2 |
| 54 | | 275 | 2 |
| 56 | | 306 | 2 |
| 59 | | 306 | 2 |
| 74 | | 355 | 2 |
| 76 | | 374 | 2 |
| 202 | | 266 | 2 |
| 297 | | 356 | 2 |
| 298 | | 358 | 2 |
| 299 | | 359 | 2 |

1                          **I N D E X**

2                       **E X H I B I T S**

3     **TRIAL EXHIBITS**                          **IDEN**  **EVID**  **VOL.**

4     300                                                  360    2

5     301                                                  361    2

6     302                                                  361    2

7     303                                                  305    2

8     304                                                  361    2

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OPENING STATEMENT / BLACK

```
 1   case.  Thank you.
 2           THE COURT:  Thank you.
 3       Okay.  Mr. Black, your opening?
 4       You may proceed when you're ready.
 5           MR. BLACK:  Thank you, Your Honor.
 6                   OPENING STATEMENT
 7           MR. BLACK:  Members of the jury, let me start by
 8   thanking you for your time and reintroducing my team.  At
 9   counsel table we have Nisha Patel, Mike Joshi, Charles Hsu.
10   And with us from Biogen in the back rows over there we have
11   Susan Alexander, Martha Born, and Kim Motley.
12       We are here on behalf of Biogen to ask for your help.  We
13   need your help in getting Genentech to live by the terms of the
14   agreement that the parties signed in 2004.
15       There are a number of points on which we agree, one of
16   which is that this document, Exhibit 1, which is in your
17   binders, is the most important document in the case.  There are
18   certain sections which should be boxed in in your binder, in
19   the copy in your binder, and we urge you to look at those
20   sections and to review them throughout the case.
21       Biogen and its partner Elan faithfully paid royalties for
22   over 12 years, hundreds of millions of dollars for use of the
23   Cabilly patent.  Biogen respects IP rights.  Sometimes it pays
24   royalties and sometimes it receives them.  And whether it does
25   that and whether inventory is covered is a matter of
```

**OPENING STATEMENT / BLACK**

1    contractual agreement.  Each agreement must be considered

2    separately.  And this agreement does not require Biogen to pay

3    royalties following the expiration of the Cabilly patent.  In

4    fact, he did not even mention the most important provision,

5    4.02.

6        The term of agreement ended on December 18th, 2018, when

7    the Cabilly patent expired.  With that date, the obligation to

8    pay royalties expired.  It says it in the agreement.  I'm going

9    to show it to you in a minute.

10       Now, I'm briefly going to go over a road map today.  This

11   will only take about 20 minutes, introduction, then we'll go

12   through the license agreement, talk about why Genentech cannot

13   meet its burden of proof, and show you that Biogen paid all

14   royalties due.

15       Let's start with the license agreement and take a little

16   bit deeper dive.  It is a patent license agreement over the

17   Cabilly patent.  In the front of the agreement on the first

18   page, you'll see a series of "whereas" clauses which tell us

19   what the basic commercial transaction is.

20       Genentech owns and controls certain patent rights.  That's

21   Cabilly.  Licensee, which is a combination of Elan and Biogen

22   because they had a joint venture, is developing and intends to

23   commercialize antibody products, in this case, Tysabri, and

24   Genentech is willing to grant such a non-exclusive license to

25   licensee on the terms and conditions set forth below.  The

1    license is granted.  Biogen and Elan will pay the royalties on

2    the terms defined below.

3        Now, we don't have to get too far into patent law in this

4    case, fortunately, but there is one concept which you do need

5    to understand how the patent system works.  Now, I believe

6    the Court will instruct you that patents are good for limited

7    times and that it will not be disputed that during the time

8    period at issue, the Cabilly patent was in force for exactly

9    17 years.  From December 1 -- December 18th, 2018, the day it

10   was issued -- excuse me -- December 18th, 2001, until

11   December 18th, 2018, the day it expired.

12       When an inventor comes up with a new and innovative idea,

13   they can go to the Patent Office and ask the Patent Office to

14   take a look at it and determine whether it's patentable; and if

15   the Patent Office agrees, it will issue a patent.  At that

16   point the inventor has certain rights, including the right to

17   license for 17 years.

18       But once you hit the dotted line here and the patent

19   expires, the invention becomes free to the public.  It's owned

20   by the public.  It's an important feature of the patent system.

21       In this case, the license agreement, like any other

22   contract, answers a number of questions that have to be

23   answered in any contract.

24       Anything where you have payments over time -- a car loan,

25   a lease payment, mortgage payment -- you're going to find

1  business and has helped to cure disease and ameliorate

2  sickness.

3      But the system only works if people abide by their

4  contracts and live by the words of the agreements that they

5  sign and don't try to overreach.

6      Now, one of these joint ventures which you'll hear about

7  was between Biogen and Elan, and that's what brought Tysabri to

8  market.  The antibody at issue is called natalizumab -- they

9  give the antibodies wonderfully unpronounceable names -- and it

10  was ultimately formulated into a drug called Tysabri.

11      Elan discovered the antibody in the '90s and began doing

12  clinical research.  It's a long, arduous, risky, expensive

13  process.  And in 2000, when they were getting closer to pivotal

14  trials, they got in touch with Biogen and the two formed a

15  partnership to do the final clinical trial work to hope it

16  would work on multiple sclerosis, a terrible disease.  And

17  that's what they did; they formed a partnership.

18      There are licenses involved from other companies.  Elan

19  negotiated those licenses.  And Carl Battle, who was Elan's IP

20  head, was the one who was the primary negotiator on this

21  license at issue here.

22      In 2004, Tysabri was approved; and since then, it has

23  treated hundreds of thousands of patients.  You can't cure MS,

24  but you can keep it at bay.  You can reduce the amount of

25  time -- you can reduce the number of relapses, increase the

1  amount of time between relapses, and improve quality of life.

2  It's administered intravenously.  And even though it's 20 years

3  old, it's still a leading treatment in the area and has treated

4  hundreds of thousands of patients, and they're very proud of

5  that.

6      So this license, it's a license under the Cabilly patent.

7  Section 2.01 is the basic license grant.  And there are

8  definitions for licensed patent and licensed product which feed

9  into that.

10     The way these agreements work is there are capitalized

11  terms.  They have meaning.  You can look at Article I when you

12  look at the agreement, and you'll see that many of these

13  provisions are specifically defined.  It's a little bit of a

14  dictionary or a glossary you can use to understand how the

15  agreement is supposed to work, what the intent of the parties

16  was.

17     How much?  The payments.  So what was the financial

18  consideration?  Well, there are actually three parts to it, not

19  just the royalties.

20     The first payment was a license grant fee of $4 million.

21  It was split between two payments, and that was due on signing.

22  And if the product never went anywhere or nothing happened

23  after that, Genentech got to pocket that and keep it.  That was

24  just the price of entry.

25     The second payment was a development milestone fee under

1    Section 3.02.  That is payable upon approval by the FDA of the

2    product.

3        Now, why would they pay money to Genentech for approval of

4    a product that Genentech had nothing to do with the development

5    of?  The reason is because once the product is approved, the

6    commercialization process begins and manufacture has to take

7    place, commercial scale manufacture.  Once the FDA's approved,

8    commercial manufacture begins, and Biogen starts paying and has

9    to pay the $5 million entry fee.

10        No further compensation or royalties are due, however,

11    until there is a sale.  And that's what's covered under

12    Section 3.03.  It says -- and the evidence will show this was

13    the intent of the parties all along -- that the licensee shall

14    pay to Genentech a royalty of a percentage of net sales of all

15    licensed products sold in the United States and overseas, all

16    licensed products sold in the territory outside the

17    United States.

18        The evidence will not show that the parties agreed that it

19    should read "product manufactured or sold."  Only upon sale is

20    there actually an accrual and obligation to pay royalties.

21        Okay.  Like a car payment, a lease payment, a mortgage

22    payment, where you have a contract that has an obligation to

23    make payments over time, there's going to be an end point to

24    when those payments are made.  It's -- we call it the

25    "how long" provision.  In this case, it's the royalty term.

1   based on the contract, and so they're going to want to talk

2   about all sorts of other things during the course of the case.

3       They're going to talk about other contracts in the Cabilly

4   licensing program, but you are not going to hear that everybody

5   else is paying tail royalties because they aren't.

6       They'll want to talk about other agreements that we had,

7   but each agreement is different.  Some agreements require

8   payment of this; some don't.  You have to look at each

9   agreement individually.  There are no shortcuts.

10      There's no ignoring Section 4.02 or 1.03 or the second

11  sentence of 7.01.  You've got to look at each agreement.  This

12  is a negotiated provision.  There's no assumptions.  That's how

13  these contracts work.

14      In the end, it is their burden of proof to establish

15  liability here.  Just like a car payment, if the -- or a

16  mortgage payment, if the bank says, "Well, you know, we forgot

17  or we want an extra payment because we think that's fair," no,

18  it's whatever was in the agreement in 2004, whatever the

19  parties agreed to.

20      You won't find the language in the agreement that allows

21  them to collect royalties once their patent expired and the

22  invention passed into the public domain.  It's just not there.

23      And, again, the entire understanding clause in 8.06 says

24  the words of the agreement control.  That's our position.

25      So we might hear about Cabilly agreements.  We might hear

1    about other Biogen licenses.  They put up on the screen some

2    Biogen licenses of people Biogen paid on other patents because

3    Biogen respects IP.  But they didn't tell you that on one or

4    two of those the money was actually refunded and that there are

5    other agreements you're going to hear about where Biogen didn't

6    pay.

7        They talked about a lawsuit.  Depends what the agreement

8    says.  Each agreement is different.  You have to read the

9    agreement.  There are no shortcuts here for Genentech.  They've

10   got to show you, to prevail, that there's an obligation to pay

11   royalties following the expiration of the licensed patent.  But

12   the evidence is going to show that's not what the parties

13   negotiated.  That's not what Section 7.01 and 4.02 and 1.03

14   say.  It's simply not there.

15       Finally, they're going to talk about budget projections,

16   but they're not going to talk about the fact that the

17   projections changed in 2018 and the final decision of the

18   company at the time that the license expired was that they were

19   not obligated to pay and that they clearly and unequivocally

20   told Genentech that they were not going to pay because the

21   royalties were not due.

22       So that's our case.  And in the end, when the evidence is

23   in, we will show you that Biogen paid all royalties that were

24   due under the agreement.

25       For over 12 years, they submitted royalty reports for each

 1   calendar quarter, with a capital C, capital Q, and they paid

 2   $750 million.  $750 million.  When Biogen owes money for IP,

 3   they pay it.

 4        But Biogen is simply not obligated to continue paying

 5   royalties.  Once the Cabilly patent expired, the obligation to

 6   pay royalties expired, and the invention passed into the public

 7   domain.

 8        That's what the evidence will show.  And when we return

 9   for closing, we will go through all the evidence and show you

10   what's been proven in the case.

11        And I believe you will see a jury verdict form that looks

12   something like this.

13        On the cause of action for breach of contract, did

14   plaintiff Genentech prove the claim by a preponderance of the

15   evidence against defendant Biogen?  We will respectfully ask

16   you to check the box "No."

17        Thank you so much for your time.  We look forward to

18   putting on our case.

19        **THE COURT:**  Okay.  Thank you, Mr. Black.

20        Plaintiffs can call their first witness.

21        **MR. GAFFNEY:**  Your Honor, Mr. Johnston has been

22   excluded, so I need to go find him and bring him in.

23        **THE COURT:**  Okay.  While he's getting the witness, let

24   me -- I'm going to give you this longer version of the daily

25   instruction, and then I'll repeat shorter versions until I'm

1  **A.**   I do.  Thank you.

2  **Q.**   -- let me know.

3      You've identified yourself to the jury.  Could you tell

4  them where you are employed?

5  **A.**   Yes.  I work at Genentech in South San Francisco, and I

6  head the legal and compliance teams there.

7  **Q.**   How long have you worked there?

8  **A.**   Quite a long time.  I actually started work as a scientist

9  before joining Genentech.  Yeah, the route I took is I went to

10 college at UC Davis and studied biochemistry, and then went to

11 UCLA to study molecular biology, got a Ph.D. degree there, and

12 began working for a small biotech company that was started by

13 my Ph.D. advisor, but only then realized I really didn't like

14 working in a laboratory.

15     So I ended up going back to school because I met at that

16 company the patent attorney who was getting patents for the

17 scientists' inventions.  So I went back to school, Stanford Law

18 School.  And while I was working at -- or, sorry.  While I was

19 in school there, I got a part-time job working at Genentech,

20 helping to pay my way through law school.

21     When I finished working -- or when I finished law

22 school -- sorry.  When I finished law school, Genentech gave me

23 an offer for a full-time job, but I decided instead to take the

24 year off and I went and clerked for a federal judge in

25 Los Angeles as their assistant.  And then after that year

1    clerkship, I returned to Genentech as a full-time employee and

2    sort of worked my way up the ladder and became the head of the

3    legal and compliance teams in 2007.

4    Q.    Mr. Johnston, you understand why we're here today?

5    A.    I do.  Biogen used Genentech's technology to make Tysabri

6    and has refused to pay us royalties like they promised to.

7    Q.    Did you work on the license agreement that is at issue in

8    this case?

9    A.    Yes.  I was involved in the negotiation of the license

10   agreement at issue here.

11   Q.    What is that agreement in general terms?

12   A.    It's a patent license.  So Genentech had a patent called

13   the Cabilly patent.  Cabilly is the last name of one of the

14   inventors.  And the Cabilly patent was for a method that had

15   been invented by our scientists, a method for making a special

16   kind of medicines called therapeutic antibodies.  And the

17   Cabilly patent was awarded in recognition of that important

18   discovery of that method for making therapeutic antibodies.

19   Q.    What exactly are therapeutic antibodies?  Could you

20   explain to the jury?

21   A.    So therapeutic antibodies are probably the most

22   significant advance in medicines in the 21st Century.  So

23   I think many of us are familiar with the antibodies that our

24   bodies naturally make in response to infections, like to

25   viruses and bacteria.

1          Therapeutic antibodies are man-made antibodies.  They're

2   specifically designed and engineered in the laboratory and then

3   made to target other things in the body that cause disease,

4   such as cancer cells.

5   **Q.**   Do you have a binder there, Mr. Johnston?

6   **A.**   I do, yes.

7   **Q.**   If you could open your binder to Exhibit 1, I believe.

8          **MR. GAFFNEY:**  If you could put this up on the screen

9   John.

10         This has been stipulated to, Your Honor.  I'd like to

11  publish it to the jury.

12         **THE COURT:**  Exhibit 1 is admitted.

13         (Trial Exhibit 1 received in evidence.)

14  **BY MR. GAFFNEY:**

15  **Q.**   What's this document, Mr. Johnston?

16  **A.**   This is the license agreement that's at issue in this case

17  between Genentech and Biogen and also the partner company they

18  had at the time that was called Elan Pharma.

19  **Q.**   Okay.  And when was it signed?

20  **A.**   On July 30th, 2004.

21  **Q.**   Did Biogen pay royalties under this agreement?

22  **A.**   For many years they did pay us royalties, and then they

23  stopped.

24  **Q.**   Okay.  What exactly is Genentech's complaint?

25  **A.**   So the complaint is that they stopped paying us royalties

1  after the Cabilly patent expired in December of 2018.  That

2  would have been fine for Tysabri, their product that was made

3  after the patent expired, because then we didn't have a patent

4  any longer.

5      The problem is that when the patent expired, Biogen

6  already had in inventory stockpiles in its warehouses somewhere

7  of billions of dollars of Tysabri that they had made while the

8  patent was still alive that used our technology to make that

9  Tysabri, but they never paid us royalties on that.  They went

10  ahead and sold that product over time, but never paid us

11  royalties on it.

12  **Q.**  We're going to come back to the license and the payment

13  issue, but first let me ask you a little of -- a little

14  background about Genentech.

15      What does your company do?

16  **A.**  So Genentech was founded in 1976 in South San Francisco by

17  a biochemistry professor from U.C. San Francisco and a young

18  businessman, and they had the idea of using biology to make

19  medicines rather than chemistry.  So before Genentech, almost

20  all medicines, ranging from antibiotics to cancer chemotherapy,

21  was made by chemical synthesis.

22      They had the idea to use biological technology, or

23  biotechnology, to make new types of medicines for serious

24  diseases, and they were quite successful at that.  So Genentech

25  was the first ever biotechnology company, and it's why today

1    South San Francisco is called the birthplace of the

2    biotechnology industry.

3    **Q.**    What successful products has your company developed?

4    **A.**    So the very first product that Genentech made using

5    biotechnology was human insulin for diabetics.  Before that,

6    some of you may know that diabetics relied on insulin that was

7    extracted from animal pancreases, which wasn't a really great

8    way to do it.

9        So Genentech came up with a way of making in a laboratory

10    at large-scale authentic human insulin.  That was a really

11    significant breakthrough for treating diabetic patients.  That

12    product is still sold today under the brand name Humulin.

13        But the greatest successes that Genentech had were with

14    these therapeutic antibodies that I made mention of a moment

15    ago.  So early on, Genentech made a therapeutic antibody called

16    Herceptin for treating breast cancer.  It was a real

17    breakthrough for treating an especially aggressive form of

18    breast cancer and significantly improved survival rates for

19    women with really serious disease.

20        That was -- other examples of therapeutic antibodies from

21    Genentech are Rituxan that is used today for treating

22    non-Hodgkin's lymphoma, Avastin that's used to treat colon

23    cancer, and actually many more therapeutic antibodies, not only

24    for cancer but for other serious diseases.

25    **Q.**    What's the -- what's the difference between a therapeutic

1    invention and the exclusive right to use that invention for a

2    limited period of time.  No one else can use the invention

3    during that time without your permission.

4    **Q.**    How important are patents to companies in your business?

5    **A.**    They're very important.  So Genentech -- I'm sure the same

6    is true for Biogen, for other biotechnology companies -- huge

7    amounts of money are spent on researching new medicines and new

8    technologies, doing clinical studies, developing manufacturing

9    process -- processes, billions of dollars each year.  And most

10    of that work actually doesn't pan out.  Biology is really

11    difficult to figure out.

12        So the work that is successful that leads to new medicines

13    or new technologies, like new manufacturing processes, it's the

14    revenue from those that help pay for future research to develop

15    even more medicines and more technologies.

16        And patents protect those investments.  Patents give you a

17    limited period of time to earn back the money that you invested

18    in the research and development work that then you can cycle

19    back into more research to develop more medicines, more

20    technology.

21        So it's sort of this -- patents allow this sort of

22    virtuous cycle of innovation, earning money to do more

23    innovation, producing more things that patients need.

24    **Q.**    And then they expire?

25    **A.**    And I was about to say, but patents, again, have a limited

1    lifetime.  And when they expire, when the patents are no longer

2    alive, then, essentially, your invention becomes public

3    property; and anyone is free to use it at that point without

4    your permission, without having to pay for it, without your

5    permission.  It's really then publicly available.

6         And that's the way that we get, for example, generic forms

7    of medicines.  When the patent on the original medicine is

8    expired, when it's dead, then other companies can copy your

9    invention and make generic forms of the medicine.

10   Q.   Has anyone made a copy of your early successes?

11   A.   Yes.  So the -- I was about to say, the generic form of

12   biotechnology medicines are called biosimilars.  It's the same

13   thing; it's copies.  And there are already a number of

14   biosimilar copies of Genentech's -- several of Genentech's

15   medicines.

16   Q.   Thank you.

17        Are you familiar, Mr. Johnston, with the Cabilly patent?

18   A.   Very.

19   Q.   Okay.  Could you describe for the jury the invention the

20   patent protects?

21   A.   Yes.  So I'll start by saying that Genentech's scientists

22   were convinced that therapeutic antibodies would be really

23   great medicines, but the challenge -- the question is whether

24   they could be manufactured or not.

25        And I had a couple of models made to sort of illustrate

1   this to the jury.  May I use those?

2   **Q.**   Sure.

3   **A.**   So this small thing here is a model I had made of the

4   human insulin protein, the human insulin molecule that

5   Genentech first made for diabetics.  And you can see it's

6   relatively small and relatively simple in shape.

7       By comparison, this is a therapeutic antibody.  It's

8   25 times larger than human insulin, and I think even from

9   there, you can see it's a very complicated folded structure,

10  very complex, and it has to be in a very specific shape in

11  order for the antibody to bind to the thing in the body that

12  causes disease but avoid binding to things in your body that

13  you need and that are good.

14      So this is a large molecule with a lot of structure that

15  has to be put together in just the right way.  And the

16  question, the challenge, was whether this could be made in sort

17  of laboratory conditions at large scale in order for it to be

18  available as medicines for patients.

19  **Q.**   Could you turn to Exhibit 2 in your binder, Mr. Johnston.

20  **A.**   Yes.  Hold on one second.  I'll move the antibody over.

21      Okay.

22  **Q.**   Actually, before I ask you about Exhibit 2, you mentioned

23  insulin.  And that product is still on the market?

24  **A.**   Yes.

25  **Q.**   Is Genentech selling that product?

1  **A.**   So Genentech sold the rights for the human insulin to

2  Lilly, the pharmaceutical company Lilly, which had a lot of

3  expertise in insulin; and they sell it today, again, under the

4  brand name, the trade name Humulin; and it's still available

5  today.

6  **Q.**   And has Genentech's patents on that, are they expired?

7  **A.**   Expired many years ago, yes.

8  **Q.**   Okay.  Exhibit 2, can you -- can you identify that

9  document?

10  **A.**   Yes.

11  **Q.**   Okay.  So what is this?

12  **A.**   So this is the first page of the Cabilly patent that we've

13  been talking about.  You see in the upper right --

14  **Q.**   Hold on.  If you could stop for a second, Mr. Johnston.

15  **A.**   Sure.

16       **MR. GAFFNEY:**  I don't believe -- is this admitted?

17       **THE COURT:**  No.

18  Is there an objection?

19       **MR. BLACK:**  No objection, Your Honor.

20       **THE COURT:**  No objection.  It's admitted.

21  (Trial Exhibit 2 received in evidence.)

22       **MR. GAFFNEY:**  If you could publish that to the jury,

23  please, sir.

24  **BY MR. GAFFNEY:**

25  **Q.**   I interrupted you.  Now that the jury has seen it, could

1  you continue?

2  **A.**   Of course.  So I was saying that this is the Cabilly

3  patent that we've been speaking about that was issued to us.

4  You see the date that the patent was issued in the upper

5  right-hand corner, December 18, 2001.  And in the left column,

6  on the left side, you see the names of the inventors.

7      Inventors are listed in alphabetical order, so Dr. Cabilly

8  was fortunate to have a last name early in the alphabet, so

9  he's famously named as the inventor of this patent.

10      And you also see above that the name of the invention.  It

11  says "Methods of Producing Immunoglobulins" and then some other

12  words.  Immunoglobulins are just another name for therapeutic

13  antibodies.  So essentially, the title is "Methods of Producing

14  Therapeutic Antibodies."

15      And, again, that's what the invention was.  It's a -- it's

16  a method.  I should add, when I was talking about patents a

17  moment ago, so some patents are on inventions that cover

18  individual medicines; and other patents, like this one, cover

19  inventions of methods that can be used for many different

20  medicines.  And that's the type of invention and -- and patent

21  that this is.

22  **Q.**   Did Genentech use this technology, the Cabilly technology,

23  to manufacture its own products?

24  **A.**   Yes, absolutely.

25  **Q.**   Okay.  How did you decide to give permission to other

1  companies to use it?

2  **A.**   So at the time the Cabilly invention was made, scientists

3  and businesspeople at Genentech recognized what a significant

4  advance it was, how important it was, and how useful it would

5  be for making therapeutic antibodies.

6      And, again, as I mentioned a moment ago, as the owner of

7  this patent, the patent gave Genentech the exclusive right to

8  use this technology if it wanted to; in other words, to use

9  this technology to only make Genentech therapeutic antibodies.

10      But I and other leaders at Genentech made the decision to

11  license this for reasonable financial terms to other companies

12  who were interested in using the Cabilly process so they could

13  make their own therapeutic antibodies and, in that way, make

14  more medicines available for more patients.

15      Now, of course, other companies could have chosen to

16  develop their own manufacturing process, an alternative way of

17  making therapeutic antibodies; but many, many companies decided

18  to use the Cabilly process and came to us for licenses.  And

19  Biogen was one of those companies that came to us.

20  **Q.**   So in basic terms, how would these licenses work?

21  **A.**   So they're really quite simple agreements, despite sort of

22  all the legal terminology in them.  In return for the license

23  that we granted, we were entitled to receive royalties if three

24  things were true:  if the product was made using the Cabilly

25  process while the patent was still alive and the product was

**PROCEEDINGS**

1    do like to take breaks at -- I don't like to cut off somebody

2    while they're testifying, so we like to take breaks at nice

3    shifts in the case.  Okay?

4        Any questions before I let you go for your first break?

5    No?

6        All right.  Then we'll stand in recess for 20 minutes.

7           **THE COURTROOM DEPUTY:**  Please rise for the jury.

8    (Proceedings were heard out of the presence of the jury.)

9           **THE COURTROOM DEPUTY:**  Thank you.  You may be seated.

10          **THE COURT:**  Okay.  For the party's reference,

11    Exhibit 31 is not offered for the truth, and so it's not

12    hearsay, and it is admissible.

13        32, 37, and 39 I'll admit as adoptive admissions.

14    (Trial Exhibits 31, 32, 37, and 39 received in evidence.)

15        We'll stand in recess.

16          **THE COURTROOM DEPUTY:**  Court is in recess.

17              (Recess taken at 10:00 a.m.)

18          (Proceedings resumed at 10:19 a.m.)

19    (Proceedings were heard out of the presence of the jury.)

20          **THE COURT:**  Let's bring the jury back in.

21    (Proceedings were heard in the presence of the jury.)

22          **THE COURT:**  Okay.  You may be seated.

23    The parties are present.  The jury is back.

24    You may proceed.

25          **MR. GAFFNEY:**  Thank you, Your Honor.

PROCEEDINGS

1    Mr. Morales, could you put up Exhibit 1 again, the first

2 page.

3 **BY MR. GAFFNEY:**

4 **Q.**   Before the break, Mr. Johnston, we were talking about what

5 your Cabilly licenses would provide generally.  At the top of

6 this license with Biogen, it makes reference to non-exclusive

7 Cabilly license agreement.

8    What was that for?

9 **A.**   So that indicates that these licenses were not exclusive

10 to any company.  We were willing to grant the licenses to any

11 companies that came to us wanting one.  And it also meant that

12 the companies, like Biogen or others, that got these licenses

13 from us couldn't use the license itself to block its

14 competitors.  So we wanted to make the technology widely

15 available to be used.

16 **Q.**   Are license agreements common in your business?

17 **A.**   Very.

18 **Q.**   How many companies licensed the Cabilly patent from

19 Genentech?

20 **A.**   I don't know the exact number, but it's upwards of 50

21 different companies who ended up taking licenses to use the

22 Cabilly process.

23 **Q.**   What did you know about Biogen in 2004?

24 **A.**   So I knew Biogen was a large, successful, well-known

25 biotechnology company based in the Boston area.  At this time,

1    also, Biogen was a partner with us for one of our therapeutic

2    antibody products.  So we actually had a business relationship

3    with Biogen.

4    **Q.**    Which product was that?

5    **A.**    It's for -- it was for Rituxan, one of the antibodies I

6    mentioned a moment ago that's used to treat non-Hodgkin's

7    lymphoma.

8        And the way that came about is the original research and

9    early development on the Rituxan therapeutic antibody was done

10   by a company in San Diego called IDEC Pharmaceuticals, and

11   Genentech formed a collaboration partnership with IDEC early on

12   for Genentech to finish the development work and begin

13   manufacturing Rituxan.

14       And as a result of that, after Genentech began selling

15   Rituxan itself, we would pay royalties or share in the revenue

16   from Rituxan.  We would share that with IDEC, send them checks

17   as we sold Rituxan.

18       So around 2003, Biogen bought IDEC, and from that point

19   forward, Biogen was our partner for that product, and we would

20   be sending payments to Biogen then for sales of Rituxan.

21   **Q.**    Now, Exhibit 1 up on your screen, the Cabilly license with

22   Biogen, how did that come about?

23   **A.**    So we communicated, I think in the industry, that we were

24   willing to grant licenses under the Cabilly patent; and in late

25   2003, early 2004, I was contacted by the head of Biogen's

1    patent group, a patent attorney by the name of Ray Arner who

2    asked -- who discussed -- wanted to discuss with me the

3    availability of a Cabilly license and to set up an in-person

4    meeting at Genentech to discuss that.

5    **Q.**    Did you know Mr. Arner at the time?

6    **A.**    I did.  I don't recall sort of the exact circumstances

7    when I got to know him.  It was through correspondence or phone

8    calls or email.  I just don't remember the details.  But as of

9    the time we began talking about this, I did know him.  And he's

10   a nice guy.  I liked him.

11   **Q.**    Did he -- did he bring anyone with him to this meeting?

12   **A.**    Yes.  So I think we saw a moment ago, this license

13   agreement -- here it is on the screen.  Biogen had a partner at

14   the time called Elan Pharmaceuticals, and so Ray brought with

15   him the head patent attorney from Elan Pharma, a gentleman by

16   the name of Carl Battle.

17   **Q.**    Did you know him prior to the meeting?

18   **A.**    I didn't know Carl.  I hadn't met him or spoken with him

19   before.

20   **Q.**    Now, at this time of the meeting -- you say January 2004?

21   **A.**    I believe the meeting itself was in January of 2004.

22   **Q.**    Now, at the time of this meeting, were Biogen and Elan

23   already selling Tysabri?

24   **A.**    No, but they were getting close.  If I recall correctly,

25   Tysabri launched -- they began selling Tysabri for patients in

PROCEEDINGS

 1  November of 2004.  So this -- the meeting was occurring maybe

 2  ten months before they actually began launching the product.

 3  So I would guess in this time frame, they were awaiting

 4  approval by the Food and Drug Administration or were applying

 5  for approval, but they were quite late in the process of

 6  getting this Tysabri product ready to go to market.

 7          **MR. GAFFNEY:**  John, could you put Exhibit 5 up on the

 8  screen.

 9      Your Honor, this is an exhibit that has been -- whose

10  admission is stipulated to.

11          **THE COURT:**  It's admitted then.

12      (Trial Exhibit 5 received in evidence.)

13          **MR. GAFFNEY:**  And if we could publish that to the

14  jury.

15  **BY MR. GAFFNEY:**

16  **Q.**  Do you recognize this document, Mr. Johnston?

17  **A.**  I do, yes.

18  **Q.**  What is it?

19  **A.**  It's an email sent by my colleague Tim Schwartz to Ray and

20  Carl on January 20, 2004, providing our first draft of the

21  Cabilly license agreement by which we would give Biogen and

22  Elan a license to make Tysabri.

23  **Q.**  Who's Tim Schwartz?

24  **A.**  Tim was another patent attorney within my group at

25  Genentech.  I was his manager.  And at some point in the

1    process of doing Cabilly licensing, I asked him to help me do

2    that, and he was involved specifically in this discussion and

3    negotiation process with Biogen and Elan.

4    **Q.**    Now, were you -- were you involved in the -- did you draft

5    it or were you otherwise involved in this agreement?

6    **A.**    No, not in this one.  In other agreements I was.  This

7    one, the negotiations were handled primarily by Tim, but we

8    spoke all the time.  I was copied on the drafts and exchanges

9    of the license agreements as we were working through it with

10   Biogen and Elan.

11        He and I would have discussed the financial terms in

12   advance of the discussions that he would have with Biogen and

13   Elan.  So we worked collaboratively with one another, but he

14   was the one primarily leading the discussions with Ray and

15   Carl.

16   **Q.**    Were you involved in the preparation of the first draft,

17   Exhibit 5 that's in front of you?

18   **A.**    No, I wasn't.  I'm pretty sure I wasn't.  I think this was

19   drafted by Tim.  But I recognize language in this agreement

20   that I had used in prior agreements.  So in that sense,

21   you know, parts of what I had done before, language I had used

22   before was being moved into this new agreement by Tim.

23   **Q.**    What involvement did you have in the terms that Genentech

24   proposed to Biogen in this agreement, the economic terms and

25   the other terms?

1    **A.**    Yes.  As I mentioned a moment ago, Tim and I would -- it

2    was our practice, and it would have been the case here, that he

3    and I would have discussed the financial terms that we would be

4    seeking for this license.  And then, again, language that I had

5    used before would show up in this agreement as well.

6    **Q.**    You've taken a look at this in recent days before your

7    testimony?

8    **A.**    Yes.

9    **Q.**    Does the final form of the license that the parties signed

10    in July, does it change much from this draft?

11    **A.**    No, not -- not much.  It changed a little in different

12    places in, what I'd say, relatively minor ways, but no

13    significant changes.

14    **Q.**    Why would it change at all?

15    **A.**    Well, I like to say it's an occupational hazard for

16    attorneys that different attorneys have preferred ways of

17    writing things and saying things, saying the same thing in

18    different words.

19         And there were instances of that where Carl or Ray would

20    ask for some specific language on something; and as long as it

21    doesn't materially change, significantly change the meaning and

22    what we were trying to do, we were fine with that.  We'd work

23    it out and include that.  And there were a number of instances

24    where that occurred.

25    **Q.**    Were there terms in this January draft where you were not

1  flexible?

2  **A.**    Mainly the financial terms.

3  **Q.**    Why were you inflexible on those?

4  **A.**    Well, we were doing licensing with other companies, so we

5  thought the terms that we were offering to Biogen and Elan were

6  reasonable, fair for this type of technology, what other

7  companies were willing to pay for licenses under the Cabilly

8  patent for the Cabilly process and also in line with what

9  Genentech was accustomed to paying itself when we took licenses

10 from other companies for technology.

11 **Q.**    Okay.  So let's go back to the draft Mr. Schwartz sent,

12 the one in front of you.

13         What rights was Genentech offering to Biogen and Elan?

14 Where in the agreement does that exist?

15 **A.**    So you find the license grant, what we gave them, in

16 Section 2.01 of the agreement.  Yes, here.  It's headed --

17 underlined "License."

18         And here it says, in a few more legal words, that we're

19 giving them a license, permission to make, have made, use,

20 sell, import licensed product.

21         And "licensed product" is what we call a defined term.

22 And the way you know it's a defined term is because it's

23 capitalized, capital L, capital P, "Licensed Product."  And

24 that term you'll find then defined elsewhere in the agreement,

25 and specifically, licensed product is defined in Section 1.11

**PROCEEDINGS**

1    of the agreement.  There it is.

2        So this is the definition of licensed product.  And to be

3    a licensed product under this agreement, it needs to satisfy a

4    couple of conditions.  First, it has to be a therapeutic

5    antibody that binds specifically to Alpha4.  That's in the

6    first line, an antibody that binds specifically to Alpha4, and

7    that is Tysabri.  I don't think that's disputed.  The target

8    that -- in the body that Tysabri goes to is called Alpha4.

9        And then, in addition, the licensed product has to be made

10   using the Cabilly process while the Cabilly patent is still

11   alive.  That's what the remainder of the language covers here.

12       So if Biogen is making Tysabri while -- using the Cabilly

13   process while the Cabilly patent is alive, it's a licensed

14   product.

15   **Q.**  So in --

16       **MR. GAFFNEY:**  You can take that down, Mr. Morales.

17   **BY MR. GAFFNEY:**

18   **Q.**  In exchange for the grant of rights in 2001, what did

19   Genentech propose to get in return?

20   **A.**  So you find that in Sections 3.01 through 3.03 of the

21   agreement.

22   **Q.**  Okay.  So what are the -- I've got up on the screen

23   Sections 3.01 and 3.02.  The jury heard a little bit about

24   these from Mr. Black in the opening.  But what's the purpose of

25   this -- these payments?

PROCEEDINGS

 1   **A.**   So I don't see it on my screen, but I have it here in

 2   front of me.

 3           **THE COURT:**  It can be published.

 4           **MR. GAFFNEY:**  I think it's stipulated to, this

 5   exhibit.

 6           **THE COURT:**  This exhibit is in.  I don't know why it's

 7   not on.

 8           **MR. BLACK:**  Yes.

 9           **THE COURT:**  It should turn on.

10           **MR. BLACK:**  It's just a techinical --

11           **THE WITNESS:**  Oh, got it.

12       So there were two sort of fixed up-front payments for

13   specific amounts of money that were required to be paid.  The

14   first was called a license grant fee, $4 million to be paid

15   when this agreement got signed.  For granting the license, we

16   would get paid $4 million.  Genentech would be paid $4 million.

17       And then the second was called a development milestone

18   fee.  And when you read that there, it's that when Tysabri is

19   approved by the Food and Drug Administration, then the

20   licensee -- that's Biogen and Elan, they're the licensees --

21   they'll pay us, and they did pay us, a fee of $5 million.

22       So two fixed payments right at the beginning, one for

23   signing the agreement and the second for getting FDA approval

24   of Tysabri.

25   **BY MR. GAFFNEY:**

**PROCEEDINGS**

1  you will pay us royalties on all net sales of all licensed

2  product.  And "all" means "all."

3  **Q.**  Did you ever have a discussion by phone or by email with

4  Mr. Arner or Mr. Battle about this?  Did you discuss it

5  verbally or in writing?

6  **A.**  No.  No.

7  **Q.**  Did they ever complain about the language?

8  **A.**  No, no, they never complained about Section 3.03, never

9  commented, never asked for it to be changed.

10  **Q.**  I want to highlight something in 3.03.

11      **MR. GAFFNEY:**  John, could you call up that slide.

12  All right.

13  **BY MR. GAFFNEY:**

14  **Q.**  So see where I put some red underlining, Mr. Johnston, up

15  on the screen?

16  **A.**  It's not on my screen.

17      **THE COURT:**  It can be again.

18      **MR. GAFFNEY:**  May I publish that, Your Honor?  It's

19  just the same text.  I'm just highlighting.

20      **THE COURT:**  Again, I don't know -- it's publishable,

21  yes.

22      **THE WITNESS:**  Okay.  I see it now.

23  **BY MR. GAFFNEY:**

24  **Q.**  So there's some red under- -- I put some red underlining

25  in both provisions --

1   **A.**   Yes.

2   **Q.**   -- right?

3      Sold in the United States and sold in a territory outside

4   the United States; right?

5   **A.**   I see that.

6   **Q.**   What function -- why is that in there?

7   **A.**   Well, so you see here, we -- we agreed with Biogen and

8   Elan to charge two different royalties, depending on where the

9   product is being sold:  so the 4 1/2 cents on the dollar if

10   it's sold in the United States, 3 1/2 cents on the dollar if

11   it's sold outside the United States.  So that's what these

12   words mean.  It's to differentiate, when you pay the 4 1/2 and

13   when you pay the 3 1/2 cents depends on whether the Tysabri is

14   sold in the United States or sold outside the United States.

15   **Q.**   The jury has heard the term "tail royalties."  Have you

16   heard of that term before?

17   **A.**   I have, yes.

18   **Q.**   Do you have an understanding of what it refers to?

19   **A.**   Yes.  I mean, my understanding of it, and I think how most

20   people use it, is just a shorthand expression for these

21   royalties that are due on inventory that was made before the

22   patent expired; that inventory made using the patent before it

23   expires, the royalties then you owe on that are called the tail

24   royalties.

25   **Q.**   Did your first draft that Genentech sent over, did it have

1  a tail royalties provision?

2  **A.**   I think it did.   Again, by virtue of the language here in

3  Section 3.03, it says royalties are payable on all net sales of

4  all licensed product.

5       And we looked a moment ago.   I told you that licensed

6  product includes any product that was made using the Cabilly

7  process while the patent was alive and that was sold.   And all

8  of those things are true of the inventory that they had on

9  which they never paid us royalties.

10 **Q.**   Was it customary among licensing professionals in 2004 for

11 a patent license to require royalties on inventory sold after

12 the patent expires?

13 **A.**   Yes.   Yes.

14 **Q.**   Is that still the custom today?

15 **A.**   Yes, unless there's language in the agreement that very

16 clearly expressly says something different.   And sometimes

17 that -- sometimes you may agree to that; but it's -- if there's

18 going to be an exception to that sort of custom, then there'll

19 be very express language in the agreement saying that.   That's

20 not true in this Biogen/Elan agreement.

21 **Q.**   Did Biogen and Elan ever propose such language?

22 **A.**   No.

23      **MR. GAFFNEY:**   Mr. Morales, could you call up

24 Section 4.02.   If you could blow that out on the screen.

25 **BY MR. GAFFNEY:**

PROCEEDINGS

1    Q.    Do you see that up on the screen, Mr. Johnston, "Reports"?

2    A.    I do, yes.

3              THE COURT:  We're still on Exhibit 5; right?

4              MR. GAFFNEY:  We're still on Exhibit 5.

5    BY MR. GAFFNEY:

6    Q.    Was the purpose of this provision to exclude tail

7    royalties from what Biogen owed?

8    A.    No.

9    Q.    What does this provision do?

10   A.    This just requires Biogen to report to us its sales

11   numbers, the amount of sales they made by giving us a report of

12   that.  Yes, it's a sort of financial reporting requirement.

13   Q.    Is it customary among people who do patent licenses to

14   include -- when they want to exclude tail royalties from an

15   agreement, that they do it in the "Reports" provision?

16   A.    No, absolutely not.  I have never seen that done.  And

17   that's certainly not the purpose of this provision in the

18   agreement, absolutely positively not.

19             MR. GAFFNEY:  You can take that down, Mr. Morales.

20   BY MR. GAFFNEY:

21   Q.    Did Biogen request any concessions at all on the economic

22   terms of the license that you're aware of?

23   A.    They did ask for a few.  One that I remember -- we looked

24   at the up-front payments, a $4 million signing fee, the

25   $5 million approval fee following FDA approval.

1    We had originally written the agreement that they would be

2    paid in full amounts, 4 million and 5 million, and Biogen asked

3    to make them in two payments, which we thought was a little

4    strange for a really big company, but we agreed they could pay

5    them in two installments.

6    I remember they also asked for a change in the definition

7    of net sales.  Remember, net sales is defined as the gross

8    price less 5 percent.  I think they asked for a bigger

9    discount, the opportunity to take even more deductions from

10   gross sales, and we didn't agree to that.

11   And then they also asked us for a license under every

12   other patent that we owned in case they might need it to

13   manufacture Tysabri.

14   So beyond the Cabilly patent, they asked, "Give us a

15   license to everything you have in case we need it."

16   And, of course, we told them no, but we did say, "Come

17   back to us if you do need something and we'd be willing to

18   negotiate with you on reasonable financial terms if you really

19   needed something else."

20 **Q.**  Could you turn to Exhibit 7 in your binder.

21       **THE COURT:**  And that's stipulated, so it's admitted.

22       (Trial Exhibit 7 received in evidence.)

23       **THE WITNESS:**  Yes, I have it here.

24       **MR. GAFFNEY:**  This is another, Your Honor, where we've

25   stipulated to the admission.

```
 1              THE COURT:  It's stipulated, so it's admitted.
 2    BY MR. GAFFNEY:
 3    Q.   What's this document, Mr. Johnston?
 4    A.   So this is a covering email that Carl sent to Tim
 5    Schwartz, my colleague, and I'm copied, and so is Ray at
 6    Biogen.  And what Carl is sending to Tim here is their
 7    revisions to the original draft of the agreement that Tim had
 8    sent.
 9              So Tim sent the draft.  Ray says here -- or, sorry.  Carl
10    says that he and Ray reviewed it with their managements, and
11    now they're providing us comments back and proposed revisions
12    to the agreement.  And that's in the middle of February 2004.
13    Q.   Now, by this point in time, was Mr. Schwartz handling the
14    back-and-forth?
15    A.   Yes, he was.  But, again, I was being copied on this
16    and --
17    Q.   What was your pref- -- I'm sorry.
18    A.   So I was going to say, so when this came back, although I
19    don't have a recollection specifically 21 years later, it was
20    my practice to review these drafts when they came back and
21    especially to focus on the redlining, the places where the
22    changes were made so I could see what the other party was
23    asking us to change.
24    Q.   Could you turn to Section 7.01 of the draft.
25    A.   Yes.
```

1          **MR. GAFFNEY:**  And, Mr. Morales, do we have a blow-up

2    of that?  There we go.

3    **BY MR. GAFFNEY:**

4    **Q.**   Do you see the edit that Mr. Battle was proposing?

5    **A.**   Yes, I see that.

6    **Q.**   And that's the one that's up on the screen?

7    **A.**   Correct.

8    **Q.**   Did you have any --

9    **A.**   It was up on the screen.

10          **MR. GAFFNEY:**  John, can you keep that 7.01 up on the

11   screen?  Thank you.

12          **THE WITNESS:**  Good.  Thank you.

13   **BY MR. GAFFNEY:**

14   **Q.**   Did you have any objection to adding this language?

15   **A.**   No.

16   **Q.**   Why not?

17   **A.**   I'm pretty sure I used this language myself in -- in

18   another agreement, in another Cabilly agreement, actually.  So

19   this wasn't sort of unusual.

20   **Q.**   What purpose did it serve when you used it?

21   **A.**   So when I used it, this language -- a lot of words,

22   again -- was used to address a legal issue --

23          **MR. BLACK:**  Your Honor, objection.  We're getting into

24   subjective intent.

25          **THE COURT:**  The objection is sustained.

**PROCEEDINGS**

1      **MR. GAFFNEY:**  May I ask him why he used it in another

2  agreement?

3          **THE COURT:**  Okay.  Then how is it relevant?

4          **MR. GAFFNEY:**  It goes to the practice of using --

5          **THE COURT:**  Subjective --

6          **MR. GAFFNEY:**  -- this language.

7          **THE COURT:**  The subjective intent that was -- I mean,

8  that's the point; right?

9  **BY MR. GAFFNEY:**

10 **Q.**   You mentioned something, Mr. Johnston, about the -- if

11 I -- if I heard it correctly -- maybe I'm -- I didn't hear it,

12 but a legal doctrine?

13 **A.**   Yes.

14         **MR. GAFFNEY:**  You can take this down, Mr. Morales.

15 **BY MR. GAFFNEY:**

16 **Q.**   I just want to ask you generally, a legal doctrine

17 about -- in patent law; is that right?

18 **A.**   Correct.

19 **Q.**   And does that affect the custom and practice of how people

20 draft licenses?

21 **A.**   Yes.

22 **Q.**   And what's the -- what's the legal doctrine you're

23 referring to that influences this custom and practice?

24 **A.**   It's called the Brulotte-Kimble doctrine from the

25 U.S. Supreme Court, and it's an important doctrine that you

PROCEEDINGS

1   have to make sure you deal with correctly in a patent license

2   agreement.

3   **Q.**   And what does the doctrine say?

4   **A.**   It says that you may charge royalties if someone uses your

5   patented technology while the patent is still alive, but you

6   may not charge royalties on the use of your invention after the

7   patent expires or is dead, essentially.  So it just -- it

8   emphasizes that royalties are payable when someone uses your

9   invention while the patent is still alive.

10   **Q.**   Do you have --

11   **A.**   And because it then enters -- after the patent expires or

12   is dead and becomes publicly available, the patent owner is not

13   allowed to charge any more royalties for the use of the

14   invention.

15   **Q.**   Have you prepared an illustration of this?

16   **A.**   I did.  Because the words are difficult to explain

17   verbally, I asked for an animation to be prepared to sort of

18   show this.

19          **THE COURTROOM DEPUTY:**  Can this be displayed,

20   Your Honor?

21          **THE COURT:**  Yes.

22   **BY MR. GAFFNEY:**

23   **Q.**   I'm going to hand you the clicker --

24   **A.**   Okay.

25   **Q.**   -- so you can control it.

 1  context of the Brulotte doctrine?

 2  **A.**   Yes.  So that's the next step --

 3          **MR. BLACK:**  Your Honor.  Your Honor, objection that

 4  he's giving legal conclusions.

 5          **THE COURT:**  Go ahead.

 6          **MR. GAFFNEY:**  He is -- I'm asking the witness to

 7  explain the influence of the Brulotte-Kimble doctrine on custom

 8  and practice among licensing professionals.

 9          **THE COURT:**  Okay.  So I'm going to allow him to tell

10  you what he thinks.  That doesn't mean it's true, doesn't mean

11  it's accurate.  I will tell you what the law is, and you'll --

12  to the extent it's relevant.  But he can explain to you his

13  thought process.

14      Overruled.  Proceed.

15  **BY MR. GAFFNEY:**

16  **Q.**   So how does this --

17  **A.**   So moving on, so the next step is -- is here.

18      So after the patent expires, after December 18, 2018, now

19  Tysabri continues to be manufactured but the patent is expired.

20  And so that product that's being made at this point, after the

21  patent expired, is not a licensed product.  And this

22  Brulotte-Kimble doctrine addresses this situation right here

23  where there's two things going on.

24      In the warehouse, there's the licensed product that was

25  made before the patent expired, and there's the gray boxes of

1    product made after the patent expired.  And the doctrine says,

2    essentially, that the patent owner can charge royalties on the

3    green boxes, but not on the gray boxes.

4         That's what the doctrine says.  And it's important that

5    you make that clear in a license agreement because if you get

6    it wrong, the license agreement can be held invalid,

7    unenforceable.  It can be thrown out by a court.  So this is

8    something that patent attorneys who are involved in licensing

9    pay a fair amount of attention to get this right so that the

10   validity of the license agreement isn't jeopardized.

11        **MR. GAFFNEY:**  You can take that down, Mr. Morales.

12   **BY MR. GAFFNEY:**

13   **Q.**   Mr. Johnston, if patent lawyers are familiar with it, why

14   does it need to be spelled out in the agreement?

15   **A.**   So that someone else reading the agreement, a court or

16   anyone else who wasn't involved in it, they can see it in

17   writing that that was what the parties intended, understood,

18   and meant at the time.

19        **MR. GAFFNEY:**  Mr. Morales, could you put up that

20   Section 7.01 blow-up again?

21   **BY MR. GAFFNEY:**

22   **Q.**   Now, you said Genentech had no objection to adding

23   license -- language -- this language or something close to it

24   into the final agreement; right?

25   **A.**   Yes.

1  **Q.**    Okay.  Did Mr. Battle or Mr. Arner ever tell you that this

2  additional language was intended to eliminate royalties on

3  licensed product sold after Cabilly expired?

4  **A.**    No, definitely not.

5      I mean, that -- I wouldn't have understood this language

6  to mean --

7          **MR. BLACK:**  Objection, Your Honor.

8          **THE COURT:**  Sustained.

9  **BY MR. GAFFNEY:**

10 **Q.**    Did anyone from Biogen or Elan tell you that they didn't

11 want to pay royalties on the Tysabri they'd have at inventory

12 when Cabilly expired?

13 **A.**    No.

14 **Q.**    Would you have agreed to that if they'd asked?

15 **A.**    No.  No.

16 **Q.**    Why not?

17 **A.**    I think the royalty terms we were offering at the time

18 were fair and reasonable for the technology that we were

19 providing them, the Cabilly process.  It was in line with what

20 we were charging other licensees and in line with what we

21 ourselves, Genentech, paid when we were licensing technology.

22 So I think the terms were fair and reasonable as they were.

23         **MR. GAFFNEY:**  Could you put up Section 7.05,

24 Mr. Morales.

25 **BY MR. GAFFNEY:**

1    **Q.**    Mr. Battle also requested this change, did he not?

2    **A.**    Let me see.  Yes, he did.

3    **Q.**    Were these edits acceptable?

4    **A.**    Yes.

5    **Q.**    Why is that?

6    **A.**    Well, so the second sentence of this Section 7.05 applies

7    in the situation where either Biogen or Genentech ends the

8    agreement early, prematurely.  And examples of how that might

9    happen are found in a few of the earlier sections.

10        So, for example -- can we display this as well so people

11    can read along?

12        So in Section 7.02, this section says that licensee,

13    that's Biogen and Elan, they are free to terminate the

14    agreement really whenever they want, if they want to, just by

15    giving us notice.

16        7.03 says that we, Genentech, could terminate the

17    agreement early if Biogen is in breach of the agreement for

18    some reason and doesn't fix that.

19        7.04 is a circumstance where we can terminate the

20    agreement if Biogen ends up in bankruptcy or a court determines

21    that they're bankrupt.

22        So in those circumstances, it's either Biogen itself

23    terminating, like under 7.02, or Genentech terminating the

24    agreement early under 7.03 or 7.04 or perhaps for other

25    reasons.

1        In that circumstance where the agreement is ending early,

2   the addition to Section 7.05 says that before the agreement is

3   completely ended, Biogen wanted a period of 90 days for the

4   disposition of any existing inventory of licensed product that

5   they had.

6        So this is an acknowledgment that Biogen would have

7   Tysabri in its warehouses in inventory and they wanted --

8   before the agreement was finally ended by one of us, they

9   wanted to have a chance to quickly sell off that inventory

10  during a 90-day period so it didn't go to waste.

11       And we were perfectly agreeable to that, to allow them to

12  sell that inventory off for a period of 90 days, provided, of

13  course, that they paid us royalties on that inventory.

14  **Q.**  What would happen after 90 days?

15  **A.**  So at the end of 90 days, the agreement is gone, but the

16  patent is still alive.  This is a premature, early termination.

17  So the Cabilly patent is still alive.  They couldn't sell the

18  product after the 90 days because, otherwise, they'd be

19  violating our patent at that point.

20       **MR. BLACK:**  Objection, Your Honor.  That's a legal

21  conclusion about --

22       **THE COURT:**  It is.

23       So his ultimate conclusion is stricken.

24  **BY MR. GAFFNEY:**

25  **Q.**  Could you turn to Exhibit 15 in your binder.

1    **A.**    No, they never said that to me, and I never heard that

2    from Tim either.

3    **Q.**    Did they ever say that Mr. Adair had already agreed to

4    terms under which they could license the patent?

5    **A.**    No.  And I'll also note that he -- Mr. Adair was -- even

6    in this document, was not agreeing on terms, because it says at

7    the top it's non-binding, and at the bottom it says it's

8    subject to the approval of appropriate Biogen and Genentech

9    management, and that would have included me, and the execution

10   of a definitive agreement.

11        So I don't know what exactly to call this, some

12   preliminary ideas, but it certainly wasn't sort of an offer

13   that was -- could just be accepted.

14   **Q.**    When did this dispute with Biogen materialize?

15        **MR. GAFFNEY:**  You can take down, John.

16        **THE WITNESS:**  I believe it was in the beginning of

17   2019.  So the last royalty payment that Biogen made to us was

18   in early 2019 that covered sales that ended by December 18,

19   2018.  So they stopped calculating royalties when the patent

20   expired on December 18, 2018, and then they paid us the

21   royalties they owed at the beginning of 2019, and they told

22   us -- told us that that was going to be their last payment and

23   that they didn't owe any royalties to us beyond that on any

24   product that they might have in inventory.

25   **BY MR. GAFFNEY:**

1    **Q.**    How did Genentech respond to that?

2    **A.**    Well, we obviously disagreed for all the reasons we've

3    been talking about today.  That's -- that was not what they had

4    promised to do.

5         And so we tried to engage with Biogen to point out that we

6    thought they were mistaken.  We tried to get information about

7    how much product they had in inventory so we could know, like,

8    is this a dispute that, you know, is worth having or not, and

9    Biogen just wouldn't engage with us.

10        And really unfortunate, because they had been and were our

11   partner on Rituxan for many years.  And at some point I

12   understand that the attorneys at Biogen just told us, "Go ahead

13   and sue us," and that's how we ended up here.

14   **Q.**    Now, you mentioned a number of companies, other companies

15   have licensed Cabilly; right?

16   **A.**    Yes.  Yes.

17   **Q.**    Did you receive tail royalties from all of them?

18   **A.**    Not from all of them, no.

19   **Q.**    Do you know why?

20   **A.**    For various reasons.  Some companies took a license but

21   never made a commercial product; they never sold product.

22   There were some companies where we agreed to add express, clear

23   language in the agreement that allowed them to stop paying

24   royalties at the date that the patent expired, that they

25   wouldn't need to pay us tail royalties.

**PROCEEDINGS**

1    Q.    When did that happen?

2    A.    So the first of those was in 2009, 2010 with the

3    pharmaceutical company called Abbott Laboratories.

4    Q.    What was their product?

5    A.    Their product for which they did a license is called

6    Humira.  It's used to treat rheumatoid arthritis.  It's

7    probably -- it's been the most successful, the best-selling

8    therapeutic antibody in history, and they have a license under

9    Cabilly for that product.

10        THE COURT:  Let me -- I'm going to interrupt.

11        Have you given a list of these words to the court

12    reporter, that is, all of these medical terms?  And if not,

13    could you please spell what you just said.

14        THE WITNESS:  Yes.  So the name of the product is

15    Humira, it's H-u-m, as in "Mary," i-r-a.

16        THE COURT:  Okay.

17        THE WITNESS:  For rheumatoid arthritis.

18        THE COURT:  So if both sides could do that.

19        MR. GAFFNEY:  Thank you.  Will do, Your Honor.

20    BY MR. GAFFNEY:

21    Q.    You said they came to you in 2009 or 2010.  Were they

22    already selling Humira?

23    A.    They were selling Humira.  And they already had a license

24    from us, so I had worked on them -- worked with them on a

25    license under the Cabilly patent back in 2002.  So Abbott had

 1   an existing Cabilly license from us.

 2       And the general counsel of Abbott reached out to me in

 3   2009, 2010 and said that she'd like --

 4           MR. BLACK:  Objection.  Hearsay.

 5           MR. GAFFNEY:  It's not for the truth of the matter

 6   asserted, Your Honor.  It's just the existence of the

 7   conversation.

 8           MR. BLACK:  Depends what he's about to say next.

 9           THE COURT:  Okay.  So they had a conversation.  So

10   what would be the next question, given that it's not offered

11   for any truth and just the existence of a conversation?  They

12   had a conversation.  So now what?

13           MR. GAFFNEY:  Sure.

14   BY MR. GAFFNEY:

15   Q.   What did Abbott request?

16           MR. BLACK:  Hearsay.

17           MR. GAFFNEY:  It's not being asserted -- not for the

18   truth of the matter asserted.  It's just that this conversation

19   occurred.

20           THE COURT:  Okay.  So a conversation occurred.

21           MR. GAFFNEY:  And this is what -- this is what was --

22   this is what I heard -- what did you hear Biogen say -- I mean,

23   Abbott say?

24           THE COURT:  So it's -- what I think is --

25       Did you do something in response to the question -- or in

PROCEEDINGS

 1    response to what you heard?

 2             **THE WITNESS:**  Yes.

 3             **THE COURT:**  Okay.  So it's really for purposes of what

 4    actions he took in response.

 5        For that purpose, I'll allow it in.

 6             **MR. GAFFNEY:**  Correct.  I mean, not "correct."

 7    Thank you, Your Honor.

 8             **THE COURT:**  Yes.

 9             **MR. GAFFNEY:**  You make the rulings.  I just live by

10    them.

11             **THE COURT:**  So not for the truth, but we're going to

12    hear what he heard to understand what he actually did once he

13    heard this.  Okay?

14    **BY MR. GAFFNEY:**

15    **Q.**   What did they ask for when they came to visit?

16    **A.**   So I was going to say what I did was set up a meeting

17    in -- at Genentech with the general counsel of Abbott because

18    they wanted to request a lower royalty rate, lower than the

19    rate that they were paying under the 2002 agreement.

20    **Q.**   Did they -- were there any other requests?

21    **A.**   So that was the number one request.  The other request

22    they made was to --

23             **MR. BLACK:**  Objection.  Hearsay, Your Honor.

24             **MR. GAFFNEY:**  We're about to get to what he did in

25    response to it, Your Honor.

1      **THE COURT:**  Again, it is admitted for a limited

2   purpose.  So let me give the jury an example.

3      If somebody was testifying they were in a building and

4   they heard someone scream "Fire," no one knows whether or not

5   the fire existed.  It wasn't really relevant whether the fire

6   existed.  What we're trying to get to is that everybody ran out

7   of the building; and when they ran out of the building, they

8   saw something, which was the point.  Okay?

9      So it's not for the truth.  It's for what this particular

10  witness did.  If we want to hear about what that other person

11  thought, they've got to have that person on the stand.  Okay?

12  So not for the truth.

13     Go ahead.

14  **BY MR. GAFFNEY:**

15  **Q.**   What was the second request you received?

16  **A.**   The second request received was for Abbott to be able to

17  stop paying royalties on sales that occurred -- sales of Humira

18  that occurred after December 18, 2018.  They wanted a definite

19  date on which they could stop paying us royalties under the

20  Cabilly license.

21  **Q.**   Were they offering anything in return?

22  **A.**   Yes.  So one of the things they agreed is they wouldn't

23  make a legal challenge against the Cabilly patent; and second,

24  they would agree to faithfully pay us royalties until

25  December 18, 2018.

1   **Q.**   Were you worried about the threatened litigation?

2   **A.**   The challenge?

3   **Q.**   Yeah.

4   **A.**   Because the challenge perhaps could be in the

5   Patent Office.  Not really because the Cabilly -- patents do

6   get challenged from time to time, especially important patents.

7   And the Cabilly patent had already been challenged.  It had

8   gone through a proceeding in the Patent Office brought by

9   several licensees, and it was reconfirmed, revalidated by the

10  Patent Office.  So we were successful; the challengers were

11  not.

12       So for that reason, I wasn't especially concerned that the

13  patent was at risk.  But it's still -- it's a huge production

14  to go through a challenge, and I was glad to avoid that with

15  Abbott.

16  **Q.**   Why would you lower the royalty rate and eliminate

17  royalties on their inventory at expiration if you weren't

18  worried about your patent?

19  **A.**   So regarding the lowering of the royalty rate, Biogen had

20  at that point been paying us huge amounts of royalties --

21  **Q.**   Do you mean --

22  **A.**   I'm sorry.  Sorry.  Abbott, not Biogen.

23       Abbott had been paying us huge amounts of royalties on

24  Humira.  Their royalty rate was high relative to others.  They

25  had agreed initially to pay us a 5 1/2 percent royalty versus

1   the 4 1/2 percent that Biogen -- we had agreed to with Biogen.

2   So Abbott was paying more, 5 1/2 percent.  Humira was

3   enormously successful, so it was generating a very large amount

4   of royalty income to Genentech.

5        And for those reasons, we were willing to reduce the

6   royalty rate and bring it down, especially because we'd given

7   other licensees after that lower royalty rates.

8        I don't know why they wanted sort of to make a specific

9   date when they could end royalties.  I don't know the reason

10  for that.  But I do know at the time they -- they represented

11  to us that they kept a relatively low amount of Humira in

12  inventory, and so we were okay agreeing to that as well and did

13  it with very clear language.

14  Q.   If you could turn to Exhibit 54 in your binder.

15  A.   Yes.

16  Q.   Can you identify this document?

17  A.   Yes.  So this is the -- it's titled the "Amended and

18  Restated Agreement" that I negotiated with Abbott in 2010 that

19  accomplished the things I just mentioned, lowering the royalty

20  rate and giving them a specific date when they could stop

21  paying us the royalties on -- on the Cabilly patent.

22            MR. GAFFNEY:  Your Honor, I move to admit Exhibit 54.

23            THE COURT:  The objection -- previous objection is

24  noted.  Overruled.  It is admitted.

25       (Trial Exhibit 54 received in evidence.)

1  **BY MR. GAFFNEY:**

2  **Q.**   So it's now up, Mr. Johnston, in front of the -- in front

3  of the jury.

4       Did you negotiate this agreement?

5  **A.**   I did, yes.

6  **Q.**   And where is the language that you put in in response to

7  Abbott's request not to pay on its -- on the royal- -- on the

8  inventory it had when Cabilly expired?

9  **A.**   So that's in Section 3.01, and it's here.  So the first

10 thing you'll see is, in this amended agreement, we've lowered

11 the royalty rate from 5 1/2 percent to 3 percent for product

12 sold in the United States.

13      And then there's this added language at the end that it's

14 for net sales of licensed products that occur between the

15 effective date and December 18, 2018.  So net sales that occur

16 on or before December 2018 are what they need to pay us

17 royalties on.  So that's stating a specific date on which we no

18 longer would receive royalties on net sales.

19 **Q.**   And was that highlighted language at the end, was that in

20 the 2002 agreement?

21 **A.**   No, it was not.  And I -- I'm now recalling, I think I had

22 someone create sort of a graphic that shows the two agreements

23 side by side.

24 **Q.**   Before we do that, why don't you take a look at Exhibit 53

25 in your binder.

1    **A.**    Okay.

2    **Q.**    And if you could identify that.

3    **A.**    Yes.  So this -- this is the original -- the first license

4    agreement with Abbott for Humira.  So this was the agreement in

5    2002 that had the higher royalty rate.

6    **Q.**    You negotiated this one?

7    **A.**    Yes.

8        **MR. GAFFNEY:**  Your Honor, I move to admit.

9        **THE COURT:**  Again, the objections are noted for the

10    record.  Overruled.  It's admitted.

11        (Trial Exhibit 53 received in evidence.)

12    **BY MR. GAFFNEY:**

13    **Q.**    Now, you mentioned a slide you had, Mr. Johnston?

14    **A.**    Yes.  It puts the two provisions side by side so it's

15    easier to see the differences.

16    **Q.**    So what's the difference here?

17    **A.**    So at the top is the language from the original agreement,

18    the 2002 agreement.  You'll see that the agreement was to pay

19    us a royalty of 5 1/2 percent.  That's the much higher royalty

20    I was talking about.  But it has the same language that's in

21    the Biogen agreement.  It's a royalty on all net sales of all

22    licensed product.

23        And in the 2010 agreement that we amended, again, shown

24    below, we brought the royalty rate down to 3 percent, and we

25    added this language saying that royalties would end for net

1    sales -- would only be payable for net sales occurring on or

2    before December 18, 2018, so adding this very explicit, express

3    language that December 18, 2018, is when the obligation to pay

4    royalties on net sales would end.

5    **Q.**    Did Biogen and Elan ever request language like you have in

6    the -- in the 2010 agreement with Abbott?

7    **A.**    Never.

8    **Q.**    Did they -- at any point in time after they executed the

9    license and started paying royalties, did they ever come back

10   and say, "Hey, we'd like to renegotiate.  We would like to

11   reduce our royalty," or "We'd like to not pay royalties on our

12   inventory that we sell after Cabilly expires"?

13   **A.**    No, they never did that either.

14        **MR. GAFFNEY:**  Okay.  Mr. Morales, you can take that

15   down.

16   **BY MR. GAFFNEY:**

17   **Q.**    Were there other licensees of Cabilly who didn't

18   renegotiate to take this issue off the table but who didn't pay

19   tail royalties on inventory and that Genentech hasn't sued?

20   **A.**    Can you say that one more time, again?  Sorry.

21   **Q.**    Sure.  Among the Cabilly licensees who were paying you

22   royalties in 2018 -- okay? -- some, like Abbott,

23   renegotiated --

24   **A.**    Mm-hmm.

25   **Q.**    -- is that right?

**PROCEEDINGS**

1  **A.**  Yes.

2  **Q.**  Some paid on post-expiration royalties?

3  **A.**  Correct.

4  **Q.**  But there were some that did not pay; correct?

5  **A.**  Correct.

6  **Q.**  And didn't renegotiate the deal?

7  **A.**  Yes.  Understood.

8  **Q.**  Have you sued all of them?

9  **A.**  No.  Some we have, and some we haven't.

10  **Q.**  Why not sue all of them?

11  **A.**  Litigation is expensive.  This obviously is a huge

12  production.  And every situation, every licensee, the

13  circumstances are different.  And we just have to make choices

14  about which legal actions we're going to take and not take.

15  **Q.**  Just a few more questions about the custom and practice

16  you testified about earlier, that is, in particular, the --

17  that it's customary to pay royalties on your inventory sold

18  after the patent expired unless there's language in the

19  agreement that says you don't have to.

20  **A.**  Correct.  For -- especially for patents covering

21  manufacturing processes.

22  **Q.**  Did Genentech follow this custom and practice when you

23  were the licensee?

24  **A.**  Yes, we did.

25  **Q.**  Have you paid royalties on product in your inventory that

PROCEEDINGS

1   you sold after --

2   **A.**    Yes.

3   **Q.**    -- licensed patents expired?

4   **A.**    Yes, absolutely.  So I can think of -- we did that with a

5   company called Protein Design Labs, PDL.  We paid them tail

6   royalties on product under their patent.  We had licensed their

7   patent.  We paid them tail royalties.

8       And then we also paid tail royalties ourselves on the

9   Cabilly patent because when we made the Cabilly invention, we

10  had a collaborator.

11          **MR. BLACK:**  Objection, Your Honor.  This is MIL.

12          **MR. GAFFNEY:**  There's no reference -- he's not making

13  any reference to the name of the collaboration.

14          **THE COURT:**  Oh, I'm not --

15          **MR. BLACK:**  It's not the --

16          **THE COURT:**  All right.  Let's move on, and we can talk

17  about it at the break.

18          **MR. GAFFNEY:**  I have no further questions of the

19  witness, Your Honor.

20          **THE COURT:**  All right.  That's reserved.

21      Cross.

22          **MR. BLACK:**  May we hand up the cross binder,

23  Your Honor?

24          **THE COURT:**  Yes.  Thank you.

25          **THE WITNESS:**  Thank you.

 1              **THE COURT:**  Mr. Black, you may proceed when you're

 2   ready.

 3              **MR. BLACK:**  Thank you, Your Honor.

 4                      **<u>CROSS-EXAMINATION</u>**

 5   **BY MR. BLACK:**

 6   **Q.**   Good morning, Mr. Johnston.

 7   **A.**   Good morning.

 8   **Q.**   Good to see you again.

 9   **A.**   Likewise.

10   **Q.**   You mentioned that there were 50 companies that took

11   Cabilly licenses; correct?

12   **A.**   I think I actually said it was more than --

13   **Q.**   More than 50?

14   **A.**   -- 50.

15        I just didn't know the exact number, but more than 50.

16   **Q.**   And there's quite a few, actually, that were selling

17   product on the date that the Cabilly patent expired but have

18   not paid tail royalties to Genentech; correct?

19   **A.**   I don't know how many of those there are, but there are

20   some, yes.

21   **Q.**   And your role at Genentech in 2004 was chief IP counsel;

22   is that right?

23   **A.**   Correct.  Well, vice president of intellectual property.

24   But, yes, the head of the patent group.

25   **Q.**   I'm sorry.  Our companies have different titles.  You were

1    vice president of intellectual property.

2        The important thing is:  What were the responsibilities

3    that you had?  What areas were you covering within the company?

4    **A.**   So it was -- it was -- the primary responsibility for the

5    team I led was obtaining patents on the inventions made by

6    Genentech scientists.  That was our number one responsibility.

7    But we were also involved in patent licensing, like in the case

8    of the Cabilly patent, and we were also involved in patent

9    litigation.

10   **Q.**   And how many people were you supervising?

11   **A.**   So I directly managed -- I don't know.  I'm going to guess

12   now.  It's so long ago.  Maybe I directly managed four,

13   five people.  But the entire patent team was probably 30; 25,

14   30 employees in total.

15   **Q.**   Right.  So you're managing 25 or 30 employees, and the

16   agreement at issue in this case was just one small part of the

17   overall subject matter that you had responsibility for;

18   correct?

19   **A.**   Well, I wouldn't say it was a small part of my

20   responsibility.  This was a very important part of my

21   responsibility.

22   **Q.**   The Cabilly program was.  But just one license agreement

23   within the Cabilly program, you did not have time to personally

24   engage in each one of the licenses that were being negotiated;

25   right?

1    **A.**    Well, I think I did engage in all the licensing in the way

2    that I think we talked about how I was interacting with

3    Mr. Schwartz.  He was primarily responsible for handling the

4    discussions with Ray and Carl, but I was being copied on

5    correspondence.  Tim was setting up meetings with me.  He and I

6    discussed the financial terms.

7        So we were regularly interacting.  But sort of the most

8    number of hours on any given day were being -- were performed

9    by Tim, not by me, but I was definitely involved.

10   **Q.**    The agreement, Exhibit 1, if you would turn to the last

11   page.

12   **A.**    Give me just one second.

13        Sorry.  Yes, I have that in front of me.

14   **Q.**    And it's the -- it was the habit at Genentech for the

15   primary negotiator to put his or her initials next to the

16   signature line on the agreement; correct?

17   **A.**    In general, yes.

18   **Q.**    And this agreement, which is Exhibit 1, has the initials

19   T.S.; right?

20   **A.**    Correct.

21   **Q.**    That's for Tim Schwartz?

22   **A.**    It is, yes.

23   **Q.**    Because he was the primary negotiator; right?

24   **A.**    He was the primary negotiator, yes.

25   **Q.**    And I think you described your involvement as you were

 1  involved tangentially and consulted with Mr. Schwartz.  Is that

 2  fair?

 3  **A.**    Sure.

 4  **Q.**    You mentioned a term sheet that was sent by Mr. Adair;

 5  correct?

 6  **A.**    Correct.

 7  **Q.**    Who did Mr. Adair report to?

 8  **A.**    I don't recall who his manager was, but he was in the

 9  organization that was headed by Mr. McCracken, whose name we

10  looked at a moment ago.

11  **Q.**    Right.  So if we just pull up the signature page again,

12  just so it's clear, this agreement was signed by Joseph

13  McCracken on behalf of Genentech with the title of VP of

14  business development; right?

15  **A.**    That's correct.

16  **Q.**    And Mr. Adair was in his organization; correct?

17  **A.**    Correct.

18  **Q.**    Now, the term sheet, if we could pull that up, it's got

19  the odd number 202B.  That's dated, as we see on the top,

20  August 7th, 2002; correct?

21  **A.**    Correct.

22  **Q.**    And this term sheet was provided to Biogen; right?

23  **A.**    I don't know that except by seeing an email from Jim Adair

24  indicating that he had sent it to Ray at Biogen.

25  **Q.**    Right.  That's 202A, which is an email from Mr. Adair to

 1  reading [as read]:

 2           "Licensee's obligation to pay royalties to

 3       Genentech under this Agreement . . . ."

 4       And that's taking you back to Section 3.03, I think, or

 5  3.01 in the Abbott agreement, the provision that specifies the

 6  royalties that are paid.

 7       So when it says "under this agreement," you have to look

 8  elsewhere to understand what is it under this agreement that

 9  obligates the payment of royalties.

10  Q.   Right.  It's a basic principle of reading contracts that

11  you have to read the whole agreement together; correct?

12  A.   Yes.  And in appropriate context, and incorporate the

13  license terms and all that, yes, I agree.

14  Q.   And you've got to read 3.03 together with 7.01 to make

15  sense of the contract; right?

16  A.   I think you have to read them in parallel to understand

17  what the obligation to pay royalties is because this alone

18  doesn't tell you what the royalties are.  You have to go to

19  Section -- I don't know -- 3.01 to understand what the

20  royalties are, how those are calculated.

21  Q.   Right.  But the timing of when the licensee's obligation

22  to pay royalties ends is actually right here in 7.01.  It says

23  "until expiration of the last patent"?

24  A.   No.  The -- that's what I mean.  You're reading this out

25  of context.  The obligation to pay royalties on licensed

1    product, and licensed product is defined as anything that was

2    made with the process while the patent was alive that ends up

3    being sold.  That's the obligation, and that's what applies to

4    the inventory that was on hand.

5    **Q.**    Okay.

6    **A.**    And "until expiration" is the language used to specify the

7    patent is still alive and you have the royalty obligation, that

8    obligation to pay royalties on the inventory for any product

9    made while the patent is still alive, which is until the patent

10   expires.

11   **Q.**    Okay, sir.  Could we move on to Exhibit 10.  This should

12   be in your binder.  This is an email from Mr. Schwartz to

13   Mr. Battle with a draft dated April 24th, 2004; correct?

14   **A.**    Correct.

15   **Q.**    Now, you're not copied on this and neither is Mr. Arner;

16   correct?

17   **A.**    Correct.

18   **Q.**    And there are actually a number of drafts -- or maybe you

19   don't know.  Are you aware that there are a number of drafts

20   after this which only involve Mr. Battle and Mr. Schwartz?

21   **A.**    I think I recall that, but I'm not certain.

22   **Q.**    Let's just --

23   **A.**    I trust that that's the case.

24        **THE COURT:**  Mr. Black, are you trying -- are you

25   offering 10?

PROCEEDINGS

 1              MR. BLACK:  Yes.  I'm sorry, Your Honor.  10 --

 2    offering 10.

 3              THE COURT:  10 is stipulated, so it's admitted.

 4         (Trial Exhibit 10 received in evidence.)

 5              THE COURT:  It can be published.

 6              MR. BLACK:  Let's take a look at 11, please.  This is

 7    an email May 19th, 2004, from Mr. Battle to Mr. Schwartz.

 8         And this is also a stipulated exhibit.

 9              THE COURT:  It's admitted.

10         (Trial Exhibit 11 received in evidence.)

11    BY MR. BLACK:

12    Q.   So this is another draft.  And, again, you're not copied

13    on this; correct?

14    A.   Correct.

15    Q.   Now, in Exhibit 20, which has already been admitted, this

16    is --

17              THE COURTROOM DEPUTY:  Excuse me, Counsel.  Just

18    stipulated or admitted already?

19              MR. BLACK:  I believe it's admitted already.  20?

20              THE COURTROOM DEPUTY:  I do not have it, Your Honor.

21              THE COURT:  I don't either.

22              MR. BLACK:  Oh, I apologize then.  I thought it was

23    discussed.  Sorry.

24              THE COURT:  It is admitted.

25              MR. BLACK:  It was discussed but not admitted.  20.

1    **A.**    I do.

2    **Q.**    Okay.  Now, I believe the suggestion from the -- the

3    questioning was that somehow because royalty reports are only

4    due during the calendar quarter and the calendar quarter ends

5    on October 1st of each -- only exists during the term --

6    **A.**    Yes.

7    **Q.**    -- and because "term" is defined as the last -- ends at

8    the last to expire of the patents, capital T term.

9    **A.**    Uh-huh.

10   **Q.**    Okay.  Did you follow the logic of his questions?

11   **A.**    I understood the question.  I disagreed with the

12   conclusion, though.

13   **Q.**    And why do you disagree with the conclusion?

14   **A.**    Well, I think the question was:  Doesn't this obligation

15   to provide reports end on December 18, 2018, when the patent

16   expires?

17         And the reason I said "small T term" is because there is a

18   defined term in the agreement that's capitalized.  And the

19   capitalized T term does mean December 18, 2018, when the

20   Cabilly patent expires.  But that's not -- the capitalized

21   T term is not used here.

22         And I know to a non-lawyer it seems like:  What's the big

23   deal over a small letter or a capital letter?  It matters a lot

24   to patent attorneys doing licensing because defined terms are

25   used very carefully and specifically.

1        And, in fact, I remember in the very first draft revision

2   to the agreement that Mr. Battle sent back to us, we had

3   written in the agreement the term "third party" with small

4   letters, third-party referring to someone other than Biogen and

5   Genentech and Elan, some other company.  And he came back and

6   capitalized that and made it a defined term.

7        And I point that out because just to emphasize that's

8   super important to attorneys doing this to be very precise and

9   accurate because these terms matter.  The words matter, and

10  whether they're capitalized or not matters a lot.

11       So this is not the capitalized T term that's used in the

12  calendar quarter definition.  It's small T.  And we know from

13  other parts of the agreement that this provision about royalty

14  reports that's 4.02 -- if you could put that up there, 4.02 --

15  we know from another part of the agreement that that provision

16  continues beyond the expiration of the Cabilly patent.  It

17  extends beyond December 18, 2018.

18       They're obligated to continue paying us or providing us --

19  sorry -- royalty reports because there's a provision in the

20  agreement that says, "This section shall continue even after

21  the termination of the agreement."  And that's somewhere in

22  Section 7.  I just can't remember where it is.

23  Q.   Did --

24  A.   So for lots of reasons, this cannot be viewed as something

25  that allowed Biogen to stop paying us royalties on the

 1   inventory they had in hand.

 2       The last thing I would say is this would be an extremely

 3   odd place and a very odd way to try to do that.  You saw how we

 4   did it in the Abbott agreement where it's very expressly laid

 5   out in the royalty provision.  This would be very strange, very

 6   crazy to try to address that through the report requirement.

 7   That would be very weird, very weird.

 8   **Q.**  Thank you.

 9       **MR. GAFFNEY:**  Mr. Morales, would you mind taking this

10   down and going to Exhibit 53, the Abbott 2002 agreement.

11       If you could put up in the first instance at the top 3.01,

12   or -- it might be 3.03, actually.

13       **THE WITNESS:**  Okay.  I don't think I have it, so I'll

14   just read it off the screen, if that's okay.

15   **BY MR. GAFFNEY:**

16   **Q.**  Sure.  It should be in your binder.

17       **THE COURT:**  It's in the binder that --

18       **THE WITNESS:**  Oh, sorry.  The other one.  Okay.

19   Sorry.  I forgot about that.  Okay.

20       **MR. GAFFNEY:**  I'm sorry.  It's 3.02, Mr. Morales.  I

21   got that wrong.

22       **THE WITNESS:**  Okay.  Now I have it.  Thank you.

23       **THE COURT:**  So not 302?  We only have a 303.

24       **MR. GAFFNEY:**  And if you could move that up.

25       **THE COURT:**  Mr. Gaffney, we only have a 303 in the

 1   binder.  Oh, I see.  You're talking about --

 2            **MR. GAFFNEY:**  Section 3.

 3            **THE COURT:**  -- the Section 3.02.

 4            **MR. GAFFNEY:**  So many different numerals, but, yes,

 5   Exhibit 53, Section 3.02.

 6        And if you could put up 7.01 as well.

 7   **BY MR. GAFFNEY:**

 8   **Q.**   So this -- to refresh the jury, Mr. Johnston, this was a

 9   license you personally negotiated?

10   **A.**   Yes.

11   **Q.**   In what year?

12   **A.**   2002.

13   **Q.**   Okay.  And here, it says the licensee shall pay on all net

14   sales of all licensed product.

15   **A.**   Yes.  "All" and "all."

16   **Q.**   And could you tell us how licensed product is defined in

17   this particular agreement?

18   **A.**   So licensed product is a defined term, and that's found in

19   Section 1.07.

20   **Q.**   And how does it -- does it define it in the same way that

21   the Biogen license defines licensed product?

22   **A.**   No.  Let me just double-check here.

23            **MR. GAFFNEY:**  Mr. Morales, do you have the definition

24   of -- there we go.

25   \\\

 1          The additional language to provide for all of that in

 2    legal terms is found in different places in the two agreements,

 3    but it's there.  It's absolutely there.

 4    **BY MR. GAFFNEY:**

 5    **Q.**    Okay.

 6    **A.**    So functionally, it's the same between the two agreements.

 7    **Q.**    In that Biogen agreement, licensed product is defined with

 8    respect to the patent; correct?

 9    **A.**    In the Biogen agreement?

10    **Q.**    In the Biogen agreement.

11    **A.**    Yes, yes.

12    **Q.**    And in the Abbott agreement, it just says the product and

13    the infringement issue is taken care of in 3.02?

14    **A.**    Exactly.  That's exactly it.

15    **Q.**    Could you --

16          **MR. GAFFNEY:**  I'm sorry about this, Mr. Morales.  I've

17    got you jumping all around.  But could you go back to where we

18    were with just 3.01(i) on the top and 7.01 on the bottom.

19    **BY MR. GAFFNEY:**

20    **Q.**    So we put up 7.01 of the Biogen license; right?  We saw

21    that 3.03 is basically the same, I think you said, as the -- as

22    the Biogen license.  I'm sorry.  And we put up 7.01 of the

23    Abbott license.

24          Can you confirm that in your -- in your binder?

25    **A.**    So 7.01 of the --

JOHNSTON - REDIRECT / GAFFNEY

1   **Q.**   Abbott 2002.

2   **A.**   Okay.  Yes, I see it here.  7.01 in the 2002 Abbott

3   agreement.

4   **Q.**   Okay.  And that's what's on the screen; correct?

5   **A.**   Yes.  Yes.

6           **MR. GAFFNEY:**  Mr. Morales, could you highlight the

7   last sentence of 7.01.

8   **Q.**   So the language in the Abbott version of 7.01 is basically

9   the same as the language that you were being asked questions

10  about in the Biogen agreement, is it not?

11  **A.**   Where was that in the Biogen agreement?

12  **Q.**   7.01 of the Biogen agreement.

13  **A.**   Yeah.  Yes, yes.  Here it's being used -- yes, the same

14  language in the Abbott agreement.  I think I tes- -- well --

15  yeah.

16  **Q.**   I think you testified earlier that you had used -- when

17  Mr. Battle proposed that language to you in 7.01 of his draft

18  to you, and you said you accepted it and you had used it

19  before?

20  **A.**   Yes.  It's in this agreement.  I'm remembering now.  It's

21  in this 2002 Abbott agreement.  This was -- this is what I had

22  in mind.  This is where I used it.  I was used to this language

23  being used.

24  **Q.**   And as I understand your earlier testimony, Abbott asked

25  to amend this agreement?

1    **A.**    To include this.

2    **Q.**    Well, they asked to amend this agreement to include the

3    language in 2010?

4    **A.**    Yes.

5    **Q.**    That expressly cut off tail royalties?

6    **A.**    Correct.  The language we looked at in 3.01 --

7    **Q.**    Right.

8    **A.**    -- in the 2010 Abbott agreement.

9    **Q.**    So this language from 2002 was already in the Abbott

10    agreement, and Abbott asked to change it?

11    **A.**    Yes, exactly.  This had nothing to do with tail royalties.

12    It had a different purpose that we talked about.  So when

13    Abbott came to me in 2009, 2010, for that reason, they said:

14    We want to revise the agreement to specify clearly that we're

15    going to take away the tail royalty obligation.

16        And that's the language we saw in 3.01, where it's written

17    in that it's for product net sales up to December 18, 2018.

18    That had to be added at Abbott's request in order for them not

19    to pay us on the inventory of Humira that they had.

20        **MR. GAFFNEY:**  Could you put up 3.03 -- I'm sorry --

21    3.01 John of the Abbott amended agreement, 2010.  We used it in

22    his direct examination.

23    **BY MR. GAFFNEY:**

24    **Q.**    This is the 2010 agreement?

25    **A.**    Yes.

1    **A.**    I worked at Genentech.

2    **Q.**    How long were you there?

3    **A.**    Before my official retirement, I was there for -- I was

4    hired in 1997 and retired in 2014.  I chose that date because

5    my granddaughter was born the year before and I wanted to spend

6    time with her.  So I thought I'd worked hard enough and I

7    retired.

8    **Q.**    What did you do after you retired in 2014?

9    **A.**    I took a couple weeks off, but I also signed a contract

10   with Genentech to work as a contractor.  And so -- at reduced

11   hours.  So it allowed me to spend time with my granddaughter.

12   **Q.**    How much longer did you stay at Genentech after your

13   retirement?

14   **A.**    Well, with reduced hours -- reducing the hours over the

15   years until the end of 2021, so December 2021.

16   **Q.**    Did you specialize in any area in particular?

17   **A.**    Patents.

18   **Q.**    Did you work in the legal department?

19   **A.**    I did.

20   **Q.**    Are you familiar with the Cabilly patent?

21   **A.**    Yes, I am.

22   **Q.**    Sir, we're going to need you to speak up a little

23   louder --

24   **A.**    Sorry.  Sorry.

25   **Q.**    -- or bring the mic a little closer.

**SCHWARTZ - DIRECT / GAFFNEY**

1  A.  Yes, I am.

2  Q.  Thank you.

3      Did you have any responsibilities with respect to it?

4  A.  Yes, I did.

5  Q.  What were they?

6  A.  I -- together with my boss, Sean Johnston, I was

7  responsible for licensing the patent.

8  Q.  Were you familiar with the Cabilly technology?

9  A.  I -- generally familiar.  I have a Ph.D. in organic

10  chemistry, which is related, but, you know, it's related to

11  biochemistry.  So I spent my prior work before Genentech and at

12  Genentech helping scientists get patents on their technology.

13  So I understood the basics of the technology.

14  Q.  How did Cabilly licensing end up as part of your job?

15  A.  Well, so Sean asked me.  Quite honestly, the answer is

16  Sean just asked me to help him do that licensing.

17  Q.  Was anyone else on your Cabilly licensing team?

18  A.  No.  It was just Sean and I.  We worked fairly closely

19  together.

20  Q.  What did the work involve?

21  A.  Typically, companies would come to us.  The patent was out

22  there, so they knew about the patent.  And I think the method

23  that the patent covered was well-known as a good way of

24  manufacturing antibodies in the field.  And so they would come

25  to us to get a license when they felt that they had -- they

1    were going to use our process and they wanted freedom to

2    operate licenses.

3    **Q.**    By the time you started doing this, by the time

4    Mr. Johnston asked you to get involved, had Genentech already

5    licensed the Cabilly patent to any other companies?

6    **A.**    Yes, they had.

7    **Q.**    Do you know how many?

8    **A.**    I don't know exactly, but probably ten or so licenses.

9    **Q.**    And after you started on this part of your job, how many

10   Cabilly licenses would you estimate you negotiated after that?

11   **A.**    Well, several dozen.  I mean, there were -- I did dozens

12   of them.

13   **Q.**    Mr. Schwartz, I'm going to put up on the screen Exhibit 1

14   in this case.  It will be also in your binder if you'd prefer

15   to look at it in hard copy.

16        But you recognize this document?

17   **A.**    Yes, I do.

18   **Q.**    Did you have any role in negotiating this one?

19   **A.**    Yes, I did.

20   **Q.**    How did that come about?

21   **A.**    Well, as I recall, representatives from Elan and Biogen

22   called Sean and asked him about the license -- getting a

23   license in early 2004.  They wanted to come over to Genentech

24   and talk about it.  They set up a meeting, and Sean asked me to

25   attend that meeting, and that was my first participation.

1   Q.   Who attended for Biogen and Elan?

2   A.   It was Ray Arner and Carl Battle.

3   Q.   Did you know either of them before this meeting?

4   A.   I did not.

5   Q.   Prior to this meeting, did you have any discussions with

6   Biogen or Elan about a Cabilly license for Tysabri?

7   A.   I did not.

8   Q.   Could you turn to Exhibit 5 in your binder.

9        MR. GAFFNEY:   And, Mr. Morales, if you could put that

10  up on the screen.

11  BY MR. GAFFNEY:

12  Q.   Do you recognize that document, sir?

13  A.   Yes.  It's an email to me from Ray -- hold it.  Now it's

14  bigger.  It's an email to me from Ray Arner and Carl Battle --

15  or, no.  It's from me to Ray Arner and Carl Battle.

16  Q.   And what's the purpose of this email?

17  A.   So after speaking with them, this is my first draft of the

18  Cabilly license agreement containing the terms that we

19  agreed -- or not agreed, but discussed at least in that first

20  meeting.  And I'm sending a hard-copy first draft to them.

21  Q.   Was this based on a form that Genentech had in the office?

22  A.   Not really.  I mean, we did not have a form agreement that

23  I could just turn over; but we did have these other earlier

24  agreements, as I said.  So I would typically go back to one of

25  the other agreements, pull up the terms, strip out, you know,

1  what didn't apply, and then start with that document.  So there

2  were, you know, general terms that went from -- were the same

3  from agreement to agreement.

4  Q.  What were the financial terms proposed in your draft?

5  A.  The financial terms were -- there were three of them,

6  really, I mean, that have numbers in them.  There was a license

7  signing fee or a license grant fee, same thing, for $4 million;

8  there was a development milestone on FDA approval of

9  $5 million; and then there were royalties, depending on where

10  you sold the product that you made.

11  Q.  Were these fees that were in this draft, the three

12  different ones you mentioned, were those unique to Biogen?  Did

13  Genentech charge those to anyone else?

14  A.  Well, I mean, they were nego- -- they were presented to

15  Biogen.  They were not unique in the sense that they were in

16  the range that we were granting licenses.

17      Did we ever grant exactly those terms?  I couldn't tell

18  you.

19  Q.  But did other licensees pay signing fees?

20  A.  Oh, yes, yes.

21  Q.  Did other licensees pay development fees?

22  A.  Yes.  All of our licenses had signing fees, development

23  milestones, and royalties of some kind.  It may not have been

24  exactly these -- these terms, however.

25  Q.  And we put up on the screen all of the Sections 3.03.  Is

1    this the earned royalty provision you provided?

2    **A.**    Yes.

3    **Q.**    Where did the -- where did the rates come from?

4    **A.**    Well, they would have come out of that discussion with

5    Biogen and IDEC -- or Biogen and Elan and Sean and I at that

6    time.  I don't know if we proposed them or they proposed them,

7    but they came out of that discussion.

8    **Q.**    Was this draft you sent on January 20th, was this

9    something Biogen and Elan could have signed right away?

10    **A.**    Well, I like to think it was a complete draft.  I mean, I

11    did it.  It could have been signed.  We didn't really expect

12    them to sign it because these are, you know, large

13    pharmaceutical companies.  They typically negotiate terms.  But

14    they could have signed it if they had wished.

15    **Q.**    Now, you know, from this point on, when you sent the

16    agreement, were the -- in your -- in Genentech's mind, were the

17    financial terms up for negotiation?

18    **A.**    These financial terms that we're looking at in 3.01, 3.02,

19    and 3.03, those numbers show up in the final agreement.  So,

20    no, these numbers were not negotiated.

21    **Q.**    How far along was Tysabri's development when Biogen and

22    Elan asked for their meeting?

23    **A.**    Well, typically -- so, typically, companies would come

24    earlier, I think, than Biogen and Elan did.  You know, if

25    they -- if a company plan -- there are really two ways of

1  looking at it, I think.  If you have a medi- -- you're

2  preparing a medical antibody, you want to see if it works; you

3  have to do some trials.  And you may want to line up all your

4  licenses at the beginning to make sure you can go forward if

5  it's positive.

6      Alternatively, you can do those trials and wait to take

7  your licenses to see if it's going to work.  I mean, there's a

8  high failure rate in these products.  So if you come late, then

9  you're sure you're going to need the license, and you typically

10  pay more.

11     And I think Biogen and Elan were in that later phase.

12  They had already done their clinical trials and they knew the

13  product was going to work.

14  **Q.**  Were there licensees who were charged higher rates in

15  their agreements than Biogen and Elan?

16  **A.**  Yes.

17  **Q.**  Did the -- did their delay in getting the license relative

18  to when other companies would come, did that mean they ended up

19  with higher royalty rates?

20  **A.**  Well, I think -- so for us, there were two factors that we

21  thought about when we proposed royalties and these development

22  milestones as well.

23     But one was the target of the antibodies.  Antibodies are

24  specific to particular targets, as you probably know, and we

25  thought about what was that target and what medical condition

1  were those antibodies being developed to treat.  So that was

2  one consideration.

3       The second consideration was where in the development

4  program were they with their molecule.  And as I said, if they

5  came earlier, the license grant fees were much less than

6  $4 million, for example.  If they came later, they were more

7  like this.

8  **Q.**  Could you turn to Exhibit 7 in your binder.

9       **MR. GAFFNEY:**  And if you could put that up on the

10  screen, Mr. Morales.  It's been already admitted.

11  **BY MR. GAFFNEY:**

12  **Q.**  Do you see this document, Mr. Schwartz?

13  **A.**  Yeah, I do.  It's an email from Carl Battle to myself,

14  copying Sean and Ray Arner.

15  **Q.**  So this is Mr. Battle's response to your draft?

16  **A.**  Yes.  He says that.  He says thanks for forwarding -- in

17  the first couple lines there, he says:  Thanks for the draft of

18  January 20th.  We have these revisions in this attached draft.

19  **Q.**  I see he sent it to Mr. Johnston as well as you.

20  **A.**  Yes.

21  **Q.**  What -- at this stage, where your license is already

22  drafted by Genentech and now you're getting back comments,

23  what's Mr. Johnston's role at this point?

24  **A.**  Well, Sean and I worked fairly closely on these things.

25  My -- you know, I could agree to certain changes on my own, but

 1   if there was a material change to the financial provisions, I

 2   would go talk to Sean about it and get his -- we would discuss

 3   it, come up with a resolution, and I would respond.

 4        I was the front-end of this two-man team, if you will, the

 5   front person with the client, with the potential licensee.  But

 6   I would always check on it with Sean.

 7              MR. GAFFNEY:  Could you, Mr. Morales, put up page 4.

 8   BY MR. GAFFNEY:

 9   Q.   And if you can turn to that in your book.

10   A.   Mm-hmm.

11   Q.   So this is where you've got the definition of licensed

12   product.  Do you see that?

13   A.   Yes.  Yep.  Yes.

14   Q.   Did Biogen or Elan ever propose to change that definition?

15   A.   Not that I'm aware of.  These were -- this was our --

16   our -- our definition.

17   Q.   Did they ever ask to reword this so licensed product was

18   only Tysabri that was sold before the patent expired?

19   A.   No.

20   Q.   Okay.  Could you turn to --

21              MR. GAFFNEY:  Put up, Mr. Morales, the definition of

22   net sales.

23   BY MR. GAFFNEY:

24   Q.   So they've made one proposed change here.  Do you see

25   that?

1   **A.**   Yes.  They changed third party to capitalized Third Party.

2   **Q.**   Okay.  Did -- during the negotiations, did Mr. Arner or

3   Mr. Battle ever propose to modify the definition of net sales

4   so it only applied to sales of Tysabri before the patent

5   expired?

6   **A.**   No, they did not, no.  They made several changes, or they

7   attempted several changes to this provision.  This was the

8   first one.

9   **Q.**   Could you turn to Section 3.01 and 3.02.

10   Do you see that language?

11   **A.**   Yes.

12   **Q.**   And what's the proposed edit there?

13   **A.**   There's a couple edits.  One, they crossed out the term

14   "non-creditable."  So our original language had said you have

15   to pay this fee and it's not creditable or refundable for any

16   purpose.  They crossed out the "non-creditable" and put in that

17   they would like it to be credited against the earned royalties

18   of Section 3.03.  And they did the same thing with the

19   development milestone.

20   **Q.**   Was that proposed change acceptable to Genentech?

21   **A.**   No.  Remember, these are -- this was probably $9 million

22   worth of fees that they wanted to take away from us.  They

23   would deduct it from their royalties so we would be down

24   $9 million.  And that's a significant term, and we would not

25   have accepted it, or we did not.

1          **MR. GAFFNEY:**  So if you could put up the -- put up

2     Section 3.03, Mr. Morales.

3     **BY MR. GAFFNEY:**

4     **Q.**    You see the edits here?

5     **A.**    Yes.  Quite a few.

6     **Q.**    Did Biogen ever propose edits to 3.03 that reworded it so

7     that royalties would only be due on licensed products sold

8     before the Cabilly patent expired?

9     **A.**    So let me just read through what they have here.

10         No, there is nothing in this section that they have

11    proposed that goes to that point.

12    **Q.**    And did they ever do that?  Did they ever propose to

13    change earned royalties, the earned royalties sections to say

14    we don't have to pay tail royalties?

15    **A.**    Well, yeah, so this idea of tail royalties, I think, is

16    a -- sort of a misnomer.  We never talked about tail royalties

17    at all.  This is a royalty provision, and this is what we

18    discussed.

19    **Q.**    And did they ever propose edits that would have the effect

20    of eliminating tail royalties?

21    **A.**    No, they did not.

22    **Q.**    Is that something Genentech would have agreed to if they

23    had proposed it?

24    **A.**    I don't think so.  I think it would have been a material

25    financial term.  I could not have agreed to that myself.  I

 1    would have talked to Sean about it, and I don't think he would

 2    have agreed to it.

 3    **Q.**    Why not?

 4    **A.**    Because it would have reduced our royalties.  Our basic --

 5    our basic sense was that -- our guiding principle, if you will,

 6    in the license was if you used our technology to make your

 7    product, you would owe us a royalty as the payment for that

 8    license.  And it was on all -- it was all net sales of all

 9    licensed product.  And we stuck with that through the whole

10    negotiation.  And I think this kind of provision where you

11    don't pay after a certain term would have been counter to that.

12            **MR. GAFFNEY:**  Mr. Morales, would you mind putting up

13    Section 3.05, please.

14    **BY MR. GAFFNEY:**

15    **Q.**    Do you see that, Mr. Schwartz?

16    **A.**    Yes, I do.

17    **Q.**    Was this proposed edit from Mr. Battle, was this

18    acceptable?

19    **A.**    So the proposal is in blue here, and it was not accepted.

20    **Q.**    Why not?

21    **A.**    Again, I think this was another attempt to pay less.  So

22    the edit basically says that if you distributed commercially

23    reasonable amounts for research and development purposes, you

24    don't have to pay the royalty.  And our position was, yes, you

25    would have to pay the royalty.  And that's where -- and that

SCHWARTZ - DIRECT / GAFFNEY

1   was our original language, and that's what we went back to.

2   **Q.**   Could you turn to page 13, the edit to Section 7.01.

3        Do you see the change they proposed there?

4   **A.**   I do.  Yes, I do.

5   **Q.**   Okay.  I'm sorry.  This is in the term and termination

6   provision?

7   **A.**   Yes, it is.

8   **Q.**   Okay.  What purpose does a -- generally speaking, a term

9   and termination provision serve in a patent license?

10  **A.**   Well, in this -- so in this first sentence, the basic

11  effect is to define the term in which you have your license.

12  Your license starts on the effective date of the signing of the

13  agreement, and it lasts until the expiration of the last patent

14  within licensed patents.  So it's the length of your -- it's

15  the period of time for which you have your license.  That was

16  our original language.

17  **Q.**   Okay.  And did you -- did Genentech add the language that

18  Mr. Battle proposed?

19  **A.**   We can look at -- I'd have to look again.  There's a lot

20  of words here.  But I think we accepted some of this and we

21  modified some of it.

22  **Q.**   Why did Genentech agree to add this?

23  **A.**   Well, we felt that -- I mean, this is -- so the second --

24        **MR. BLACK:**  Objection, Your Honor.  Subjective intent.

25        **THE COURT:**  Sustained.

1          MR. GAFFNEY: Did you --

2          THE COURT: I said sustained.

3          MR. GAFFNEY: Sustained.  Okay.

4   BY MR. GAFFNEY:

5   Q.   Well, let me ask this question, Mr. Schwartz.  When this

6   was proposed to you, did Mr. Battle or Mr. Arner ever tell you

7   that they intended to limit their royalty obligation to Tysabri

8   made before -- I'm sorry -- to eliminate their royalty

9   obligation on the inventory they had when the patent expired

10  and sold after?

11  A.   They did not say that.

12  Q.   Did they ever say anything to the effect of "We don't want

13  to pay tail royalties and that's why we're adding this"?

14  A.   No.  That never came up.

15  Q.   Did they ever tell you that they intended this language to

16  narrow their obligation to pay all net sales of all licensed

17  product?

18  A.   No.

19  Q.   Is that something you would have remembered if they had

20  said that?

21  A.   It's something I would have remembered because I would

22  have had to talk to Sean about it and we would have discussed

23  it and come to a conclusion.

24  Q.   Is that something Genentech would have agreed to?

25  A.   No.  I mean, I think in this industry, it's common to have

1   an inventory, especially when you are late in development.  I

2   mean, Genentech did the same thing.  You build up an inventory

3   of product so that when you launch, you have it to sell to

4   the -- to your customers.

5       These are patients that need it, so you need an inventory

6   to be able to deal with the patient -- you know, patient needs

7   of your product.  That's common.

8       And I think they would have -- I would expect Biogen and

9   Elan to have built up an inventory for exactly that purpose.

10  And if we had agreed that they didn't have to pay on an

11  inventory that they had prior to the expiration, we would have

12  lost the royalty on all that product.

13  **Q.**   Could we look at the proposed edit to 7.05.

14      Do you see this one, Mr. Schwartz?

15  **A.**   Yes, I do.

16  **Q.**   Were you okay with this one?

17  **A.**   So this is a -- this is a provision that -- so this is a

18  termination provision, initially.  So it basically says:  Upon

19  termination of the license, termination of the license shall

20  result in -- termination of the agreement shall result in

21  termination of the licenses.  So in that circumstance, Biogen

22  and Elan would have -- if that terminated, they would have no

23  license to sell their inventory.

24      And what they're asking us for is 90 days, a 90-day period

25  to sell their existing inventory without a license because the

 1   license would have expired, been terminated.  And so that's the

 2   provision.  And we did agree to a version of this.  You know,

 3   it was good for us, too, I suppose.  We would get royalties on

 4   that amount of inventory.

 5        But I think you'll see later on Sean added a couple of

 6   words that said something like provided they pay the royalty.

 7   **Q.**   Did this apply in the circumstance where the license

 8   agreement ended with the expiration of the patents?

 9   **A.**   No.

10   **Q.**   How do you know?  How can you tell?

11   **A.**   Because you don't need a termination of license.  At the

12   expiration, the patent licenses are expired, and then you can

13   sell -- whatever product you make after that is no longer

14   covered as a licensed product and you can sell it without a

15   royalty.  This would have been an infringement had they tried

16   that.

17   **Q.**   Why is that?

18   **A.**   Well, because the license terminated, and they wanted to

19   continue to sell.  They wouldn't have had a license at that

20   point.

21   **Q.**   So what would have happened -- under this provision, what

22   happened after 90 days?

23   **A.**   They would have to stop selling.

24   **Q.**   Because the license had not expired?

25        **MR. BLACK:**  Objection, Your Honor.  It's a legal

1    conclusion.

2            **THE COURT:**  At this point, sustained.

3    **BY MR. GAFFNEY:**

4    **Q.**   Could you turn to Exhibit 11, please.

5            Do you have Exhibit 11?

6    **A.**   I'm, yeah, looking at an email from Carl Battle to myself,

7    yes, on May 19th.

8    **Q.**   Yes.  That's it.

9            And does it have an agreement attached to it, your

10   version?

11   **A.**   Yes.

12   **Q.**   These are additional revisions?

13   **A.**   Yes.

14   **Q.**   Okay.  If we could turn to Section 1.13, the definition of

15   net sales, do you see that edit?

16   **A.**   I do, yes.

17   **Q.**   Was Genentech okay with this edit?

18   **A.**   Yes, we were.  And I think we agreed to this.  This is a

19   provision that, basically, they thought they might want to sell

20   their Tysabri antibody together with another one of their

21   products called Avonex and interferon, and they wanted to be

22   sure that the net sales were only directed to the product that

23   was made using our technology; and apparently, interferon was

24   not.

25           And so it seemed fair to us that, you know, what they

1  would pay on would be what was covered by the license, and the

2  combination product was not -- didn't need to be covered.  Just

3  the part that they used to make their own product.

4  **Q.**    If you could turn to Section 2.04.  You see this edit?

5  **A.**    Yeah.  This is an entirely new provision here.

6  **Q.**    Was this provision acceptable to Genentech?

7  **A.**    Yeah.  So this is what I would call an "I'm sorry"

8  provision.  It's pretty clear here, I think, that they -- well,

9  what they would like -- they would like the license to cover

10  activities to manufacture their product prior to the effective

11  date of the agreement.  That would have been an infringement.

12        There was no agreement.  They were building up inventory

13  using our process.  And this is kind of like "Oops, sorry.

14  We'd like to include it in the license."  And we said, "Okay.

15  We'll include it in the license if you pay royalties on it."

16  **Q.**    What would have happened if you had said, "We're not

17  giving you a license for that"?

18  **A.**    I don't know.  We'd have to talk about that.

19  **Q.**    Did this provision potentially affect their launch date?

20  **A.**    Well, again, I'm assuming that they were building up an

21  inventory and that was the purpose of this provision.  So it

22  would have helped them build up inventory and launch on time.

23  **Q.**    And that was fine with Genentech?

24  **A.**    And that was fine with us.

25  **Q.**    How about the edit to Section 2.05 that he proposed?  Do

1  you remember this one?

2  **A.**   Yes.  There's a lot of words here.  It's a covenant not to

3  sue.  So it's a promise not -- it's our promise not to sue

4  Biogen and IDEC for any infringement of any claim of a patent

5  owned by Genentech.  So this is an ask for a covenant not to

6  sue, so a promise not to sue them on some other patent we might

7  have, not Cabilly, but some other patent in our portfolio of

8  patents that might pertain or be relevant to their molecule and

9  the manufacture of their molecule.  So they wanted us to

10  promise not to sue them for that.

11  **Q.**   Was that acceptable to Genentech?

12  **A.**   No, not this way, no, it wasn't.  We basically reworded

13  it, I think, and said, "Look, we don't know all the details of

14  your manufacturing process or your molecule.  You know that.

15  And our patents are public.  So it's your obligation" -- I'm

16  guessing this is how I would have done the negotiation.  "It's

17  your obligation to go tell us what you need.  And if you find

18  something you need, we will undertake to have a good faith

19  negotiation and license it to you.  But it's not our

20  responsibility.  It's yours."

21       **MR. GAFFNEY:**  You can take that down, Mr. Morales.

22       Could you put up Exhibit 15.

23  **BY MR. GAFFNEY:**

24  **Q.**   And that should be in your binder.

25  **A.**   I see it.

1    Q.    What's this document?

2    A.    This is a short email from myself to Sean, my boss at the

3    time, saying I'd like to talk about two Cabilly issues later in

4    the afternoon and is 3:00 p.m. possible for you?  A little

5    presumptive, but I'm trying to get a meeting to talk to him

6    about these Cabilly licenses.

7    Q.    Any recollection of what you talked about?

8    A.    No, not specifically, but it would have been about the

9    terms in these licenses.

10    Q.    Was it unusual for you to meet with Mr. Johnston during

11    the course of your interactions with potential licensees?

12    A.    No.  As I've said before, he and I worked closely.  Our

13    offices were about 50 feet away.  And he was really very good.

14    I would knock on his door and say, "Hey, you got a couple of

15    minutes to talk about this?"  And he would say yes oftentimes.

16    Sometimes I had to make an appointment to get it, but he was

17    available.

18    Q.    Could you turn to Exhibit 1.

19          **MR. GAFFNEY:**  And, Mr. Morales, if you could put up

20    the signature page.

21    **BY MR. GAFFNEY:**

22    Q.    Do you see that Exhibit 1 and the signature page in front

23    of you?

24    A.    Yes, I do.

25    Q.    Do you know the gentleman who signed for Genentech?

SCHWARTZ - CROSS / BLACK

 1  **A.**    Good to see you.

 2  **Q.**    You were the point person for the Cabilly licenses in

 3  2004; correct?

 4  **A.**    That's correct.

 5  **Q.**    And you negotiated quite a few of them.  I think you said

 6  dozens?

 7  **A.**    Yes.

 8  **Q.**    Did you keep track of how many of your licenses actually

 9  resulted in the payment of tail royalties after Cabilly

10  expired?

11  **A.**    I didn't keep track of whether they paid any kind of

12  royalties.

13  **Q.**    I see.  So the division of labor at Genentech was you

14  would negotiate the licenses and then someone else, presumably

15  in finance, would take care of the process of collecting and

16  verifying the royalties?

17  **A.**    That's exactly right.

18  **Q.**    Do you know Mr. Felix Wong?

19  **A.**    I do.

20  **Q.**    Do you know whether he will know whether or not tail

21  royalties were paid under the licenses you negotiated?

22  **A.**    I would ask him.

23  **Q.**    We will.

24         Okay.  In 2004, you were personally unaware of a custom or

25  practice in the industry regarding the payment of tail

SCHWARTZ - CROSS / BLACK

1    royalties; correct?

2    **A.**    Yes.  You asked me that in the deposition.

3    **Q.**    And you were unaware of a custom and practice?

4    **A.**    Correct.

5    **Q.**    Thank you.

6         There was a January 2004 meeting at Genentech with

7    Mr. Battle, Mr. Arner, and you.

8         Do you know whether Mr. Johnston was there or not?

9    **A.**    I believe he was, yes.

10   **Q.**    Okay.  At your deposition, I think you were unclear about

11   that.  Did something refresh your recollection?

12   **A.**    Just that the email was -- you know, Sean had set up the

13   mes- -- the meeting, and I believe he was there with me.

14   **Q.**    Okay.  Prior to that, there were some interactions with

15   the business development department relating to the Tysabri

16   license; right?

17   **A.**    Are you referring to the nonbinding term sheets?

18   **Q.**    There was a term sheet that Mr. Adair sent to Biogen;

19   correct?

20   **A.**    Yes.

21   **Q.**    And Mr. Adair sent the term sheet to you sometime in 2003;

22   right?

23   **A.**    Yes.

24   **Q.**    And then you had that, as did Biogen and Elan, at the time

25   the parties sat down for the face-to-face in January 2004;

1  right?

2  **A.**   Yes.

3  **Q.**   Okay.  If you'll take a look in your binder at Exhibit 74,

4  and just tell me when you're there.

5  **A.**   I don't think I have a 74.

6  **Q.**   Oh, you know what?  That's because I did not give you the

7  cross binder.  Hold on a second.

8         **MR. BLACK:**  Your Honor, may I approach the witness?

9         **THE COURT:**  You may.

10        **MR. BLACK:**  Does everybody have it except for the

11  witness?  Okay.  Everybody got it except for the witness.

12  That's not very effective.

13     Here you go.

14        **THE WITNESS:**  Thank you.

15  **BY MR. BLACK:**

16  **Q.**   All right.  Exhibit 74, please.

17     Are you there, sir?

18  **A.**   Yes.

19  **Q.**   Okay.  I'm not going to ask you about all the numbers in

20  here.  I just want you to identify them for the record.

21     These are the quarterly royalty statements provided by

22  Elan and then Biogen that were sent to Genentech and on which

23  you appear to be copied; correct?

24  **A.**   Yeah.  I'm cc'd at the bottom here.

25  **Q.**   Right.  These are not things that you normally spent any

1    also send royalty reports to our external partners, usually on

2    a quarterly basis.  We also detail how much -- how much units

3    we've sold and also wire them usually the payment automatically

4    as well.

5    **Q.**  So in a given year, roughly, how much in royalties would

6    Genentech pay to other companies?

7    **A.**  In the last ten years, on average, we paid over $1 billion

8    annually.

9    **Q.**  And do you and your department come up with projections to

10   determine how much you might owe to your royalty partners under

11   your license agreements?

12   **A.**  Yes.

13   **Q.**  And what does that process look like of coming up with

14   projections?

15   **A.**  Yes.  So, again, part of that projection is not only

16   reviewing historical royalty data, what analyst reports are

17   saying, what our licensees report externally, but we also work

18   closely with our colleagues from legal department.

19   **Q.**  Do Genentech's projections assume that Genentech will pay

20   royalties on products that it made before a patent expired but

21   sold after that patent expired?

22   **A.**  Yes.  If that's what our legal determines the agreement

23   requires.

24   **Q.**  And does Genentech ever make payments on a patent that

25   expired but for product that was made before the patent

1  expired?

2  A.    Yes.

3  Q.    When Genentech makes one of those payments, does it send a

4  royalty report to accompany the payment?

5  A.    Yes.

6  Q.    And is that true even when the patent at issue has

7  expired?

8  A.    Yes.

9  Q.    Is it important, Mr. Wong, for Genentech's projections of

10 its own royalty obligations to be accurate?

11 A.    Yes.  I mean, Genentech, we have a large pipeline of

12 promising -- promising drugs.  But the reality of it is that

13 similar to other pharma companies, we don't have unlimited

14 capital, so we're forced to make decisions.

15      So for planning purposes, it's very important for us to

16 make sure our projections are as accurate as possible just to

17 make sure that our senior management have -- or know how much

18 resources they have available for investment purposes.

19 Q.    You mentioned Genentech's legal department.  Is

20 Genentech's legal department involved in the process of

21 preparing projections at Genentech?

22 A.    Yes.  We work closely with them.

23 Q.    In your experience, are employees at Genentech careful in

24 coming up with projections of Genentech's royalty obligations?

25 A.    Yes.  Because of its importance, we have a lot of people

1    working on projections.

2    **Q.**   Are mistakes common in that process?

3    **A.**   No.  Our processes are designed to prevent that.

4    **Q.**   Mr. Wong, I want to direct your attention back to the

5    facts of this case.

6         Are you familiar with the licenses that Genentech granted

7    under the Cabilly patent?

8    **A.**   Yes.

9    **Q.**   Do those licenses create a lot of work for you and your

10   group?

11   **A.**   Not anymore.  The patent expired about seven years ago, so

12   there aren't any active Cabilly licensees that's paying us now.

13   But before the patent expired, there were a lot of licensees

14   with Cabilly -- I mean, Cabilly licensees with successful

15   medicines, so there was a lot of royalty streams or royalty

16   reports that we were handling.

17   **Q.**   Do you know, roughly, how many companies paid royalties

18   under the Cabilly patent?

19   **A.**   Roughly, two dozen.

20   **Q.**   Of those two dozen companies, roughly, which one paid

21   most?

22   **A.**   That would be AbbVie.  They paid 3 billion in royalties on

23   their sales of Humira.

24   **Q.**   I think you were referring to the company AbbVie.  Is that

25   company sometimes also called Abbott?

1   **A.**   Yes.

2   **Q.**   So Abbott was first.  Who paid the second-most royalties

3   under the Cabilly patent?

4   **A.**   Genentech.  We paid 2 billion in Cabilly royalties to an

5   external partner.

6          **MS. PATEL:**  Objection, Your Honor.  MIL.  This has

7   been excluded via MIL, Your Honor.

8          **MR. McCLOUD:**  Your Honor, that's not correct.

9          **THE COURT:**  Keep going and get off this topic.

10  **BY MR. McCLOUD:**

11  **Q.**   Let's focus on Biogen now.  Did you oversee the royalty

12  payments that Biogen made to Genentech under Biogen's Cabilly

13  license?

14  **A.**   Yes, for many years.

15  **Q.**   Mr. Wong, I'd like you to turn in your binder to

16  Exhibit 74, which is already in evidence.

17         **MR. McCLOUD:**  Permission to publish this, Your Honor,

18  Exhibit 74?

19         **THE COURT:**  If it's in evidence, you can.

20         **THE WITNESS:**  I'm there.

21  **BY MR. McCLOUD:**

22  **Q.**   Mr. Wong, can you tell us what this document is?

23  **A.**   This is a compilation of royalty reports that we receive

24  from Elan and Biogen.

25  **Q.**   So when was the first of these royalty reports provided to

**WONG - DIRECT / McCLOUD**

1   Genentech?

2   **A.**    In November 2006.

3   **Q.**    And what period of time did this particular royalty report

4   cover?

5   **A.**    For Q3 of 2006.

6   **Q.**    I see that there's a reference on this royalty report to

7   Elan Pharma International.  Do you see that?

8   **A.**    Yes.

9   **Q.**    Do you have an understanding of why Elan was mentioned on

10  this royalty report?

11  **A.**    Yeah.  My understanding is that the license was given to

12  both Elan and Biogen.

13  **Q.**    And did Biogen ever assume the obligations of Elan under

14  the agreement?

15  **A.**    Yes.

16  **Q.**    Did Biogen provide royalty reports to Genentech on a

17  regular basis?

18  **A.**    Yes.  On a quarterly basis.

19  **Q.**    And did Genentech ever audit the royalty reports or

20  investigate the royalty reports that Biogen provided?

21  **A.**    We did not audit them.

22  **Q.**    Mr. Wong, can you turn to page 97 of Exhibit 74.  Just let

23  me know when you're there.

24  **A.**    I'm there.

25  **Q.**    So, Mr. Wong, what is this page of the document showing?

**WONG - DIRECT / McCLOUD**

1   **A.**   This is the last royalty report that we received from

2   Biogen.

3   **Q.**   What's the date of the document?

4   **A.**   March 1st, 2019.

5   **Q.**   And can you tell when the sales that are covered by this

6   royalty statement were made?

7   **A.**   Yes.  It says Q4 2018.

8   **Q.**   So, Mr. Wong, I want to direct your attention to the

9   portion of this document that says [as read]:

10          "This is our final payment under the License

11      Agreement."

12      Do you see that?

13   **A.**   Yes.

14   **Q.**   Did you have any reaction when you saw that statement in

15   Biogen's royalty report?

16   **A.**   I was surprised.

17   **Q.**   Why were you surprised?

18   **A.**   Because it says "This is our final payment," but we

19   expected them to have inventory after the patent expired, so we

20   expected to continue receiving royalty reports as those sales

21   are made.

22   **Q.**   And why did you expect that Biogen would still have

23   inventory at the point that the Cabilly patent expired?

24   **A.**   Because my understanding of the agreement was that they

25   have to pay on inventory that were manufactured prior to patent

1    expiry but sold after.

2    **Q.**   Did the internal projections of royalty obligations that

3    your group prepared reflect that expectation that Biogen would

4    pay on product made before but sold after the patent expired?

5    **A.**   Yes.

6    **Q.**   Mr. Wong, did you reach out to Biogen after receiving this

7    letter?

8    **A.**   Yes.  We emailed them.  We told them that under the

9    license, they're required to pay us on sales on products that

10   were manufactured before the patent expired.  We told them to

11   revise -- send us a revised royalty statement as well as the

12   difference in payment.

13   **Q.**   Did Biogen ever send you a revised royalty statement?

14   **A.**   No.

15   **Q.**   Did Biogen ever send you the difference in payment?

16   **A.**   No.

17   **Q.**   Mr. Wong, I'd like you to turn in your binder to

18   Exhibit 76.  Now, in your binder, this is a slipsheet for an

19   exhibit that is in Excel form.

20        **MR. McCLOUD:**  And, Your Honor, this has a stipulation

21   to admit.

22        **THE COURT:**  It's admitted.

23        (Trial Exhibit 76 received in evidence.)

24        **MR. McCLOUD:**  And if we can publish that, please.

25   \\\

1   BY MR. McCLOUD:

2   Q.    So, Mr. Wong, did Genentech ever learn whether Biogen, in

3   fact, had an inventory of Tysabri on hand at the point that the

4   Cabilly patent expired?

5   A.    Yes.  As part of the case, we asked them to let us know

6   the amount of inventory they had prior to patent expiry.

7   Q.    And did Biogen provide that information to Genentech?

8   A.    Yes.

9   Q.    Mr. Wong, you can see Exhibit 76 on your screen.  Do you

10  recognize this document?

11  A.    Yes.

12  Q.    And what is this document?

13  A.    This is the data we asked Biogen to provide, essentially

14  what was the inventory or sales on product that were

15  manufactured before the patent expired.

16  Q.    So, Mr. Wong, it's a big spreadsheet.  I don't want to go

17  through the whole thing, but I would like to focus your

18  attention on the sheet that is showing that says "Alleged

19  Royalty Bearing Units."

20        And my first question is:  Do you have an understanding of

21  what the term "royalty bearing units" means on this sheet?

22  A.    Yes.

23  Q.    What is your understanding?

24  A.    Alleged royalty bearing units is essentially the units or

25  quantity that Biogen manufacture before the patent expired but

1    sold afterwards where they did not pay us royalties.

2    **Q.**   And how much licensed product did Biogen have on hand at

3    the point that the Cabilly patent expired?

4    **A.**   Roughly 400,000.

5    **Q.**   Is that the number that is being highlighted there on the

6    spreadsheet?

7    **A.**   Yes, where it says 397,311.

8    **Q.**   Okay.  Mr. Wong, let's turn to the tab titled "Net sales."

9           **MR. McCLOUD:**  Mr. Morales, if you could go there,

10   please.

11          **THE WITNESS:**  Okay.

12   **BY MR. McCLOUD:**

13   **Q.**   Mr. Wong, what is being shown on this page of the

14   spreadsheet?

15   **A.**   Essentially country-by-country, month-by-month information

16   on their inventory.  They have the units that were shown on the

17   prior tab of this spreadsheet as well as the gross sales price

18   per unit, which leads to the sales and discounts to calculate

19   the royalties.

20   **Q.**   And, Mr. Wong, can you tell from this spreadsheet how long

21   Biogen continued to sell Tysabri that it made before the

22   Cabilly patent expired?

23   **A.**   Yes.  I believe if you scroll all the way to the right,

24   it'll be until September 2020 or so.

25          **MR. McCLOUD:**  Thank you, Mr. Wong.

```
 1        No further questions.
 2              THE COURT:  Cross.
 3              MS. PATEL:  Yes, Your Honor.
 4        Your Honor, may I approach to provide the binder?
 5              THE COURT:  You may.
 6              MS. PATEL:  Thank you.
 7                     CROSS-EXAMINATION
 8   BY MS. PATEL:
 9   Q.   Good afternoon, Mr. Wong.
10   A.   Good afternoon.
11   Q.   Good to see you again.
12        You testified that you're the head of royalty controlling
13   at Genentech; is that right?
14   A.   Yes.
15   Q.   And you've been part of the royalty team since 2012.  Do I
16   have that right?
17   A.   Yes.
18   Q.   You also, I think, mentioned that you oversee Genentech's
19   incoming and outgoing royalty payments for various patent
20   license agreements; is that right?
21   A.   Yes.
22   Q.   And that's because sometimes Genentech is a licensee and
23   sometimes Genentech is a licensor; right?
24   A.   Right.
25   Q.   So there's been some discussion of tail royalties today.
```

**PROCEEDINGS**

1    Mr. Johnston is retiring at the end -- in all couple of

2  months after 35 years, and he would like to take a picture of

3  himself with a colleague in the courtroom before court.  I

4  assume we need your permission to do that.

5         **THE COURT:**  You would, but that's okay.

6         **MR. GAFFNEY:**  Thanks.

7         **THE COURT:**  All right.  We'll see you tomorrow.

8         **THE COURTROOM DEPUTY:**  Court is in recess.

9            (Proceedings adjourned at 4:43 p.m.)

10                  ---o0o---

11

12         <u>**CERTIFICATE OF REPORTER**</u>

13    I certify that the foregoing is a correct transcript

14  from the record of proceedings in the above-entitled matter.

15

16  DATE:  Monday, June 30, 2025

17

18

19

20            _Ana Dub_

21  _____

22       Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

23       CSR No. 7445, Official United States Reporter

24

25

**Volume 3**

**Pages 415 - 586**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

```
GENENTECH, INC.,            )
                            )
          Plaintiff,        )
                            )
  VS.                       )   NO. 4:23-cv-00909 YGR
                            )
BIOGEN MA INC.,             )
                            )
          Defendant.        )
_____)
```

Oakland, California
Tuesday, July 1, 2025

<u>**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:

For Plaintiff:

WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, D.C. 20024
**BY:  PAUL B. GAFFNEY, ATTORNEY AT LAW
C. LUKE McCLOUD, ATTORNEY AT LAW
RICARDO LEYVA, ATTORNEY AT LAW**


SKAGGS FAUCETTE LLP
505 Montgomery Street, 11th Floor
San Francisco, California 94111
**BY:  JEFFREY E. FAUCETTE, ATTORNEY AT LAW**


**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter

**APPEARANCES**:  (CONTINUED)

For Defendant:

                            DECHERT LLP
                            Cira Centre
                            2929 Arch Street
                            Philadelphia, Pennsylvania 19104-2808
          BY:  **MARTIN J. BLACK, ATTORNEY AT LAW**

                            DECHERT LLP
                            45 Fremont Street, 26th Floor
                            San Francisco, California 94105
          BY:  **CHARLES HSU, ATTORNEY AT LAW**
                    **MICHAEL H. JOSHI, ATTORNEY AT LAW**

                            DECHERT LLP
                            US Bank Tower
                            633 West 5th Street, Suite 4900
                            Los Angeles, California 90071-2032
          BY:  **NISHA PATEL, ATTORNEY AT LAW**

Also Present:             **Hannah Yuen**

1                          **I N D E X**

2

3    Tuesday, July 1, 2025 - Volume 3

4                                                          **PAGE**   **VOL.**

5    Plaintiff  Rests                                       516      3
     Defense Rests                                          561      3
6

7

     **PLAINTIFF'S WITNESSES**                             **PAGE**   **VOL.**
8
     **STONE, CHRISTOPHER**
9    (SWORN)                                                429      3
     Direct Examination by Mr. McCloud                      429      3
10   Cross-Examination by Ms. Patel                         438      3
     Redirect Examination by Mr. McCloud                    440      3
11

12   **STRATE, CHRISTOPHER**
     (SWORN)                                                442      3
13   Direct Examination by Mr. Leyva                        442      3
     Cross-Examination by Mr. Black                         447      3
14

15   **SEATON, CHRISTOPHER**
     (SWORN)                                                452      3
16   Direct Examination by Mr. McCloud                      452      3
     Cross-Examination by Mr. Black                         474      3
17   Redirect Examination by Mr. McCloud                    489      3
     Recross-Examination by Mr. Black                       497      3
18   Further Redirect Examination by Mr. McCloud            501      3

19

20   **DEFENDANT'S WITNESSES**                             **PAGE**   **VOL.**

21   **BATTLE, CARL**
     By Video Deposition (not reported)                     517      3
22

23   **BUTHUSIEM, EDWARD**
     (SWORN)                                                517      3
24   Direct Examination by Ms. Patel                        518      3
     Cross-Examination by Mr. Gaffney                       534      3
25

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 24 | | 468 | 3 |
| 26 | | 428 | 3 |
| 27 | | 428 | 3 |
| 29 | | 428 | 3 |
| 30 | | 428 | 3 |
| 31 | | 428 | 3 |
| 32 | | 428 | 3 |
| 37 | | 428 | 3 |
| 39 | | 428 | 3 |
| 40 | | 487 | 3 |
| 41 | | 428 | 3 |
| 42 | | 428 | 3 |
| 43 | | 428 | 3 |
| 46 | | 428 | 3 |
| 47 | | 428 | 3 |
| 48 | | 432 | 3 |
| 50 | | 435 | 3 |
| 51 | | 437 | 3 |
| 52 | | 487 | 3 |
| 87 | | 516 | 3 |
| 357 | | 488 | 3 |

<u>**Tuesday - July 1, 2025**</u>                                    <u>**8:00 a.m.**</u>

1

2                    <u>**P R O C E E D I N G S**</u>

3                        ---o0o---

4        (Proceedings were heard out of the presence of the jury.)

5            **THE COURTROOM DEPUTY:**  Thank you.  Please be seated.

6        Good morning again.  Calling the Civil Matter

7   23-CV-909-YGR, Genentech, Incorporated versus Biogen MA,

8   Incorporated.

9            Parties, please step forward and state your appearances

10  for the record, starting with the plaintiff.

11           **MR. GAFFNEY:**  Good morning, Your Honor.  Paul Gaffney,

12  Luke McCloud, Ricardo Leyva of Williams & Connolly for the

13  plaintiff.  Sitting at counsel table is Hannah Yuen of -- the

14  executive at Genentech in charge of the case.

15           **THE COURT:**  Good morning.

16           **MR. BLACK:**  Good morning, Your Honor.  Martin Black,

17  Nisha Patel, Mike Joshi, and Charles Hsu from Dechert for

18  Biogen.

19           **THE COURT:**  Okay.  Good morning.

20       So, Mr. Gaffney, stop leaving the podium.  Or are you not

21  speaking this morning?

22           **MR. GAFFNEY:**  I'm sorry?

23           **THE COURT:**  I said are you not speaking this morning?

24           **MR. GAFFNEY:**  On the matters that have come up that

25  were part of the report, Mr. McCloud is going to handle those.

PROCEEDINGS

1          THE COURT:  Okay.

2          MR. GAFFNEY:  If Your Honor is --

3          THE COURT:  That's fine.

4          MR. GAFFNEY:  -- hearing anything as a leftover from

5     that privilege issue that Mr. Black raised, I would like -- I

6     thought about it, went back and looked, and I would like to

7     bring up something which I think is rather --

8          THE COURT:  So I am going to address that.  I have

9     the -- and I have the late night filing also, which will get

10    addressed this morning.

11        Are there any other issues other than those two?

12         MR. GAFFNEY:  Yes.  We would like to admit the

13    Dickerson exhibits from the deposition yesterday. Mr. Leyva

14    will handle that.  We, I think, agree that this can be done

15    before the jury comes in if we don't...

16         THE COURT:  Okay.  What else?

17         MR. GAFFNEY:  I think that's it from our end.

18         THE COURT:  Mr. Black, anything from your end?

19         MR. BLACK:  Nothing else, Your Honor.

20         THE COURT:  All right.  Let's do the --

21         MR. BLACK:  The privilege issue?

22         THE COURT:  Well, let's deal with Dicker- -- not the

23    exhibits.  Let's deal with the privilege issue first.

24         MR. GAFFNEY:  Yeah.  Your Honor, I went back last

25    night because all this was ringing a bell and I feel like it's

 1   something out of the -- out of the movie Groundhog Day because

 2   I went back and I thought I remembered this.  This exact issue

 3   was in Motion in Limine Number 5, the conclusion of which

 4   asks -- I mean, the same cases.  Genentech should be barred

 5   from making arguments regarding Biogen's legal advice or

 6   assertions of privilege concerning the same.

 7               THE COURT:  Right.  I saw that.

 8               MR. GAFFNEY:  And it was denied.

 9         And I went and did what I did in opening, and now I'm

10   being accused yesterday of stepping over some line.

11               THE COURT:  I should have been more explicit in the

12   order.

13         The motion is denied and I will put -- it's obviously

14   preserved for purposes of appeal, but the motion is denied.

15         Again, I should have been more explicit in the pretrial

16   order.  Frankly, in so many ways, because this is such a -- I

17   know this is a big dollar case, but it's a small case in terms

18   of my time.  I usually don't have two-day, three-day trials.  I

19   should have focused more on being more comprehensive, and I was

20   not.

21         So there are a couple of things.  First is I've gone back

22   and reread the Dickerson deposition.  And I do believe that

23   there is a conflation in the law with respect to the use of

24   lawyers, at least in the Ninth Circuit.  It's not explicitly

25   discussed in the California case law.  But in the

**PROCEEDINGS**

1    Ninth Circuit, communications with counsel can involve both

2    legal and non-legal analysis and can be both business related

3    and legal related.  So that concept exists, and we know that

4    because lawyers have testified today about -- or yesterday, and

5    they serve in business capacities.

6        In this case, based upon my review of the deposition

7    designations, it does appear to me that the questions that

8    Ms. Dickerson were asking were business-related questions to

9    the department, and they are not privileged.

10       That said, to the extent that they are privileged, the

11   privilege was waived.  There is nothing in here that suggests

12   that the actual question or the content of the question was --

13   that an objection at the time was made to those issues or those

14   questions in terms of the content of the question that was

15   received during the examination.

16       In addition, going back and reading the case that was

17   cited, *Carroll v. Communications on* -- I thought I printed

18   it -- *Teacher Credentialing*, this is 56 Cal.App.5th, 365 at

19   380.  That case I find to be distinctly different than the one

20   at issue here.

21       There, there was a significant objection made.  It was

22   timely.  It was discussed.  It was thoroughly litigated during

23   the time of the questioning, during the time of the Court's

24   analysis.  And given the circumstances of how the information

25   even got to the other side suggested that there was potential

**PROCEEDINGS**

 1  issues of attorney-client privilege.  The manner in which it

 2  was disclosed created complications.

 3      This case is nothing, in my view, like *Carroll*.

 4      So as I told you yesterday, the worst thing a trial judge

 5  could have a Court of Appeal find is for me to try some case

 6  again, but if I had to try it again, so be it.

 7      But there's the ruling, and we're going to proceed.  Okay?

 8      **MR. GAFFNEY:**  Thank you, Your Honor.  I'm going to

 9  cede the mic to Mr. McCloud.

10      **THE COURT:**  All right.

11      **MR. BLACK:**  And I'm going to cede the mic to Mr. Joshi

12  or Ms. Patel, depending on which issue you want to take up

13  first.

14      **THE COURT:**  Well, I got your joint report from --

15  I think it was 11:56 last night as opposed to midnight exactly.

16      **MR. BLACK:**  Well, we were waiting for their response,

17  but fortunately, these issues are not too complicated.

18      **THE COURT:**  So we'll take them one at a time.

19      Regarding the playing of Carl Battle, the designations,

20  play the longer video.  You all have given me the time stamps.

21  It's not beyond the realm of possibility that things may be

22  duplicative.  Can I say that it violates 403 because we're

23  talking about two minutes?  No, I cannot.  And they think it's

24  important.  So play the longer video.

25      **MR. JOSHI:**  We'll do that, Your Honor.  Thank you.

PROCEEDINGS

 1          THE COURT:  Next, regarding Mr. Seaton, I have to

 2    find -- I have to find my copy of his report.

 3          MR. McCLOUD:  I have a copy I can hand to you,

 4    Your Honor, if you would prefer.

 5          THE COURT:  So here's the question.  And it's always

 6    the question with experts, and I mentioned this to you all

 7    before.  The testimony has to track his opinions and what he's

 8    disclosed.

 9          MR. McCLOUD:  Yes, Your Honor.

10          THE COURT:  If it does that, then it comes in.  And

11    having a demonstrative that helps the jury can be shown.  If he

12    hasn't referenced it, then it doesn't come in.  It's all about

13    what was disclosed.

14      So tell me the paragraphs that I have to look at that

15    track these slides.

16          MR. McCLOUD:  So, Your Honor, it would be in his

17    redlined opening report, and it's paragraphs 55 and 56.

18          THE COURT:  All right.  Let me grab them.

19      So redline 55?

20          MR. McCLOUD:  Redline 55 and 56, Your Honor.

21          THE COURT:  All right.  Response.

22          MS. PATEL:  Yes, Your Honor.  In this Court's MIL

23    order, it stated that Mr. Seaton may not --

24          THE COURT:  Which one?

25          MS. PATEL:  The June 17th MIL order from this Court.

1    **A.**    I am the chief executive officer and general counsel of

2    PDL BioPharma.

3    **Q.**    Where is PDL located?

4    **A.**    Right now we are located in our homes because we're

5    completely remote and have no office but --

6    **Q.**    And where is your home located, Mr. Stone?

7    **A.**    Northern Nevada.  So it's Gardnerville, Nevada.

8    **Q.**    How long have you worked at PDL?

9    **A.**    Since 2009.

10    **Q.**    And what does PDL do?

11    **A.**    PDL was a fully integrated biotechnology company for a

12    number of years.  In 2009, they split into two pieces.  One was

13    the manufacturing, research, and development capabilities; and

14    then PDL retained the royalty obligation business, the contract

15    business and moved from Redwood City in California to northern

16    Nevada.

17    **Q.**    You mentioned that you're CEO and general counsel of PDL.

18    Broadly speaking, what are your responsibilities in that

19    position?

20    **A.**    As general counsel, I was responsible for all of the legal

21    activities of the company from 2009 to 2020.  And then in 2020,

22    we entered dissolution, and I became the chief executive

23    officer, which effectively manages the monetization of the

24    remaining assets of the company and the distribution of the

25    money to the shareholders.

STONE - DIRECT / McCLOUD

1  **Q.**  Did PDL ever have shares that someone could buy on a stock

2  exchange somewhere?

3  **A.**  Yeah.  PDL was public for 30 years or so.

4  **Q.**  Mr. Stone, are you familiar with the two parties to this

5  litigation, Genentech and Biogen?

6  **A.**  I am familiar with both companies, yes.

7  **Q.**  And how are you familiar with them?

8  **A.**  Generally, but also because they were both licensees of

9  technology that PDL outlicensed.

10  **Q.**  What was the technology that Genentech and Biogen took

11  licenses to?

12  **A.**  The Queen patents.  So the Queen patents were a set of

13  technology invented by Cary Queen related to humanized

14  antibodies.  Humanized antibodies are useful as pharmaceutical

15  products.

16  **Q.**  And generally speaking, for us non-scientists in the room,

17  what did the Queen patents do?

18  **A.**  They provided a method of designing, creating,

19  manufacturing, and using humanized antibodies as

20  pharmaceuticals.

21  **Q.**  Let's start with Genentech.  What products did Genentech

22  have that were made using PDL's technology?

23  **A.**  There were a number.  I think the most prominent were

24  Avastin, Herceptin, Xolair, Lucentis.  There were a few others.

25  Kadcyla comes to mind.

STONE - DIRECT / McCLOUD

1  **Q.**   Did Genentech pay royalties to PDL on the sales of those

2  products?

3  **A.**   They did.   They paid royalties on the net sales of those

4  products.

5  **Q.**   What about Biogen?   What Biogen product or products were

6  covered by the Queen patents and subject to a license?

7  **A.**   Just one product.   Tysabri.

8  **Q.**   And did Biogen pay royalties to PDL on net sales of

9  Tysabri?

10  **A.**   Yes, they did.

11  **Q.**   Have the Queen patents expired?

12  **A.**   They expired at the end of 2014.

13  **Q.**   Mr. Stone, could you turn in your binder to Exhibit 48.

14      **MR. McCLOUD:**   And this is a document the parties have

15  stipulated to admit, Your Honor.

16      **THE COURT:**   Okay.   It's admitted.

17  (Trial Exhibit 48 received in evidence.)

18  **BY MR. McCLOUD:**

19  **Q.**   Mr. Stone, let me know when you're there.

20  **A.**   I'm there.

21  **Q.**   What is this document, Mr. Stone?

22  **A.**   This is the patent license agreement between Protein

23  Design Labs and Elan International.

24  **Q.**   And when did PDL grant this license?

25  **A.**   In 1998.

1   Q.   So I see Protein Design Labs is listed.  Do you know what

2   company that is?

3   A.   Protein Design Labs was the -- was the name of what is now

4   PDL BioPharma.  The name was changed at some later point.

5   Q.   I also see Elan International Services Limited.  Do you

6   have an understanding of why Biogen was paying royalties on a

7   license assigned by Elan?

8   A.   Tysabri was -- was created through a collaboration between

9   Elan -- or marketed between a -- a collaboration between Elan

10  and Biogen.

11  Q.   Mr. Stone, could you turn to page 4 of the agreement.  And

12  I want to direct your attention specifically to Section 3.02.

13       Do you see that provision?

14  A.   I do.

15  Q.   Generally speaking, what did this provision do in the

16  agreement?

17  A.   This is the -- this represents the royalty obligation.  So

18  this is the obligation to pay royalties to PDL in consideration

19  for the license.

20  Q.   It says that PDL will receive 3 percent of the net sales

21  of all licensed products sold by Elan.

22       Do you know what the licensed product was under this

23  license?

24  A.   In this license, it was Tysabri.

25  Q.   Did Biogen ever dispute that Tysabri was a licensed

**STONE - DIRECT / McCLOUD**

1  product under this license?

2  **A.**    They did not.

3  **Q.**    Did Biogen pay PDL 3 percent of the net sales of Tysabri

4  manufactured under this license?

5  **A.**    To my understanding, yes.

6  **Q.**    And, Mr. Stone, can you remind us when the Queen patents

7  expired?

8  **A.**    The last expired in December of 2014.

9  **Q.**    Did Biogen pay royalties under this license to PDL on

10  Tysabri it manufactured before the Queen patents expired but

11  that Biogen sold after the patents expired?

12  **A.**    Biogen continued to pay royalties after expiration.

13  **Q.**    Did PDL agree it was entitled to those royalties?

14  **A.**    Yes.

15  **Q.**    Did PDL ever state publicly somewhere that it believed

16  that this license required Biogen to pay royalties on a

17  stockpile made before the patent expired but sold after?

18  **A.**    We did.

19  **Q.**    Mr. Stone, I'd like you to turn in your binder now to

20  Exhibit 50.

21  **A.**    Okay.

22  **Q.**    And do you recognize this document, Mr. Stone?

23  **A.**    This is a Form 10-Q that was filed by PDL BioPharma with

24  the Securities and Exchange Commission.

25  **Q.**    Were you involved in drafting this document?

1    **A.**    Involved in drafting and reviewing, yes.

2    **Q.**    Was this document prepared and kept in the ordinary course

3    of PDL's business?

4    **A.**    It was.

5            **MR. McCLOUD:**  Your Honor, I'd move the admission of

6    Exhibit 50.

7            **THE COURT:**  Any objection?

8            **MS. PATEL:**  No objection.

9            **THE COURT:**  It's admitted.

10    (Trial Exhibit 50 received in evidence.)

11    **BY MR. McCLOUD:**

12    **Q.**    Mr. Stone, could you please turn to page 40 of the

13    agreement -- or of the 10-Q.

14    **A.**    Okay.

15    **Q.**    And I want to direct your attention to the paragraph that

16    begins with the header "Biogen Idec."

17            Do you see that?

18    **A.**    I do.

19    **Q.**    Now, within that paragraph, there is a statement that says

20    [as read]:

21            "Our license agreement with Elan entitles us to

22            royalties following the expiration of our patents

23            with respect to sales of licensed product

24            manufactured prior to patent expiry in jurisdictions

25            providing patent protection."

STONE - DIRECT / McCLOUD

1     Did I read that correctly?

2  **A.**  You did.

3  **Q.**  And was that PDL's position with respect to its license

4  with Biogen?

5  **A.**  It was, yes.

6  **Q.**  Did PDL ever disagree with the statement I just read and

7  take the position that it did not need to pay royalties on a

8  stockpile of Tysabri made before the patent expired but sold

9  after?

10  **A.**  I think you mean Biogen.

11  **Q.**  I'm sorry.

12  **A.**  Yeah.

13  **Q.**  Did Biogen ever take that position?

14  **A.**  Biogen never took that position with us.

15  **Q.**  Did Biogen ever object to paying royalties on sales of

16  Tysabri after the Queen patents expired?

17  **A.**  They did not.

18  **Q.**  Did Biogen ever contact PDL after the Queen patents

19  expired and say, "Hey, our accounting folks made a big mistake

20  and we want this money back"?

21  **A.**  That never happened.

22  **Q.**  How long after the Queen patents expired did Biogen

23  continue paying royalties to PDL?

24  **A.**  It was up into 2019.

25  **Q.**  Mr. Stone, can you turn in your binder to Exhibit 51.

1    **A.**    Okay.

2    **Q.**    Do you recognize this document?

3    **A.**    I recognize this as a series of documents that are royalty

4    reports sent from Biogen to PDL.

5    **Q.**    Were these reports kept in the ordinary course of PDL's

6    business?

7    **A.**    Yes, they were.

8         **MR. McCLOUD:**  Your Honor, I'd move the admission of

9    Exhibit 51.

10         **THE COURT:**  Any objections?

11         **MS. PATEL:**  No objections, Your Honor.

12         **THE COURT:**  It's admitted.

13    (Trial Exhibit 51 received in evidence.)

14    **BY MR. McCLOUD:**

15    **Q.**    Mr. Stone, how much in royalties did Biogen pay to PDL

16    after the Queen patents expired?

17    **A.**    It was somewhere in the range of $140 million.

18    **Q.**    And was that $140 million on sales of Tysabri made before

19    the patents expired but sold after?

20    **A.**    Presumably, yes.

21    **Q.**    One more question, Mr. Stone.  After the Queen patents

22    expired, did Genentech continue to pay royalties on sales of

23    its products made before the Queen patent expired but sold

24    after?

25    **A.**    They did.

STONE - CROSS / PATEL

1   **A.**   I was not.

2   **Q.**   Okay.  I just want to talk briefly about your company,

3   PDL BioPharma.

4        It's correct that in December 2008, PDL BioPharma spun out

5   all of its manufacturing operations to a company called Facet;

6   is that right?

7   **A.**   That's correct, yes.

8   **Q.**   And after the spinoff, you'd agree that PDL retained only

9   the royalty piece, the royalty receipt piece of the company?

10  **A.**   I'm not sure if "only" is accurate, but PDL did retain the

11  royalty piece, yes.

12  **Q.**   Okay.  Well, is it fair to say, then, that since the

13  spinoff in 2008, PDL has largely been on the receiving end of

14  royalty payments?

15  **A.**   Yes.  Yes.  It's fair to say that from -- PDL acquired --

16  or PDL retained the royalty agreements and retained the royalty

17  obligations of PDL BioPharma.

18  **Q.**   Now, you've been in the biopharma space since at least

19  2009.  Maybe before that?

20  **A.**   Well before that, yeah.

21  **Q.**   You would agree, wouldn't you, that the question of

22  whether a licensee must pay tail royalties involves an

23  agreement-by-agreement analysis?

24  **A.**   Yes.

25  **Q.**   And that question of whether tail royalties are due is

STONE - REDIRECT / McCLOUD

1  ultimately based on the language of the underlying contract;

2  right?

3  **A.**   Of course.

4  **Q.**   Now, you understand that this trial here, the reason why

5  we've all gathered is to discuss a license agreement between

6  Genentech and Biogen; right?

7  **A.**   That's my understanding, yes.

8  **Q.**   PDL isn't a party to that agreement?

9  **A.**   We are not.

10  **Q.**   And you weren't involved in any of the discussions leading

11  up to the agreement between Genentech and Biogen; right?

12  **A.**   I was not.

13  **Q.**   You don't have any personal knowledge about the license

14  agreement at issue in this case; yes?

15  **A.**   I have no personal knowledge.

16          **MS. PATEL:**   Okay.  Thank you, Mr. Stone.

17          **THE COURT:**   Any redirect limited to the scope of

18  cross?

19                    <u>**REDIRECT EXAMINATION**</u>

20  **BY MR. McCLOUD:**

21  **Q.**   Mr. Stone, can you remind us how long you've worked in the

22  biopharma industry?

23  **A.**   Since 1990.

24  **Q.**   And based on your experience since 1990, do you have an

25  understanding of whether there's any industry custom and

STONE - REDIRECT / McCLOUD

1  practice relating to the payment of royalties on product made

2  before a patent expires but sold after?

3  **A.**    I mean, I can say I've never done an exhaustive analysis

4  of an agreement that's out there, but my personal practice

5  would typically be to -- as a licensor, I would expect to be

6  paid on -- royalties on product that was manufactured under the

7  patent.

8          **MR. McCLOUD:**  No further questions.

9          **THE COURT:**  Any recross limited to those questions?

10          **MS. PATEL:**  No, Your Honor.

11          **THE COURT:**  Is there any reason to maintain this

12  witness in recall status?

13          **MR. McCLOUD:**  No, Your Honor.

14          **MS. PATEL:**  No, Your Honor.

15          **THE COURT:**  All right.  Then you're excused.  Thank

16  you.

17          **THE WITNESS:**  Thank you, Your Honor.

18                      (Witness excused.)

19          **THE COURT:**  Next witness.

20          **MR. LEYVA:**  Your Honor, Genentech calls Christopher

21  Strate.

22    (Witness enters the courtroom and steps forward to be sworn.)

23          **THE COURTROOM DEPUTY:**  Please remain standing and

24  raise your right hand to be sworn, sir.

25  \\\

STRATE - DIRECT / LEYVA

```
 1                    CHRISTOPHER STRATE,

 2  called as a witness for the Plaintiff, having been duly sworn,

 3  testified as follows:

 4            THE WITNESS:  I do.

 5            THE COURTROOM DEPUTY:  Thank you, sir.  Please be

 6  seated and speak clearly into the microphone.

 7            MR. LEYVA:  Good morning, Mr. Strate.

 8            THE COURT:  Hold on.

 9            THE COURTROOM DEPUTY:  Please state your full name and

10  spell out your last name for the record.

11            THE WITNESS:  Christopher Strate, S-t-r-a-t-e.

12            THE COURTROOM DEPUTY:  Thank you, sir.

13            THE COURT:  Good morning.

14            THE WITNESS:  Good morning.

15            THE COURT:  You may proceed now.

16  BY MR. LEYVA:

17  Q.   Good morning, Mr. Strate.  What do you do for work?

18  A.   I'm an intellectual property attorney with the Gibbons law

19  firm in Newark, New Jersey.

20  Q.   Have you done any work involving either party in this

21  case?

22  A.   I was opposing counsel in a litigation representing

23  The Medicines Company against Biogen.

24  Q.   Could you describe that dispute for the jury.

25  A.   So The Medicines Company was a licensee to Biogen.  Biogen
```

STRATE - DIRECT / LEYVA

```
 1   licensed some intellectual property, know-how patents to

 2   The Medicines Company for a product called Angiomax, and at

 3   some point the patent term for the U.S. patent ended and

 4   The Medicines Company concluded that it no longer owed a

 5   royalty to Biogen.

 6   Q.   Did the dispute involve a patent license?

 7   A.   Yes.

 8   Q.   And was the dispute about the amount of royalties that

 9   were owed on that patent license?

10   A.   Yes.

11   Q.   Was there a lawsuit that was filed in that case?

12   A.   Yes.   Initially, Biogen reached out to The Medicines

13   Company and informed The Medicines Company that it owed a

14   continuing duty to pay royalties to Biogen.   The Medicines

15   Company disagreed, and so we filed suit in the District of

16   New Jersey on behalf of -- on behalf of The Medicines Company,

17   wanting to get clarity that The Medicines Company no longer

18   owed money to Biogen.

19   Q.   Did Biogen assert any claims of its own?

20   A.   Yes.   A counterclaim that The Medicines Company had a

21   continuing duty to pay.

22   Q.   When did this lawsuit happen?

23   A.   I believe it was instituted sometime around 2015.

24   Q.   Could you please turn to Exhibit 30 in your binder.

25         MR. LEYVA:   This has already been admitted into
```

1    evidence.

2         Mr. Morales, could you please pull it up.

3    **BY MR. LEYVA:**

4    **Q.**   Mr. Strate, is this the license that you're talking about?

5    **A.**   Yes.

6    **Q.**   When did Biogen and TMC execute it?

7    **A.**   The agreement indicates that it was in March 1997.

8    **Q.**   Could you please now turn to Exhibit 37 in your binder.

9         **MR. LEYVA:**   And this has also already been admitted

10   into evidence.  So, Mr. Morales, could you please pull that up.

11   **BY MR. LEYVA:**

12   **Q.**   Mr. Strate, what is this?

13   **A.**   This is a letter from Biogen's counsel to Steve Rodin, who

14   was the general counsel for The Medicines Company, informing

15   Mr. Rodin that Biogen believed that The Medicines Company had a

16   continuing duty to pay a royalty to Biogen.

17   **Q.**   Did Biogen's lawyers offer their interpretation of the TMC

18   license?  And I can direct your attention to the bottom part of

19   the first page.

20   **A.**   I believe so, yes.

21   **Q.**   So what I've blown up on the screen, Mr. Strate, this says

22   that Biogen said that Section 6.3(d) of the license agreement

23   required TMC to pay royalties for the sale of any product

24   manufactured in a country in which Biogen patent rights are in

25   force at the time of manufacture, regardless of when or where

**STRATE - DIRECT / LEYVA**

 1    such product is later sold.

 2         Do you see that?

 3    **A.**    Yeah, that's what letter says.

 4         **MR. LEYVA:**    Mr. Morales, could you please pull up

 5    Section 6.3(d) in the TMC license in Exhibit 30.

 6    **BY MR. LEYVA:**

 7    **Q.**    Mr. Strate, is this the Section 6.3(d) that Biogen is

 8    referring to in the letter?

 9    **A.**    That would be my understanding.

10    **Q.**    Was Biogen's position that even though its patent had

11    expired, TMC had to keep paying royalties until TMC sold all

12    the licensed product it had in inventory as of that date?

13    **A.**    I believe that was the claim.

14    **Q.**    Did Biogen ever tell TMC that it was changing this

15    position?

16    **A.**    I don't recall that.

17    **Q.**    Could you please turn to admitted Exhibit 32.

18         **MR. LEYVA:**    Mr. Morales, could you please pull that

19    up.

20    **BY MR. LEYVA:**

21    **Q.**    What is this document?

22    **A.**    This document is Biogen's answer to The Medicines

23    Company's complaint and counterclaims.

24    **Q.**    Let's turn to paragraph 5, and I've put that up on the

25    screen.

1          So Biogen said that they were seeking [as read]:

2               ". . . a judgment requiring TMC to pay Biogen

3          royalties for Angiomax and Angiox manufactured and/or

4          imported during the term of a licensed patent, and

5          thus using Biogen Patent Rights, but which were

6          ultimately sold after patent expiration."

7          Do you see that?

8     A.   Yes.

9     Q.   Was that Biogen's position throughout the dispute?

10    A.   That was one of their positions, yes.

11    Q.   During the litigation, did Biogen make any arguments about

12    whether its reading of the TMC license followed industry custom

13    and practice?

14    A.   I believe so.

15    Q.   Did Biogen -- did Biogen hire an expert to support this

16    position?

17    A.   Yes.

18    Q.   In this case, Biogen hired Edward Buthusiem.  Are you

19    familiar with him?

20    A.   No.

21    Q.   Did Biogen hire him in the case involving TMC?

22    A.   Not to my knowledge.

23    Q.   Did Biogen ever tell TMC that it had changed its mind and

24    no longer believed its reading of the license was consistent

25    with industry custom and practice?

1    **A.**    I don't recall that.

2    **Q.**    Did your case go to trial?

3    **A.**    No.

4    **Q.**    What was the outcome?

5    **A.**    Ultimately, the parties settled.

6    **Q.**    When?

7    **A.**    I don't recall.  A couple of years after the litigation

8    was filed.

9    **Q.**    Did TMC pay Biogen any money?

10    **A.**    I believe there was a settlement payment, yeah.

11              **MR. LEYVA:**  Thank you, Mr. Strate.

12              **THE COURT:**  Cross.

13                        **CROSS-EXAMINATION**

14    **BY MR. BLACK:**

15    **Q.**  Good morning, Mr. Strate.

16    **A.**  Good morning.

17    **Q.**  Where do you reside, sir?

18    **A.**  What town?  I'm sorry?

19    **Q.**  Well, what state first?

20    **A.**  New Jersey.

21    **Q.**  Where in New Jersey?

22    **A.**  Harrington Park.

23    **Q.**  Have you been retained by Genentech as counsel in this

24    case?

25    **A.**    No.

STRATE - CROSS / BLACK

1  Q.   Are they paying for you to be here today?

2  A.   To testify?  No.

3  Q.   Are they paying -- do you have a consulting agreement with

4  them?

5  A.   No.

6  Q.   Is TMC paying your hourly rate to be here today?

7  A.   No.

8  Q.   You mentioned during your direct examination that there

9  was a claim made by Biogen against The Medicine Company.

10 I think you said that there was more than one claim that was

11 being made in that case; is that right?

12 A.   Yes.  There was alternative theories.

13 Q.   What was the other theory that Biogen asserted in that

14 case?

15 A.   That The Medicines Company diverted sales that would have

16 otherwise occurred during the patent term until after the

17 patent expired.

18 Q.   Right.  What happened, actually, is that Biogen hired KPMG

19 to do an audit of TMC; right?

20 A.   I believe that's true, yes.

21 Q.   And after the audit, KPMG reported that there were

22 suspicious sales that had been made just after the patent

23 expired which, had they been made before the patent expired,

24 TMC would have paid on; correct?

25 A.   I don't recall the -- I mean, I know KPMG issued a report.

 1   I don't recall the specific findings from that report.  I don't

 2   remember if they ultimately found that a royalty was due

 3   because of suspicious activities or because of the agreement

 4   itself.

 5   **Q.**   You do recall, though, the counterclaim filed by Biogen

 6   that you just testified about a few minutes ago; right?

 7   **A.**   Yes.

 8           **MR. BLACK:**  If we could pull up Exhibit 32, page 15.

 9   **BY MR. BLACK:**

10   **Q.**   So this is Count III for "Breach of Contract - Implied

11   Covenant of Good Faith and Fair Dealing."

12        Do you see that?

13   **A.**   Yes.

14   **Q.**   And in paragraph 51, Biogen alleged that [as read]:

15           "On information and belief, TMC delayed and/or

16        shifted significant amounts of sales of Angiomax

17        product into the days following the expiration of the

18        '404 patent, in an attempt to avoid its royalty

19        obligations to Biogen."

20        Correct?

21   **A.**   I see that.

22   **Q.**   And this dispute involved both claims, a tail royalty

23   claim and a breach of good faith claim; correct?

24   **A.**   Correct.

25   **Q.**   And ultimately, the parties settled the dispute, and TMC

1   agreed to pay approximately $5 million; right?

2   **A.**   I'm -- I'll have to trust you on the number.  I don't

3   recall.

4   **Q.**   And you don't recall the settlement breaking out the

5   amount that was paid for the tail royalty claim and the

6   covenant of good faith claim, do you?

7   **A.**   I recall that the settlement had a periodic distribution

8   amount.  I don't remember if it was pinned to anything

9   particular.

10  **Q.**   Did the settlement agreement, do you recall, have any

11  statement that the parties were agreeing with respect to

12  liability and the division of the dollars into any specific

13  claim?

14  **A.**   I would imagine not.

15  **Q.**   You would agree that to determine whether post-expiration

16  royalties are due, you have to actually read an agreement;

17  correct?

18  **A.**   Yes.

19  **Q.**   And you referred to a paragraph from the agreement, but

20  I'd like you to take a look for a moment at Exhibit 30, which

21  is the agreement.  Just when you have that in front of you,

22  tell me.

23  **A.**   Mm-hmm, I have it.

24  **Q.**   This agreement has a Section 1, "Definitions."

25      Do you see that?

1   **A.**   Yes.

2   **Q.**   And this is fairly typical to start an agreement with a

3   definitional section of capitalized terms; correct?

4   **A.**   Correct.

5   **Q.**   Is there a definition of calendar quarter in the

6   definitions section of this agreement?

7   **A.**   Well, assuming that it would be in the alphabetical list,

8   I don't see that.

9          **MR. BLACK:**  Thank you.  No further questions.

10         **THE COURT:**  Redirect limited to the scope of cross.

11         **MR. LEYVA:**  No further questions, Your Honor.

12         **THE COURT:**  All right.  Is there any reason why this

13   witness should be subject to recall status?

14         **MR. LEYVA:**  No, Your Honor.

15         **THE COURT:**  Mr. Black?

16         **MR. BLACK:**  No, Your Honor.

17         **THE COURT:**  You're excused.

18         **THE WITNESS:**  Thank you.

19                (Witness excused.)

20         **THE COURT:**  Next witness.

21         **MR. McCLOUD:**  Your Honor, Genentech calls Christopher

22   Seaton.

23           (Witness steps forward to be sworn.)

24         **THE COURTROOM DEPUTY:**  Please raise your right hand to

25   be sworn, sir.

SEATON - DIRECT / McCLOUD

1    one I'm actually proudest of is an award we won in 2007 for a

2    deal we did with the Global Alliance for Tuberculosis, and it

3    won the public-private partnership from the LES in 2007.  It

4    didn't make us any money, but it actually brought drugs to

5    developing countries that really needed it.

6    Q.   Mr. Seaton, have you served as an expert witness in a case

7    before this one?

8    A.   Yes, sir, I have.

9    Q.   How many times?

10   A.   I served as an expert in a court trial in Chicago and,

11   more recently, as an expert in an international arbitration in

12   New York City.

13   Q.   And was your expert testimony accepted in both cases?

14   A.   Yes, sir, it was.

15            MR. McCLOUD:  Your Honor, I move to qualify Mr. Seaton

16   as an expert on pharmaceutical licensing and negotiation.

17            THE COURT:  Any --

18            MR. BLACK:  No, objection, Your Honor.

19            THE COURT:  All right.  He's admitted as such.

20   BY MR. McCLOUD:

21   Q.   Mr. Seaton, I'd like to turn to this case.

22        Have you been attending trial so far?

23   A.   Yes, sir, I have.

24   Q.   And were you here for the testimony of Genentech's general

25   counsel, Sean Johnston?

SEATON - DIRECT / McCLOUD

1   A.   Yes, sir, I was.

2   Q.   Did you hear Mr. Johnston testify about his understanding

3   of industry custom and practice in 2004 with respect to payment

4   of royalties on products made before but sold after a patent

5   expired?

6   A.   Yes, sir.  I heard him testify that he believed, as I do,

7   that if you make a product under a license while the patent is

8   valid and then sell it afterwards, that there would be an

9   expectation that you would pay a royalty when you sell the

10  product.

11  Q.   So is Mr. Johnston's understanding of custom and practice

12  consistent with your own understanding?

13  A.   It is virtually identical, sir.

14  Q.   Has the custom and practice on the issue of tail royalties

15  or the payment of royalties made -- on product made before and

16  sold after changed since 2004?

17  A.   No, sir, it hasn't.

18  Q.   Has the custom and practice on that issue been the same

19  during your entire career?

20  A.   It has been during my entire career and I suspect will

21  continue.

22  Q.   Under your understanding of industry custom and practice,

23  when does the obligation to pay royalties arise?

24  A.   Well, especially in the case of a freedom to operate

25  license or a manufacturing product, the obligation arises when

 1   you do something which you couldn't otherwise do if you didn't

 2   have a license.

 3        So when you make the product, that's when the obligation

 4   arises.  The payment will come later when you sell it.  But the

 5   obligation arises the minute you do that triggering event.

 6   Q.  So let's say that I make a bunch of product that's covered

 7   by the license and I stock it away in my warehouse somewhere.

 8   How do I figure out what my royalty obligation is going to be?

 9   A.  Well, you don't know the exact amount because you haven't

10   had a sale; right?  But you know you have an obligation when

11   you sell it.  And that will depend on the price that you sell

12   it at and, you know, how much of it you sell.  That will tell

13   you exactly what the number is.

14        But you've got it sitting there.  I mean, and it's

15   licensed product.  So when you sell it, you're going to have an

16   obligation.

17   Q.  Well, what happens if I don't sell the product?

18   A.  Ah, well, so there are many reasons.  You know, you may

19   have a product.  It may expire before you sell it so you can't

20   sell it.  Your warehouse might burn down and you don't sell it.

21   But then you don't have a sale.  Put it this way:  The

22   effective price of that is zero, so there is no royalty.  If

23   you don't sell it, there's no royalty to be paid.

24   Q.  Under your understanding of industry custom and practice,

25   when does the obligation to pay a royalty end?

1   **A.**   Well, that one is also pretty straightforward, to me

2   anyway.  Your obligation will end when you run out of licensed

3   product.  Right?  You made the licensed product.  You made the

4   product.  It's licensed because you couldn't have made it if

5   you didn't have a license.  And as long as you're selling that,

6   you will pay a royalty.

7        When you run out of that -- now, I'm presuming that you

8   will continue to make product -- right? -- but now it's not

9   licensed product because you're making it after the patent has

10  expired.

11       So when you run out of licensed product, that's when your

12  obligation to pay will end.

13  **Q.**   Mr. Seaton, do you have a sense for why the custom and

14  practice that Mr. Johnston testified about and you've testified

15  about exists within the industry?

16  **A.**   Yes.  I mean, look, it's a fundamental principle; right?

17  The licensee is not going to get something for nothing, and the

18  licensor doesn't expect to get nothing for something.  So the

19  licensor has given you this right, this freedom to operate, to

20  use their patent to make your product; and they expect, as part

21  of the bargain, that when you sell it, you are going to pay

22  them.

23       If you didn't have that expectation, it would be like

24  giving away the last year or two, or even more, of

25  manufacturing for free, and that would be an enormous

 1    concession.  It could be hundreds of millions of dollars.  It

 2    would be fundamentally unfair.

 3        So that's -- that's the principle behind it.  I mean, it's

 4    not rocket science.

 5    **Q.**   Mr. Seaton, is it possible for parties to do something

 6    different than the custom and practice that you've just

 7    described?

 8    **A.**   Oh, yes, it's quite possible.

 9    **Q.**   And in your experience, if the parties want to do

10    something different, how does that happen?

11    **A.**   Well, I mean, you know, certainly, my career, I always

12    wanted to do something different because you want to pay as

13    little as you can.  I mean, that's -- that was my job.

14        So what you do if you want to deviate from that is you

15    negotiate it and you write it down and you put it in the

16    contract.  Right?  Because you want to make it clear what your

17    limitation is when you have -- when you don't have to pay a

18    royalty.

19    **Q.**   And, Mr. Seaton, in your experience, if the parties want a

20    limitation of the sort you've described, where would that be

21    located in the agreement?

22    **A.**   Well, that one, again, is for me pretty straightforward,

23    and this is certainly what I would be doing.  There's always a

24    section in the contract that tells you what you're going to

25    pay.  So, you know, often, again, my experience, definitions

1    are Section 1, the license grant is Section 2, and by the time

2    you get to 3, you want to put the financial consequences there.

3    So you have the royalties, you have the up-front payments.

4        That's the place you put your carve-out; right?  It

5    doesn't matter what the section number is, but where it says

6    this is what your royalty is, if I want to limit my royalty or

7    I want to limit any payments, that's where I put it.

8    Q.   Mr. Seaton, do you have experience writing the sort of

9    carve-out you just described?

10   A.   Oh, yes, sir.  I mean, this kind of issue came up all the

11   time, and not just in the case of manufacturing royalties,

12   because that's just a subset is what they're talking about

13   here.  But there are often people who try to get all kinds of

14   different payments that run out beyond the patent.

15       And like most people, I'd rather pay less than more.  So I

16   would write -- negotiate and write these things often and

17   usually successfully get them put into the contract.

18   Q.   Mr. Seaton, have you been attending the trial so far?

19   A.   Yes, sir, I have.

20   Q.   And have you reviewed evidence in this case?

21   A.   Yes, sir, I have.

22   Q.   And based on what you've reviewed, are you aware of any

23   examples where companies negotiated the sort of carve-out that

24   you're describing?

25   A.   Yes, sir.

1    Q.   What example are you thinking?

2    A.   Well, the classic one is the Abbott renegotiation of their

3    contract with Genentech, where Abbott came back to Genentech

4    and renegotiated an existing contract to explicitly carve out

5    the possibility that they would have to pay royalties on

6    product made before the patent expired but sold afterwards.

7    Q.   Mr. Seaton, if the parties wanted to negotiate the sort of

8    carve-out that you've described and that you believe is in the

9    Abbott agreement, would you expect that to be the subject of

10   negotiation between the parties?

11   A.   Oh, yeah.  I mean, look, we're talking big dollars here.

12   So this is not the kind of thing that you just, you know, slip

13   in somewhere.  You're going to sit down and you're going to

14   negotiate.  And frankly, sometimes you're going to fight over

15   this issue.  I mean, you know, one party wants one thing; one

16   party wants the other.  So I would expect to see significant

17   evidence of negotiation on this issue, and I would expect to

18   see significant discussion internally within the company.

19   Q.   I want to ask you a couple of questions about your

20   experience with respect to the timing of these sorts of

21   negotiations.

22        In your experience, when a drug company wants a license to

23   another company's patent, when do they typically approach that

24   other company?

25   A.   So, to be fair, that can vary widely.  Look, it's a little

1    like, you know, you're taking your family on vacation; right?

2    And you want to buy the airline tickets well in advance; you're

3    going to get a good deal.  If you try to buy an airline ticket

4    the week before you fly to Hawaii, you're going to pay what

5    they want.  So from a leverage and negotiating standpoint, you

6    want to come earlier; right?

7        Now, the flip side of that -- and you know, by the way,

8    your manufacturing process quite early here, because before you

9    can put the drug into a human being, you have to finalize your

10   manufacturing process and you have to tell FDA how you make it.

11   So, typically, with these kinds of things, you could go very

12   early and get a good deal.

13       Some people, though, prefer to go a little later because

14   their drug might fail and they don't want to make the up-front

15   payments and all these other things and then have nothing for

16   it.

17       But you don't want to wait too late because you lose your

18   leverage.

19   **Q.**   Could the patent owner take advantage of that situation?

20   **A.**   Sure.  I mean, if you -- look, if you come late, they know

21   you need a patent; right?  The stuff is not secret.  We know

22   what clinical trials are going on.  We know when the filing is

23   expected with FDA, that sort of thing.  So you could expect the

24   patent owner to -- to use their leverage.  I mean, this happens

25   often.  And certainly they're not going to make any

1    concessions.  Let's put it that way.

2    Q.   Mr. Seaton, I want to turn back to your opinion on custom

3    and practice.  You said that you had reviewed evidence in this

4    case.

5    A.   Yes, sir.

6    Q.   Could you turn in your binder to Exhibit 1, already in

7    evidence.

8    A.   Yes, sir.

9    Q.   Do you recognize this document?

10   A.   Yes.  This is the agreement between Genentech and Biogen.

11   Q.   And have you reviewed this document?

12   A.   Yes, sir.  I have read it a number of times.

13   Q.   Were you here for the testimonies of Mr. Johnston and

14   Mr. Schwartz about the negotiation of this agreement?

15   A.   Yes, sir, I was.

16   Q.   And have you reviewed other documents relating to this

17   agreement?

18   A.   Yes, sir.  I've reviewed a number of documents.

19   Q.   And based on the evidence that you have heard and reviewed

20   so far, have you seen any evidence that is consistent with your

21   understanding of industry custom and practice?

22   A.   Yes, sir, I have.

23   Q.   And what evidence are you referring to?

24   A.   So I've seen three buckets of evidence, is how I'll put

25   it:  the TMC agreement and issue between Biogen and TMC,

 1    the -- Biogen's other Tysabri licenses, and the projections.

 2         I actually prepared a slide for that.

 3    **Q.**    Sure.

 4              **MR. McCLOUD:**  Mr. Morales, could you pull up that

 5    slide, please.

 6              **THE WITNESS:**  So, yeah.  So, you know, these are

 7    the -- these are three buckets of evidence around custom and

 8    practice that I've seen.

 9    **BY MR. McCLOUD:**

10    **Q.**    All right.  Mr. Seaton, let's go through these one by one,

11    and we'll start at the top.

12         You mentioned the TMC litigation.  Why do you cite that

13    evidence as being consistent with your understanding of custom

14    and practice?

15    **A.**    Yeah.  So this is a really interesting case because Biogen

16    was in Genentech's shoes; right?  Biogen had licensed a

17    product -- or licensed the rights to TMC.  I think it's for

18    Angiomax and Angiox.  But they had licensed products to TMC.

19         And TMC essentially didn't want to pay royalties on

20    product that was manufactured before the patent expired but

21    sold afterwards.  And Biogen cross-sued or countersued to get

22    paid for exactly the same thing.

23    **Q.**    Mr. Seaton, did you review the license agreement that was

24    at issue in the TMC litigation?

25    **A.**    Yes, sir, I did.

**SEATON - DIRECT / McCLOUD**

1  Q.   And, in your opinion, is that agreement similar to

2  Biogen's agreement with Genentech?

3  A.   Yeah.  Well, I mean, look, the agreements are obviously

4  different; right?  Different companies, different products.

5  But with regard to the relevant sections which deal with this

6  issue of product that's manufactured before the patent expired

7  but sold afterwards, they are functionally identical.

8  Q.   Do you recall when the TMC license agreement that Biogen

9  had was signed?

10 A.   Yes, sir.  I believe it was signed in 1997.

11 Q.   And is it your understanding that industry custom and

12 practice has changed between 1997 and 2004?

13 A.   No, sir.  It didn't change from '97 to 2004, it didn't

14 change to 2015 when this case was around, and it hasn't changed

15 since.

16 Q.   Mr. Seaton, the second bucket of evidence that you cited

17 is Biogen's royalty payments to other patent owners.

18     Why is that evidence significant to you?

19 A.   So this is what -- this is evidence of what Biogen

20 actually did; right?  So I have a slide for this, sir.

21 Q.   Sure.

22         MR. McCLOUD:  Mr. Morales, can you call up that slide.

23         THE WITNESS:  So Biogen needed other licenses in order

24 to be able to make Tysabri.  It wasn't just the Cabilly patent.

25 They had to go to a bunch of other people.

1        And for these five, they actually paid royalties on sales

2   that they made after the patent expired but sales of product

3   that they had made before, so licensed product; right?

4        So this is what they actually did, which is completely in

5   line with what I have described and, I think, Mr. Johnston

6   described as industry custom and practice.

7   BY MR. McCLOUD:

8   Q.   Mr. Seaton, you listed five different license agreements

9   here.  Did you review each of these license agreements?

10  A.   Yes, sir, I did.

11  Q.   And, in your opinion, are these licenses similar to

12  Biogen's license with Genentech for the Cabilly patent?

13  A.   Yes.  Again, they are different because different

14  companies, different products.  But with regard to this issue

15  of when you make a licensed product and then sell it after the

16  patent expires, with that -- in that regard, the contracts are

17  functionally identical.

18  Q.   Mr. Seaton, what is the significance, if any, of the dates

19  that you've listed on your chart?

20  A.   So I've got two sets of dates here.  The first on the left

21  side is the date the licensing agreement was done, and you can

22  see that these start from well before April 1992 through to

23  well after June 2006, the Cabilly patent agreement.  So they

24  bookend, if you will, the Genentech-Biogen agreement.  And to

25  me, that just shows you the custom and practice over time.

1          And then on the right side, I show when the patents

2    expired; right?  So this is the date, and then after that date,

3    Biogen sold product and paid royalties on this.  And you can

4    see, again, here that from February of 2014 all the way through

5    to July of 2020, before and after the Cabilly patent expired,

6    Biogen was paying these post-expiration royalties.

7    **Q.**   Do you know whether any of the companies you've listed

8    here ever gave back to Biogen a portion of the money that

9    Biogen paid?

10   **A.**   Yes, sir.  I believe GSK and MRC both refunded or returned

11   or repaid some portion of the monies that they were -- they

12   were owed.

13   **Q.**   And how, if at all, does that fact change your

14   understanding of industry custom and practice?

15   **A.**   Oh, that don't change my understanding at all, sir.

16   **Q.**   Why is that?

17   **A.**   Well, again, what I'm showing here and the evidence I'm

18   showing is about what Biogen actually did.  I have no idea for

19   what reason MRC and GSK, you know, chose to do what they did.

20   They have their own reasons, and I can't -- I can't speak to

21   that.  But Biogen paid.

22          And just one other point.  Even after MRC and GSK refunded

23   the money to Biogen, Biogen continued to pay to these other

24   licensees.

25   **Q.**   Mr. Seaton, the last category of evidence you mentioned

1    were Biogen's internal projections.  I'd like you to turn in

2    your binder to Exhibits 24, 26, and 27.

3    **A.**    Yes, sir.

4    **Q.**    And do you recognize these documents?

5    **A.**    Yes, sir, I do.

6    **Q.**    What are these documents?

7    **A.**    These documents are the internal projections done by

8    Mrs. Dickerson of Biogen.  I think she was Kristina Ramos at

9    the time.  Basically, they were Biogen's internal projections

10   of their royalty obligations over time.

11   **Q.**    And did you rely on these projections in forming your

12   opinions in this case?

13   **A.**    Yes, sir, I did.

14         **MR. McCLOUD:**  Your Honor, I move the admission of

15   Exhibit 24.  Exhibits 26 and 27 are already in evidence.

16         **MR. BLACK:**  No objection subject to our prior

17   objection.

18         **THE COURT:**  24 is admitted.

19       (Trial Exhibit 24 received in evidence.)

20         **THE COURT:**  Objection is noted.

21         **MR. McCLOUD:**  All right.  Mr. Morales, can you put up

22   24, 26, and 27, please.

23   **BY MR. McCLOUD:**

24   **Q.**   All right.  So, Mr. Seaton, can you orient us here and

25   tell us what we're seeing.

**SEATON - DIRECT / McCLOUD**

1    **A.**   Yes.  So what we're looking at here are essentially copies

2    of spreadsheets that Biogen did in 2014, in 2015, and 2017.

3    And these are the spreadsheets that show their projections for

4    how much royalty they were going to pay over time.

5    **Q.**   So you mentioned 2014, 2015, 2017.  Are you aware of a

6    projection for 2016 that's not being shown here?

7    **A.**   I have not seen a 2016 projection, sir.  But what I'm

8    seeing here is a consistent practice, and I will notice that

9    even the form of the spreadsheet in '15 and '17 is identical.

10   **Q.**   So, Mr. Seaton, why are these projections significant to

11   your understanding of industry custom and practice?

12   **A.**   So let's understand why these projections are done --

13   right? -- because that's fundamental.

14        All companies do these projections.  You have to do them

15   to get a handle -- a picture, really, of what your future looks

16   like, how much revenue you're going to have coming in or, in

17   this case, how much money you're going to spend.

18        And you do that because without that, you can't make

19   effective decisions about how much money you're going to spend

20   on research, how much money will you have to spend on

21   development, capital, you know, to build and grow your

22   business.

23        So every company that I have ever worked for and every

24   company I've ever seen has a pretty clear, usually robust and

25   diligent process for doing this.  And you take a lot of care

1    because big decisions get made on this.

2        So what I'm seeing here is -- and what Mrs. Dickerson,

3    I believe, testified to is, you know, evidence of Biogen's

4    internal process for doing these projections.  As I said,

5    they're quite important.

6    Q.   And based on the evidence you've seen and heard, was

7    Biogen's internal process consistent with your understanding of

8    practices generally in the industry?

9    A.   Yes, sir.  I mean, strikingly, Biogen's process doesn't

10   sound any different than what I believe I heard Mr. Wong

11   testify to yesterday about Genentech's processes.  It's

12   identical in every functional respect to the kind of process

13   that I ran at Bayer for many years and that I've seen across

14   this industry.

15   Q.   All right.  Let's isolate one of these examples.

16        MR. McCLOUD:  Mr. Morales, could you pull up the

17   excerpt of Exhibit 26, please.

18   BY MR. McCLOUD:

19   Q.   Okay.  Mr. Seaton, I'd like you to take us through this

20   and just tell us what we're seeing.  Let's start at the top

21   with the portion that says "Inventory turnover assumptions."

22        Do you have an understanding of what that means?

23   A.   Yes, sir.  So, you know, the first question is:  How much

24   inventory are you going to have?  And I think I've said before,

25   the inventory is important because if you don't have inventory,

1   you don't have product to sell, and even more importantly,

2   patients aren't getting drug if you don't have inventory.  So

3   you want to have a decent amount of inventory.

4       And as you can see here -- well, let me just go back to

5   process for a second.  So how do you find this out?  You go to

6   the manufacturing people, to the production scheduling people,

7   and you ask them how much inventory do you expect to have at

8   whatever is the point in time you're interested in.

9       And as you can see here, what they've been told, I assume,

10  but certainly what's in their spreadsheet, is 40 months of

11  inventory in the U.S.  So that's quite a bit, three and a

12  third years.  And in the rest of world -- that's what ROW

13  stands for -- they expect to have 20 months.  So a year and

14  eight -- a year and two-third's worth of inventory sitting

15  there.  Right?

16      So you know how much licensed inventory you're going to

17  have -- and this in case, I would assume they're talking about

18  December 18, 2018 -- how much licensed inventory they expect to

19  have when the Cabilly patent expires.

20          **MR. McCLOUD:**  Mr. Morales, could you go to the next

21  section of this spreadsheet.

22  **BY MR. McCLOUD:**

23  **Q.**  Mr. Seaton, so once you have your inventory assumptions,

24  what is the next step in the process?

25  **A.**  So, you know, whether it's the next step or -- it doesn't

1    matter.  But a key part of the process is that you must then go

2    and speak to the people who have the official responsibility in

3    your company for interpreting the contract.

4    **Q.**   Why do you say you must talk to those people?

5    **A.**   Look, I read a lot of contracts, and I'm sure

6    Mrs. Dickerson read a lot of contracts, and I can read them and

7    interpret them as well as most people.  But it's not my job and

8    I'm not a lawyer.  Right?

9         So typically, you go -- and, typically, this is in the

10   legal department.  You'll go to the legal department, and you

11   will get an opinion.  And, you know, basically, you're asking:

12   Do I have to pay royalties on this?  And, you know, for how

13   long?  And you get an opinion.

14   **Q.**   Mr. Seaton, do you know whether lawyers were consulted in

15   the preparation of the Biogen projections that our jury has

16   seen?

17   **A.**   Yes, sir.

18   **Q.**   How do you know that?

19   **A.**   Because Mrs. Dickerson testified that she spoke to six

20   different lawyers, I believe, over the course of time.  So she

21   testified that she spoke to lawyers.

22        **MR. McCLOUD:**  Mr. Morales, could you pull up the last

23   section of this spreadsheet, please.

24   **BY MR. McCLOUD:**

25   **Q.**   All right.  Mr. Seaton, what is this showing?

SEATON - DIRECT / McCLOUD

1  **A.**   So what this shows, then, is that based on the amount of

2  inventory they had and then based on the advice they got -- I

3  don't know what it is, but whatever it was, based on it, they

4  expected at this point in time and they projected -- let me say

5  that -- they projected that they would be paying royalties to

6  Genentech in 2019, 2020, 2021, and 2022.  All of this on

7  product manufactured before the patent expired on

8  December 18th, 2018, but sold afterwards.

9  **Q.**   Mr. Seaton, were you here when Mrs. Dickerson's deposition

10 video was played?

11 **A.**   Yes, sir, I was.

12 **Q.**   And do you recall Mrs. Dickerson testifying that she

13 revised Biogen's projections in 2018 after speaking with a

14 Biogen lawyer named Suzanne Murray?

15 **A.**   Yes, sir.

16 **Q.**   Does that fact change your opinions in this case?

17 **A.**   No, sir.

18 **Q.**   Why not?

19 **A.**   Well, let's come back to -- let's come back to process.

20 All right?

21     Biogen had a robust process, from what I've seen, that

22 seems to have been diligently applied over a number of years --

23 right? -- with consulting people, getting advice, and then

24 making these projections.

25     I don't know what advice Mrs. Dickerson got in 2018.  I

1   that it has?

2   **A.**   No, sir, they did not.

3   **Q.**   I'd like to ask about a couple of the patent licenses

4   Biogen has that we do have, and I'd like to start with the

5   Centocor agreement.

6        Do you recall discussing that with Mr. Black?

7   **A.**   Yes, sir, I do.

8   **Q.**   Okay.  And what is your understanding of what happened

9   with respect to Centocor?

10  **A.**   I would actually need to refresh my memory about that

11  specific one, sir, but I believe that there was some discussion

12  after the patent expired and after Biogen had paid their

13  royalty obligations on the product they made before the patent

14  expired but sold afterwards, and that I know there was some

15  money that was refunded.

16  **Q.**   And do you recall whether Biogen received all of the money

17  that it requested back?

18  **A.**   No, sir, they didn't.  In fact, I think that -- as I

19  recall it, what happened is there was a discussion.  I don't

20  know whether there was a threat of a lawsuit because I don't

21  know the content of the discussion.  But there was a,

22  I believe, relatively small payment from Centocor to Biogen, I

23  assume, because this is fairly common in the industry to let's

24  just have this issue go away.

25  **Q.**   Mr. Seaton, could you turn in your binder to Exhibit 1,

SEATON - REDIRECT / McCLOUD

1    the license agreement.

2    **A.**    I'm sorry, sir.  Which binder?

3    **Q.**    The binder that I handed you.

4    **A.**    Thank you.

5    **Q.**    The black binder.

6    **A.**    They're both black.

7    **Q.**    All right.  And I'd like to direct your attention to

8    Section 4.02 of the license agreement.

9    **A.**    Yes, sir.

10   **Q.**    Do you recall Mr. Black asking you some questions about

11   this provision?

12   **A.**    Yes, sir, I do.

13   **Q.**    Okay.  A couple of questions.

14        First, in your experience and based on your understanding

15   of custom and practice, would a carve-out from a royalty

16   obligation be located in a reporting provision?

17   **A.**    No.  No, sir.

18   **Q.**    Why not?

19   **A.**    Because, I mean, it would be most unusual to put a

20   carve-out from an obligation to pay, which is stated very

21   clearly in one section -- in this agreement, I believe it's

22   3.02 -- and you're going to carve that out and you're going to

23   put it in a reporting section?

24        No, I would not expect to see it there.  It would be most

25   unusual.  I can't say it's impossible, but I wouldn't do it.

1    Q.    Now, Mr. Black also asked you about the relationship

2    between Section 4.02, Section 7.01, and Section 1.03.

3         Do you recall those questions?

4    A.    Yes, sir, I do.

5    Q.    And, Mr. Seaton, in your experience and based on industry

6    custom and practice, would it be common to create a carve-out

7    from a royalty obligation by combining three different

8    provisions?

9    A.    No, sir.  I mean, look, you know, Mr. Black's last

10   question to me was about trying to avoid ambiguity and whether

11   licensing professionals try to avoid ambiguity in agreements.

12        And I can think of few things that would be more likely to

13   create ambiguity than trying to create a carve-out from a

14   critical, really important section, but I'm going to break it

15   up and hide it in three different sections.  I would not do

16   that.  I would not recommend anyone to do it.  And I would say

17   it would be most unusual.

18   Q.    In your experience and based on industry custom and

19   practice, is it your understanding that industry professionals

20   consider royalty reporting provisions to be the most important

21   provisions in license agreements?

22   A.    The most.  I think it's right up there with the grant of

23   the license; right?  So I want to know what I'm getting, so

24   what is it I'm paying you money for.  And I want to know how

25   much I pay for it.

1    So I would say the license grant and that royalty

2  provision are -- I mean, when we negotiate these things, that's

3  what we spend a lot of time making sure we agree and nail down.

4  And often that doesn't change till the very end.  We twiddle

5  with the rest of it, but those are critical.

6  **Q.**   Well, what about a provision like Section 4.02 that

7  requires reports on royalties.  Would you call that, based on

8  your experience, the most important provision in a license

9  agreement?

10 **A.**   It is not even close, sir.  You often have -- almost all

11 will have some reporting provision.  But, for example, after

12 years of doing this, what I would actually do is have a basic

13 reporting provision and then actually have a clause that says:

14 Look, the parties are going to create a finance committee where

15 the two finance groups are going to get together and figure out

16 all the detail of this stuff.

17    This is not the most important section in an agreement.

18 **Q.**   Is it common, in your experience, for license agreements

19 to have provisions that say which provisions continue after the

20 termination of the agreement?

21 **A.**   Yes, sir.  A survival provision is important because,

22 again, you can see that the parties could terminate the

23 agreement early, it could end.  And so you will often have this

24 provision that says:  Look, no matter how this thing ends,

25 these provisions survive because you need to have them survive,

1  Q.   Okay.  Now, interestingly, Article III is not listed here,

2  is it?

3  A.   No, sir.

4  Q.   So Article III does not survive the termination or

5  expiration of the agreement; right?

6  A.   Except to the extent that it says above that, sir, where

7  it says that you will pay all the royalties in accordance with

8  Section 3.03.

9  Q.   Stick with my question for now and the survival clause.

10  Article III does not survive termination; correct?

11  A.   Well, again, sir, to be absolutely clear, this -- it says

12  this Section 7.05 survives, and this Section 7.05 includes that

13  line that I just mentioned that you will pay all royalties in

14  accordance with Section 3.03.

15  Q.   Oh, I see.  You're referring to the second sentence

16  which --

17  A.   Yes.

18  Q.   -- is the -- okay.

19      That's an inventory -- that's a 90-day inventory provision

20  if the license terminates; correct?

21  A.   The whole thing.  But, again, I'm just trying to be

22  complete and accurate in my answer, sir.

23  Q.   Yes.  So Section 3 -- excuse me.  Article III does not

24  survive the termination or expiration of the agreement except

25  to the extent that the 90-day inventory provision in the second

1    sentence applies; is that right?

2    **A.**    I actually don't know that that's correct, sir, because if

3    you have an obligation to pay, I believe that obligation

4    survives the ending of the agreement.

5    **Q.**    Well, Article III is not in the survival section of the

6    contract.   The jury will have to decide what that means; fair

7    enough?

8    **A.**    Fair enough, sir.

9    **Q.**    Let's look at --

10   **A.**    I completely agree with you.

11   **Q.**    -- Section 3.03.

12       Section 3.03 is in Article III; right?

13   **A.**    Yes, sir.

14   **Q.**    And that's the earned royalties provision; correct?

15   **A.**    Yes, sir.

16   **Q.**    Okay.   And the article in which this provision resides is

17   not included in the survival clause on the last sentence of

18   that paragraph 7.05; right?

19   **A.**    Well, 3.03 is mentioned, sir.   I'll leave it to the

20   lawyers and the jury to debate that.

21   **Q.**    It's mentioned only in the context of a 90-day inventory

22   period upon termination; right?

23   **A.**    That's what it says there.

24   **Q.**    You mentioned during your redirect -- take that down.

25   Thank you -- that -- I think your words were:   The obligation

1    to pay royalties, if that's going to be limited, should have

2    been written into Section 3.03.  Was that --

3    **A.**   I said Section 3, but I would expect it to be either in

4    Section 3.0 -- sorry, I said Section 3.  I would expect it to

5    be either in 3.03 or its own section.  Sometimes that happens.

6    **Q.**   Okay.  And if you'd bring back 7.01.

7         Section 7.01 does explicitly discuss, quote, obligation to

8    pay royalties on the fourth line; right?

9    **A.**   Correct, sir.

10   **Q.**   Are you aware of the principle that contracts need to be

11   construed as a whole, looking at all the terms together?

12   **A.**   I am aware of that, sir.

13        **MR. BLACK:**  Thank you.

14   No further questions.

15        **THE COURT:**  Do you have any follow-up?

16        **MR. McCLOUD:**  Just a handful of questions, Your Honor.

17   Mr. Morales, could you put back up Section 7.05 of the

18   contract.

19                **FURTHER REDIRECT EXAMINATION**

20   BY MR. McCLOUD:

21   **Q.**   Mr. Seaton, Mr. Black showed you the last sentence.  I'd

22   actually like to focus on the first sentence for now.

23        **MR. McCLOUD:**  If we can highlight that.

24   BY MR. McCLOUD:

25   **Q.**   So, Mr. Seaton, this says [as read]:

1           "Termination of this Agreement in whole or in

2       part for any reason shall not relieve Licensee of its

3       obligations to pay all fees and royalties that shall

4       have accrued hereunder prior to the effective date of

5       termination."

6       Did I read that correctly?

7  A.   You read that correctly, sir.

8  Q.   And is a termination provision like this one typical in

9  your experience?

10 A.   It is -- I don't think I've ever seen an agreement that

11 didn't have one, sir.

12 Q.   And in your experience, what is the function of a

13 termination provision like this?

14 A.   Well, the function of this provision is to make it

15 absolutely clear that even though we're terminating the

16 agreement, if you've created an obligation, you have to pay it.

17 I mean, and that's why this section survives termination, this

18 whole Section 7.05 -- right? -- because it's a fundamental

19 bargain.

20      I mean, that's the deal.  I give you a license to make the

21 thing; you make the thing.  When you sell it, you're going to

22 pay me a royalty.  And you can't get out of that by simply

23 saying, "Well, I'm going to terminate the agreement," for

24 example.

25      I'm not saying that's the situation here, but that's the

1  similar positions at Danaher Corporation, which is a medical

2  device company.  For those three years, I was the head of

3  business development, legal, and intellectual property

4  licensing, and I did a number of medical device licenses there.

5  But the bulk of my work has been in the pharmaceutical space.

6  **Q.**  And were you negotiating licenses in and around 2004 in

7  the pharmaceutical space?

8  **A.**  Yes, I was.

9        **MS. PATEL:**  Your Honor, we move to qualify

10  Mr. Buthusiem as a licensing expert in the pharmaceutical

11  industry.

12        **MR. GAFFNEY:**  No objection.

13        **THE COURT:**  He's admitted.

14  **BY MS. PATEL:**

15  **Q.**  Mr. Buthusiem, are you here to offer any opinions?

16  **A.**  Yes, I am.  If you'll go to the next slide.

17        So, in my opinion, and based on my years of experience,

18  35-plus years of experience in the licensing field in

19  pharmaceuticals, there is no industry custom of paying tail

20  royalties on patent --

21        (Reporter interrupts to clarify the record.)

22        **THE COURT:**  She's trying to understand --

23        **THE WITNESS:**  I'll just repeat my answer.  So --

24        **THE COURT:**  -- what you're saying.

25        And let's not have a narrative but a question.  Start over

1    again.

2    BY MS. PATEL:

3    Q.    Mr. Buthusiem, are you offering any opinion here today?

4    A.    I am.

5    Q.    What is that opinion?

6    A.    In my opinion, there was no industry custom of paying tail

7    royalties on patent licenses either in 2004 or at present.

8    Q.    Now, you said earlier that you've negotiated hundreds of

9    license agreements.

10   A.    I have.

11   Q.    In your experience, how are patent license agreements

12   generally structured?

13   A.    So I have a slide that outlines the key provisions, if

14   you'll flip to the next slide, please.

15   Q.    Okay.  Can you please describe, based off of your

16   experience, how patent license agreements are generally

17   structured?

18   A.    Sure.  So there's several key components of a patent

19   licensing agreement.

20        So the first component is the parties, who are the

21   parties.  You have the licensor, the owner of the intellectual

22   property being licensed, and you have the licensee, the

23   recipient of the license under the license agreement.

24        You also have a section in the agreement that describes

25   the intellectual property being licensed, the licensed patents

1    and the scope of those patents.  Is it regional?  Is it global?

2    Does it apply to a specific type of disease or all diseases?

3    So it can be limited in scope as well.

4         Then, importantly, you have the payments.  And, typically,

5    those payments comprise up-front fees or licensing fees and

6    running royalties.

7         And, finally, you have the term of the agreement, which

8    describes the length of the obligation to make those payments.

9    **Q.**    I see on your slide that you differentiated between

10   up-front fees and running royalties.  Could you please describe

11   the difference between those two types of payment?

12   **A.**    So the reason why they're split this way is up-front

13   payments are made based on non-sales activities.  So, for

14   example, the right to manufacture a drug, it's the payment for

15   the receipt of the license, and it's the payment for something

16   that is not otherwise available.  You've negotiated to license

17   it.  You're compensated for those rights.

18        And then -- because the point is that the thing or the

19   product license may not ever be approved or sold.  So the

20   licensor receives compensation for the work that it's done, and

21   the licensee is paying for those rights, including the right to

22   manufacture.

23        And then you have running royalties, assuming the product

24   makes it through the FDA and gets approved and there's sales

25   that generate sales.  So those would be the sales-based

1    **MR. GAFFNEY:**  Thank you, Your Honor.

2              **CROSS-EXAMINATION**

3    **BY MR. GAFFNEY:**

4    **Q.**   Mr. Buthusiem, good to see you again.

5    **A.**   Good to see you too.

6    **Q.**   I think you're the only live witness for the defense, so

7    this may take a little longer than I expected.  I've got more

8    time than I thought.

9         I'd like to start with your opinion of custom and

10   practice.  And I gather it's your view that if a license is

11   going to require royalties on product manufactured before and

12   sold after the patent expires, it's got say that specifically.

13   **A.**   Yes.

14   **Q.**   And you heard Mr. Johnston's testimony.  You were here for

15   that; right?

16   **A.**   I was.

17   **Q.**   And his view of custom and practice is the opposite?

18   **A.**   With all due respect, I heard it, but I don't agree with

19   it.

20   **Q.**   And you heard Mr. Seaton's opinion.  It's the same as

21   Mr. Johnston's; right?

22   **A.**   And, again, with all due respect, I disagree with it.

23   **Q.**   Now, you saw the testimony of Mr. Strate, the lawyer for

24   TMC?

25   **A.**   I did.

1  **Q.**  And you're familiar enough with that case -- I know you

2  haven't offered an opinion on it, but you're familiar enough

3  with that case to know that Biogen was suing TMC for, among

4  other things, tail royalties?

5  **A.**  Correct.

6  **Q.**  Okay.  And he said -- he showed what Biogen's position was

7  as to that provision.  You saw that; right?

8  **A.**  I did see that.

9  **Q.**  And that provision did not include express language

10  requiring post-expiry royalties, did it?

11  **A.**  Well, that particular provision, no.  But there are other

12  provisions in the agreement that, in my opinion, would require

13  that.

14  **Q.**  You heard he said that Biogen took a position on custom

15  and practice in that case?

16  **A.**  I don't recall if they took a position on custom or

17  practice.  I'm not aware of that.

18  **Q.**  Well, you heard him testify to that fact; right?

19  **A.**  I don't recall him testifying to that.

20  **Q.**  Okay.  Did you ask Biogen if they had -- well, let me ask

21  this way:  Were you retained in that case to provide this

22  opinion?

23  **A.**  I was not.

24  **Q.**  And did you ask Biogen what -- whether it had an opinion

25  of custom and practice in that case?

1  **A.**   It really wasn't relevant because that wasn't the case

2  before me.  It was a different case, different circumstances,

3  different agreement.  And it wasn't this agreement.  I focused

4  on this agreement.

5          **MR. GAFFNEY:**  Mr. Morales, could you put up the copy

6  we have of Mr. Buthusiem's -- I think it's Slide Number 20.

7      There we go.  Thank you.

8  **BY MR. GAFFNEY:**

9  **Q.**   So you presented this slide in your opinion; right?

10 **A.**   Yes.

11 **Q.**   I just want to go through it.

12     Now, GSK.

13 **A.**   Yes.

14 **Q.**   Biogen paid tail royalties to GSK; correct?

15 **A.**   Under an agreement that my team negotiated, correct.

16 **Q.**   So with respect to Biogen's activity, they viewed that

17 contract as requiring tail royalties; correct?

18 **A.**   I can't testify as to what their mindset was.  All I know

19 is that they were paid.

20 **Q.**   Okay.  So let's -- I know you're going to disagree with me

21 but --

22          **MR. GAFFNEY:**  Let's click on that one.

23     We'll just deal with it.

24 **BY MR. GAFFNEY:**

25 **Q.**   So MRC, that was the same situation; right?  Biogen

1    actually paid those royalties?

2    **A.**    Yes.

3    **Q.**    And then MRC refunded them without any request from

4    Biogen?

5    **A.**    I don't know the circumstances pursuant to which they

6    refunded, but I know they were refunded.

7    **Q.**    Well, you saw Ms. Dickerson's testimony where she said

8    that Biogen didn't ask for them; they just got them.

9    **A.**    I believe that's the case, yeah.

10    **Q.**    Okay.

11        **MR. GAFFNEY:**    George, could you indicate that GSK was

12    fully refunded.

13    **BY MR. GAFFNEY:**

14    **Q.**    Now, Centocor, Biogen paid $36 million on that one?

15    **A.**    I don't know the specific amount, but I'll take your word

16    for it.

17    **Q.**    Okay.  And they paid without complaining about it,

18    without -- at the time?  They didn't call up Centocor and say,

19    "Hey, we don't owe the money"?  They paid it?

20    **A.**    Yeah, I don't know the circumstances pursuant to which

21    they were paid or what discussions happened, but it was paid at

22    least initially, yeah.

23        **MR. GAFFNEY:**    Let's change that one, too, if you

24    wouldn't mind.

25    \\\

 1   **BY MR. GAFFNEY:**

 2   **Q.**   By the way, on GSK, you heard Ms. Dickerson say that when

 3   GSK called up and said, "Hey, we want to refund some money,"

 4   that Biogen was quite surprised?

 5   **A.**   I believe I heard that yesterday, yes.

 6   **Q.**   Okay.  Now, you're familiar with all these agreements;

 7   right?

 8   **A.**   I am.

 9   **Q.**   And we spoke about them at length during your deposition

10   last year; right?

11   **A.**   We did.

12   **Q.**   And do you recall telling me that you considered the

13   payments in red here, that they were mistakes by Biogen?

14   **A.**   Well, the fact that companies like my former company, GSK,

15   refunded it indicated to me, at least, that at least in the

16   receiving party's mind, it was paid in mistake, by error, which

17   was why it was refunded.

18   **Q.**   I'm just talking about the payment.  Your position is when

19   Biogen paid GSK, when it paid MRC, when it paid Centocor, when

20   it paid PDL, when it paid Lonza, it was a mistake because those

21   contracts did not require those royalties; right?

22   **A.**   In my opinion, they did not require the payment of tail

23   royalties.

24         **MR. GAFFNEY:**  Now, could you give us the next slide,

25   George -- John.

1        So bring up the next slide, if you would.

2   BY MR. GAFFNEY:

3   Q.    So I'd like to put the timing up here in front of the

4   jury.

5        So the GSK was, you say, the first one where a refund was

6   made; correct?

7   A.    I don't recall the exact date.  I know we negotiated that

8   agreement, I believe, in 2006, but I'm not sure on the date on

9   which the payment was made or refunded.

10        MR. GAFFNEY:  Why don't we put that up, if we would.

11   BY MR. GAFFNEY:

12   Q.    So I can go back and show you the documents, but does that

13   look about right, that the patent expired in late 2014 and the

14   refund was made a few months later?

15   A.    Sounds about right, yeah.

16   Q.    Okay.  And your opinion is that if that had -- the

17   appropriate thing for Biogen to have done when it got that was

18   to look at its other licenses to see whether they required tail

19   royalties either; right?

20   A.    Well, that would have been up to Biogen to do or not do.

21   Q.    That would be the normal practice you would expect a

22   company to do; right?  If you get a refund from one company for

23   post-expiry royalties, you'd make sure -- you'd want to see

24   what your other agreements required too; right?

25   A.    Well, for all I know, they were already in the process of

1   doing that.  I just don't know.  So I can't testify what their

2   mindset was with respect to how they reacted to that or not.

3           **MR. GAFFNEY:**  Okay.  Could you put up the next click.

4   **BY MR. GAFFNEY:**

5   **Q.**   So the MRC deal, that patent expired in late 2015, and

6   they paid for -- Biogen paid for, looks like, about a year;

7   right?  That's familiar with your recollection?

8   **A.**   Yeah.

9   **Q.**   So after GSK refunded the money, Biogen started paying

10  tail royalties to MRC.  Does that surprise you?

11  **A.**   Again, I can't comment on what the internal process was or

12  what the GSK refund prompted or didn't prompt within Biogen.

13  All I know is, you know, what happened, essentially.

14          **MR. GAFFNEY:**  Okay.  Could you put up the next one.

15  **BY MR. GAFFNEY:**

16  **Q.**   So here's the other ones that were on your list of

17  licensees -- licensors who you concede that Biogen made tail

18  royalty payments to; right?

19  **A.**   Yes.

20  **Q.**   And your opinion is that none of those agreements required

21  tail royalty payments; right?

22  **A.**   In my opinion, there's no express language in those

23  agreements requiring the payment of tail royalties, correct.

24  **Q.**   Right.  And Biogen paid them anyway; right?

25  **A.**   Correct.

1   Q.   And so it was paying on Centocor at the time that GSK made

2   the refund, but they kept paying on Centocor; right?

3   A.   Apparently, yes.

4   Q.   And they had started paying on PDL before GSK -- before

5   they started paying on GSK, they get a note from GSK that

6   they're giving a refund, and they keep paying PDL -- right? --

7   for four years?

8   A.   Apparently.

9   Q.   $140 million mistake?

10  A.   Again, you know, every agreement is different.  I don't

11  know what the internal process was that -- you know, I don't

12  even know because I had left GSK by that time.

13  Q.   I'm not asking about GSK.

14  A.   I don't know what they deliberated internally with respect

15  to making payments or not making payments.  But in my view,

16  those payments were not payable.

17  Q.   So after getting notice -- you don't think they should

18  have paid GSK; right?

19  A.   No.

20  Q.   And then GSK refunded sometime in early 2015; right?

21  A.   Yes.

22  Q.   And then even after that, they started paying -- they were

23  already paying PDL and Centocor, and they started paying MRC

24  and Lonza all on agreements that, in your opinion, didn't

25  require payments?

1    **A.**    In my -- in my opinion, there was no express language in

2    those agreements that required those payments.

3    **Q.**    So under your view of custom and practice, those payments

4    weren't required?

5    **A.**    I don't believe they were.

6    **Q.**    But isn't it possible that Biogen held a different view of

7    custom and practice than you do?

8    **A.**    I'm not sure what their view on with respect to custom and

9    practice was.  The only thing I know is that we heard from Carl

10    Battle yesterday and again today that he was not aware of any

11    such custom or practice and that you have to look at each

12    agreement.

13        So when their head of IP says that he was unaware of any

14    custom or practice, to me that was probative that they weren't

15    aware of any custom or practice.

16    **Q.**    I'm sorry.  It's your understanding that Mr. Battle was

17    the head of intellectual property --

18    **A.**    Well, not the head of intellectual property.

19    **Q.**    I'm sorry.  If I can finish my question.

20    **A.**    Sorry.  Sorry.

21    **Q.**    Are you testifying that Mr. Battle was the head of

22    intellectual property at Biogen?

23    **A.**    No.  He was at Elan.

24    **Q.**    And was Elan -- did Elan negotiate these other licenses,

25    as far as you know?

1  **A.**   No.  Elan and Biogen negotiated the Tysabri license with

2  Genentech.

3  **Q.**   So Biogen's patent lawyer who worked on this deal with

4  Genentech is a man name Ray Arner; right?

5  **A.**   That's what I've heard, yes.

6  **Q.**   He hasn't been brought to testify, has he?

7  **A.**   I haven't seen him, no.

8  **Q.**   No.  And you haven't seen -- you haven't talked to him --

9  **A.**   I have not.

10  **Q.**   -- correct?

11       Right.  So you didn't even inquire of the Biogen lawyer

12  who negotiated this deal what his view of custom and practice

13  was; correct?

14  **A.**   I did not.

15  **Q.**   So you're relying on something that Mr. Battle said -- he

16  works for Elan -- but you haven't tried to figure out from the

17  Biogen's patent lawyer what it thought about the Genentech

18  agreement or what it thought about any of these other

19  agreements; right?

20  **A.**   Well, to be clear, I'm relying on my experience with

21  respect to the custom and practice.  I don't know what Biogen's

22  view with respect to custom and practice was other than in the

23  context of the Elan/Biogen agreement with Tysabri.  I don't

24  know what their belief was on custom or practice.

25       I'm testifying as to what my experience is and what my

1  belief is.

2  **Q.**   And none of Biogen's payments on this page are consistent

3  with the custom and practice, as you've described it, but they

4  are consistent with the custom and practice as Mr. Johnston

5  described it; correct?

6  **A.**   I don't agree with that, no.

7          **MR. GAFFNEY:**  Mr. Morales, could you call up that

8  Centocor email.

9  **BY MR. GAFFNEY:**

10  **Q.**   So you saw this document -- right? -- the email back and

11  forth between -- I'm sorry.  This is Exhibit 42 -- this email

12  that the Biogen and Centocor folks exchanged in 2015; right?

13  **A.**   I heard reference to it yesterday.  I'm not sure if I've

14  seen it or studied it previously, though.

15  **Q.**   You weren't provided this?

16  **A.**   I don't recall.

17  **Q.**   Okay.  And you understood -- but you saw that Ashley Chang

18  of -- could you put up the -- it's all right.  It'll make this

19  a little faster.

20      You saw that Ashley Chang of J&J asked a question of

21  Biogen, "How long are you going to continue paying after our

22  patent expires?"

23  **A.**   That's what I see here, yes.

24  **Q.**   And then she got an email back from Sean Godbout.  Do you

25  see that?

BUTHUSIEM - CROSS / GAFFNEY

1  **A.**   I do.

2  **Q.**   And you heard Ms. Dickerson's testimony that he was her

3  manager; right?

4  **A.**   Yeah.  I believe he was in the finance department.

5  **Q.**   And he is now the corporate controller of the company;

6  right?

7  **A.**   I believe so.

8  **Q.**   That's a pretty big position in a company, isn't it?

9  **A.**   Yes.

10  **Q.**   Can't get there by being a dummy?

11  **A.**   I'll say it's a big position.  I can't -- I don't know the

12  man personally.  I assume he's a smart guy.

13  **Q.**   Okay.  And so he says in the second sentence --

14       **MR. GAFFNEY:**  If you could highlight that.

15  **BY MR. GAFFNEY:**

16  **Q.**   [As read]:

17       "It is my understanding that the IP agreement

18       covers manufacturing/existing product inventory, so

19       we will continue to pay until that inventory has been

20       sold."

21       Right?  You see that?

22  **A.**   I do.

23  **Q.**   He's talking about the Centocor agreement -- right? --

24  that you thought Biogen mistakenly interpreted to require tail

25  royalties?

BUTHUSIEM - CROSS / GAFFNEY

1    **A.**    Correct.

2    **Q.**    Okay.  So Mr. Godbout, he thinks the license requires tail

3    royalties; right?

4    **A.**    I'm not sure if he thinks that.  He's saying that it's his

5    understanding.

6    **Q.**    If it's his understanding -- I'm missing something in your

7    answer.

8    **A.**    What I'm saying is, I don't know -- when he says it's his

9    understanding, I mean, to me that can mean --

10   **Q.**    It's not his understanding?

11   **A.**    Well, it is his understanding, but it might not be his --

12   I don't know where that understanding is derived from, I guess

13   is my point.  I don't know how it's derived.  It's his

14   understanding.

15          **MR. GAFFNEY:**  Okay.  You can take that down.

16       Could you put up the MRC agreement.  That was the slide

17   with the excerpt of the MRC agreement.

18   **BY MR. GAFFNEY:**

19   **Q.**    You looked at this, the MRC agreement?

20   **A.**    Yes.

21          **MR. GAFFNEY:**  And could you call up the royalty

22   provision.

23   **BY MR. GAFFNEY:**

24   **Q.**    So this is the provision that you say they -- that Biogen

25   paid royalties under this agreement erroneously; right?  You

1  thought it was a mistake?

2  **A.**    Yes.

3         **MR. GAFFNEY:**  Okay.  And -- oh, if I could publish

4  that to the jury.

5       Is this an admitted exhibit?

6         **MR. McCLOUD:**  Yes.

7         **MR. GAFFNEY:**  There's an admitted exhibit stipulation

8  on the Exhibit 47.

9         **THE COURT:**  So is it -- it's admitted.  It can be

10  published.

11         **MR. GAFFNEY:**  And then if I could publish that to the

12  jury.

13  **BY MR. GAFFNEY:**

14  **Q.**   So this is the provision of that agreement that you say --

15  well, you say that Biogen erroneously interpreted this license

16  to require tail royalties; right?

17  **A.**   I think a better way to say it was that MRC did not

18  interpret that agreement as requiring tail royalties, and

19  neither did I.

20  **Q.**   Well, that's your preferred way of saying it, but I get to

21  ask the questions.  Okay?

22       You agree that Biogen interpreted this agreement to

23  require tail royalties?

24  **A.**   Again, I'm not going to testify as to their

25  interpretation.  All I can say is they paid them.

1  Q.   And that was a mistake, in your view?

2  A.   In my view, it was.

3  Q.   Okay.  And you heard the testimony from Ms. Dickerson that

4  their team inside of Biogen, people she worked with, they

5  looked at these licenses and studied them in connection with

6  their projections activities; right?  You heard that testimony?

7  A.   I believe she said that she read the agreements but took

8  advice on their meaning.

9  Q.   From whom?

10  A.   I don't know from whom.

11  Q.   Okay.  So, and not only does -- strike that.

12      You see the highlighted language there.  That's basically

13  the same language as appears in 7.01 of the Biogen-Genentech

14  agreement; right?

15  A.   Yes.  Very similar.

16  Q.   And you -- and so you think that excuses the royalty --

17  the obligation to pay tail royalties?

18  A.   You're not reading the agreement in context.  So you're

19  looking at the term -- the term of the obligation, but the

20  obligation is to pay earned royalties.  So the question is:

21  When are royalties earned?  And, in my view and, apparently,

22  MRC's view, the royalties were earned upon sale.

23  Q.   And what was Biogen's view?

24  A.   I can't testify as to what their view was.

25  Q.   Well, you would agree that by paying royalties on that, it

1  was either their view or they made a -- they fumbled?

2  **A.**   Presumably.   But I don't know what their view was.

3  **Q.**   But you agree that payment of royalties by Biogen to MRC

4  is consistent with the custom and practice that Mr. Johnston

5  and Mr. Seaton described; correct?

6  **A.**   No.

7  **Q.**   You don't agree with that?

8  **A.**   I don't agree with it because there is no such custom for

9  paying tail royalties.

10  **Q.**   That's not my question, or if it was, I didn't ask it very

11  well.

12  **A.**   I think it was.

13  **Q.**   You would agree that Biogen's payment of tail royalties to

14  MRC in an agreement with this language, that is consistent with

15  what Mr. Johnston described as his understanding of custom and

16  practice?

17  **A.**   Well, it's what he described as what he believes to be

18  custom or practice, and I respectfully disagree that such a

19  custom exists, I guess is --

20  **Q.**   You've told us --

21  **A.**   I'm trying to answer your question.

22  **Q.**   Now, you've told us that you disagree with it, and the

23  jury's heard that.

24  **A.**   Okay.

25  **Q.**   I just -- I just want you to tell me whether -- strike

**BUTHUSIEM - CROSS / GAFFNEY**

1  that.

2          MR. GAFFNEY:  Could you put up the PDL agreement.

3  **BY MR. GAFFNEY:**

4  **Q.**  So you're familiar with the PDL agreement; right?

5  **A.**  I am.

6  **Q.**  You read that?

7  **A.**  I did.

8  **Q.**  And you saw Mr. Stone's testimony today?

9  **A.**  I did.

10         MR. GAFFNEY:  Okay.  Could you call up the royalty

11 provision there?

12 **BY MR. GAFFNEY:**

13 **Q.**  Okay.  And you say that tail royalties were not owed under

14 this agreement, in your opinion?

15 **A.**  In my opinion, there's no express language in this

16 agreement requiring the payment of tail royalties.

17 **Q.**  And Biogen paid them anyway?

18 **A.**  Yes.

19 **Q.**  And they paid them for four years?

20 **A.**  That's what I heard, yes.

21 **Q.**  And they paid $140 million?  That's your understanding

22 too?

23 **A.**  That was the testimony I heard today, yes.

24 **Q.**  Never asked for it back; right?

25 **A.**  Apparently not.

BUTHUSIEM - CROSS / GAFFNEY

1   Q.   And this is the language in the agreement that you say --

2   well, strike that.

3        This is the provision of the agreement requiring --

4   specifying what the royalty obligation is; right?

5   A.   Well, this is specifying the length of the royalty

6   obligation.

7   Q.   It just says royalties to PDL.  It says net sales on

8   licensed product; right?

9   A.   Right.  So it's basically -- it's combining -- it's net

10  sales on licensed product sold in each country until the last

11  day on which there is a valid claim.

12       So it's both addressing the triggering event, which is the

13  sale, and the termination event, which is the expiration of the

14  last filed claim.

15  Q.   And in your view, this language, as you interpret this

16  agreement and as you understand custom and practice, this

17  language means they don't -- they can stop paying royalties

18  when the patent expires; right?

19  A.   Yes.

20  Q.   Even if they have $140 million of it in inventory?

21  A.   I don't think the number really matters.  It's the

22  principle because, again, this says net sales of all product

23  sold.  So being sold being the triggering event, the bright

24  line being the expiration of the last filed claim, in my

25  experience.

1    **Q.**   Okay.  And, again, apparently either Biogen disagrees with

2    that view of custom and practice or someone made a $140 million

3    mistake?

4    **A.**   Again, I can't comment on what Biogen thought or didn't

5    think in that respect.

6    **Q.**   Is there any alternative between those two?

7    **A.**   I don't know.

8         **MR. GAFFNEY:**  Could you put up Mr. Buthusiem's slide

9    where he had the list of the Genentech licensees who didn't pay

10   tail royalties.

11        There you go.

12   **BY MR. GAFFNEY:**

13   **Q.**   Do you remember this slide?  You -- I think you prepared

14   it.

15   **A.**   I do.

16   **Q.**   Okay.  And these are a list of licensees, among the --

17   among the licenses you reviewed and the information you

18   reviewed, who had agreements similar to Biogen's but didn't pay

19   tail royalties?

20   **A.**   Didn't pay tail royalties to Genentech, correct.

21   **Q.**   Okay.  And are you -- so they didn't -- these companies

22   did not believe the licenses required tail royalties; right?

23   **A.**   Apparently not.

24   **Q.**   But you're not saying Genentech didn't believe these

25   licenses required tail royalties, are you?

1  **A.**   Again, I don't know what Genentech believed or did not

2  believe.  I just know that with respect to these agreements,

3  tail royalties were not paid.  And in two of these cases, it's

4  currently pending in litigation, that issue.

5  **Q.**   Right.  So at least in the two cases where there's

6  litigation that you've listed here, Genentech feels that the

7  licenses require the royalties, the same way as it does with

8  respect to Biogen; right?

9  **A.**   I mean, I haven't read the pleadings, but presumably.

10 **Q.**   Okay.  So then the other ones, how much money was -- how

11 much money did Elusys pay in royalties the last year of its

12 license?

13 **A.**   I don't recall.  There was some testimony to that

14 yesterday.  I don't recall the exact amount.

15 **Q.**   Okay.  Is that the same for the rest of these up here?

16 **A.**   Again, I don't recall.  I know there was testimony to that

17 effect yesterday, but I don't recall the specific amounts

18 because, you know, there were various amounts paid.

19 **Q.**   Right.  So you don't know how much they had in inventory,

20 and you don't know what the tail royalty would be if they paid

21 it; right?

22 **A.**   Sitting here today, not off the top of my head, no.

23 **Q.**   Okay.  And you agree that it doesn't make sense to sue

24 someone if the -- for non-payment of tail royalties if the

25 recovery is not going to be very large; right?

1   **A.**   See, I disagree with that because, you know, I've been in

2   that position before, and there's such a thing called principle

3   as well, which in some cases principle is more important than

4   money.

5   So, you know, if it were me, I don't know that money would

6   have been the driving factor.  I would have considered other

7   factors as well.

8   **Q.**   You agree litigation is -- it's awfully expensive; right?

9   **A.**   I'm not a litigator, but as a senior executive, if I

10  believed that the principle is worth fighting for, I wouldn't

11  worry so much about the amount recovered.

12  **Q.**   How much do you get paid?

13  **A.**   I don't recall how much I -- I mean --

14  **Q.**   It was around $1,150 an hour at the time I took your

15  deposition; right?

16  **A.**   I don't get paid anything.

17  **Q.**   No --

18  **A.**   BRG gets paid.

19  **Q.**   How much does it cost Biogen for every hour of your time?

20  **A.**   I recall that's -- I think that's the right number.

21  **Q.**   And has it gone up in the year?

22  **A.**   Has?

23  **Q.**   Has your rate gone up?

24  **A.**   Has my personal rate gone up?  Yes.

25  **Q.**   Okay.  So they were paying $1,100 last year, and they're

1  paying more this year?

2  **A.**    I don't know if the rates -- I don't know.    Honestly, I

3  don't know what the rate is.

4  **Q.**    Okay.    And you've been sitting in court for two days;

5  right?

6  **A.**    Yes.

7  **Q.**    Presumably you came to Oakland sometime over the weekend?

8  **A.**    I did.

9  **Q.**    Worked that time; right?

10  **A.**    I did.

11  **Q.**    You did a really big expert report, did a bunch of work on

12  that?

13  **A.**    I did.

14  **Q.**    Had staff help you at your company to do that?

15  **A.**    I did.

16  **Q.**    All that's super expensive, isn't it?

17  **A.**    Expense is a relative thing.    Relative to what?    Relative

18  to --

19  **Q.**    Well, how much has it cost Biogen to have you involved in

20  this case?

21  **A.**    Sitting here today, I don't know the exact number.

22  **Q.**    Okay.    But at $1,200 an hour or $1,100 an hour, what the

23  rate is, it's probably a pretty big number?

24  **A.**    You know, again, define "big."    Big relative to what?

25  **Q.**    Well, big relative to a case where the disputed amount of

1    tail royalties is a million dollars.  You would never bring

2    that case if it was required that I had to get you involved at

3    that rate; right?

4    **A.**    So, Mr. Gaffney, I have been involved in cases where the

5    amounts in controversy were single-digit millions and I've

6    billed over seven figures too because, again, it's not all

7    about the money.  Principle is important too.  I know there are

8    a lot of lawyers in this room, but some things are more

9    important than money.

10    And in a case like this, where I had a big licensing

11    portfolio that I've collected billions of dollars on, the

12    principle of collecting tail royalties is very important

13    because you're putting at risk billions of dollars potentially

14    by not -- like, by not paying if you believe payment was due.

15    **Q.**    I don't understand that.  If Genentech has decided to sue

16    Elusys, even though it thinks it owes some small amount of tail

17    royalties, what does that have to do with its right to collect

18    them against Biogen?

19    **A.**    Because if they believe that -- because these agreements

20    are all pretty much identical.  If they believe that they were

21    owed money, in my experience, I would have brought action

22    against them.  I absolutely would have because, again, the

23    principle is important here.

24    **Q.**    Well, you agree that there are times when companies have

25    claims for money against another company that they don't bring?

1  You agree with that; right?

2  **A.**   Well, you know --

3  **Q.**   Yes-or-no question.

4  **A.**   Yes.

5  **Q.**   And you -- among the other reasons, and I'm -- as you can

6  imagine, looking from your -- looking at your deposition

7  testimony, there could be extenuating circumstances you don't

8  bring a suit; right?

9  **A.**   You know, it depends.  You know, it really depends on the

10  specific facts or circumstances, and I'm not aware of what

11  those circumstances would have been in these cases.

12  **Q.**   Let me ask you about the projections you looked at.

13  **A.**   Okay.

14  **Q.**   Those are the ones that Ms. Dickerson talked about the

15  other day -- right? -- to show that Biogen was projecting an

16  obligation to pay Genentech tail royalties in one of the years

17  through 2022; right?

18  **A.**   Yes.

19  **Q.**   And you think that that -- that those projections were

20  done by mistake; right?

21  **A.**   I am not going to characterize it as a mistake.  What, to

22  me, the important thing is, before those tail royalties were

23  due in 2018, they caught and corrected the position.  So before

24  any tail royalties were due, they came to the conclusion that

25  they were not due under the agreement.

BUTHUSIEM - CROSS / GAFFNEY

1    Q.    You don't know why they changed their mind; right?

2    A.    I personally do not know what advice they got or did not

3    get or what happened to change their mind, no.

4    Q.    Okay.  You don't know why they projected tail royalties

5    and you don't know why they changed their mind; right?

6    A.    I'm not aware of what the advice was given.

7    Q.    But you were aware that as of the summer of 2028 -- I'm

8    sorry -- 2018, you saw that email where they were trying to

9    figure out how much they would have in inventory when Cabilly

10   expired and how much they would have to pay after that; right?

11   A.    I did.

12         MR. GAFFNEY:  Just about done.

13   Mr. Morales, could you put up Slide 7.

14   BY MR. GAFFNEY:

15   Q.    Now, you showed the jury -- I think this is actually from

16   your slide deck.  You looked at the earned royalties provision;

17   right?

18   A.    I did.

19   Q.    And you're saying that the sale is the infringing act that

20   triggered -- that requires a royalty?  Is that what I

21   understand?

22   A.    I didn't say that.  What I say is that the sale triggers

23   the royal- -- the royalty accrues on the sale.

24   Q.    Okay.  And you agree that licensed product is Tysabri

25   manufactured in or imported into the United States before

BUTHUSIEM - CROSS / GAFFNEY

1  Cabilly expires; right?

2  **A.**    Yes.

3  **Q.**    And you agree that net sales is unlimited by date; right?

4  It's net sales is --

5  **A.**    Net sales is just a definition.  You've got to look at the

6  term, the length of the obligation.

7  **Q.**    My question is:  The definition of net sales does not say

8  sales prior to the expiration of the patent?

9  **A.**    It does not.

10  **Q.**    Okay.  Could you -- what work do you think sold is doing

11  in this agreement?

12  **A.**    So, basically, as I testified before, it's the product,

13  when it's sold, trigger -- it's when the royalty obligation to

14  pay is accrued based on the sale.

15  **Q.**    Okay.  Could you click -- isn't it -- isn't it just as

16  reasonable to read "sold in the United States" and "sold in the

17  territory" as just a way to distinguish as to what royalty rate

18  applies?

19  **A.**    No, I don't believe that's accurate.

20  **Q.**    You heard Mr. Johnston's testimony that that's how he read

21  it?

22  **A.**    Yeah.  And I respectfully disagree with that

23  interpretation.

24         **MR. GAFFNEY:**  Okay.  You can take that down.

25  \\\

1    BY MR. GAFFNEY:

2    Q.   The projections that Ms. Dickerson and her team did, you

3    heard her testify about the process that went into doing that;

4    right?

5    A.   Yes.

6    Q.   And that process that she described, which is gathering

7    manufacturing information, talking to legal, filling out the

8    numbers, that is customary within the industry.  Every pharma

9    company does something like that; right?

10   A.   Well, it's not customary -- and I managed these -- this

11   process in two major multinational companies, the same process.

12   In fact, the person who worked for me was called Stephanie

13   Dickerson, just ironically enough.  But it's not customary to

14   collect that information on inventory for the purpose of paying

15   royalties unless there's a specific obligation.

16        So what those folks do is they look at the sale, they look

17   at the receipt for the sale, they look at the net selling

18   price, and they calculate the percentage, you know, based on

19   the net selling price, and they generate a royalty report.

20   That's what they do.

21   Q.   But as far as the process of someone in accounting

22   conferring with other folks, including legal, to see what the

23   royalty obligation is understood to be, that's part of the

24   process?

25   A.   Yeah.  I mean, I managed both functions, the legal

 1  function and that accounting function, so, yes.

 2          MR. GAFFNEY:  Thank you, Your Honor.  I have nothing

 3  further of the witness.

 4          MS. PATEL:  No redirect, Your Honor.

 5          THE COURT:  Okay.  Is there any reason to hold him in

 6  recall status?

 7      Mr. Gaffney, any reason to hold him in recall status?

 8          MR. GAFFNEY:  Oh, no, no recall.

 9          THE COURT:  All right.

10          MS. PATEL:  No, Your Honor.

11          THE COURT:  All right.  Sir, you're excused.  Just

12  hand it to the lawyers on your way down.

13          THE WITNESS:  Thanks, Your Honor.

14          THE COURT:  Okay.

15                          (Witness excused.)

16          MR. BLACK:  Can I just confer with the team for a

17  moment, Your Honor.

18          THE COURT:  Yes, Mr. Black.  Go ahead.

19              (Co-counsel confer off the record.)

20          MR. BLACK:  The defense rests, Your Honor.

21          THE COURT:  All right.  Is there any rebuttal case?

22          MR. GAFFNEY:  No, Your Honor.

23          THE COURT:  Okay.  Then subject to the Court reviewing

24  exhibits with the parties to make sure everything has been

25  admitted that was discussed during the trial, the evidentiary

**PROCEEDINGS**

1          Is that typed up?  Okay.  Has it been sent by -- can you

2     send it to them by chambers email?

3          It's about 12:30.  So if you could respond to me by 2:15,

4     I'd appreciate it.

5               **MR. BLACK:**  Sure.  Thank you, Your Honor.

6               **THE COURT:**  Okay.  We're adjourned.  We'll see you

7     tomorrow.  Thank you.

8               **MR. GAFFNEY:**  Thank you.

9               **THE COURTROOM DEPUTY:**  Court is adjourned.

10               (Proceedings adjourned at 12:26 p.m.)

11                         ---o0o---

12

13                    <u>**CERTIFICATE OF REPORTER**</u>

14          I certify that the foregoing is a correct transcript

15     from the record of proceedings in the above-entitled matter.

16

17     DATE:  Tuesday, July 1, 2025

18

19

20                        _Ana Dub_

21     _____

22          Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

23          CSR No. 7445, Official United States Reporter

24

25

**Volume 4**

**Pages 587 - 705**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

GENENTECH, INC.,                    )
                                    )
            Plaintiff,              )
                                    )
  VS.                               )   **NO. 4:23-cv-00909 YGR**
                                    )
BIOGEN MA INC.,                     )
                                    )
            Defendant.              )
_____      )

Oakland, California
Wednesday, July 2, 2025

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

                    WILLIAMS & CONNOLLY LLP
                    680 Maine Avenue, S.W.
                    Washington, D.C. 20024
                BY: **PAUL B. GAFFNEY, ATTORNEY AT LAW**
                    **C. LUKE McCLOUD, ATTORNEY AT LAW**
                    **RICARDO LEYVA, ATTORNEY AT LAW**


                    SKAGGS FAUCETTE LLP
                    505 Montgomery Street, 11th Floor
                    San Francisco, California 94111
                BY: **JEFFREY E. FAUCETTE, ATTORNEY AT LAW**


**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

```
 1    APPEARANCES:  (CONTINUED)

 2    For Defendant:
                              DECHERT LLP
 3                            Cira Centre
                              2929 Arch Street
 4                            Philadelphia, Pennsylvania 19104-2808
                        BY:  MARTIN J. BLACK, ATTORNEY AT LAW
 5

 6                            DECHERT LLP
                              45 Fremont Street, 26th Floor
 7                            San Francisco, California 94105
                        BY:  CHARLES HSU, ATTORNEY AT LAW
 8                           MICHAEL H. JOSHI, ATTORNEY AT LAW

 9                            DECHERT LLP
                              US Bank Tower
10                            633 West 5th Street, Suite 4900
                              Los Angeles, California 90071-2032
11                      BY:  NISHA PATEL, ATTORNEY AT LAW

12

13

14    Also Present:          Hannah Yuen

15

16

17

18

19

20

21

22

23

24

25
```

1                            **I N D E X**

2

3     Wednesday, July 2, 2025 - Volume 4

4
                                                    **PAGE**   **VOL.**
5
      Jury Instructions                             594      4
6     Closing Argument by Mr. Gaffney               604      4
      Closing Argument by Mr. Black                 649      4
7     Rebuttal Argument by Mr. Gaffney              679      4
      Final Jury Instructions                       693      4
8     Jury Question                                 699      4
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1    defense have -- I'm sure you've got slides or something.

 2        Okay.  There we go.

 3            **MR. BLACK:**  Okay.  Here we go.

 4                      **CLOSING ARGUMENT**

 5            **MR. BLACK:**  Members of the jury, this is my last

 6    opportunity to speak with you.

 7        When we opened the case, we told you that this case was

 8    about a contract, a license agreement that was entered into

 9    between Elan, Biogen, and Genentech in 2004, and that we needed

10    your help in getting Genentech to live by the terms of the

11    license agreement, the words that the parties wrote in 2004

12    which govern their relationship.

13        The contract is our first witness.  It is the most

14    important document in the case and the most important witness

15    in the case.

16        In a contract case, what matters are the words of the

17    agreement and how they were interpreted by the parties at the

18    time of the original negotiation in 2004.

19        What that means is that the words that the parties spoke

20    to each other in 2004 matter, whether they were oral or in

21    written communication sent back and forth.  That's the most

22    important evidence in the case.

23        To the extent there's any spaghetti thrown up against the

24    wall in this case, it's from TMC.  It's from bringing

25    Mr. Strate here and all these witnesses who have absolutely

1  nothing to do with the original negotiations.

2      With respect to Mr. Arner, he was not the lead negotiator.

3  That was Mr. Battle.  Mr. Gaffney had every opportunity to get

4  any evidence from him that he thought he wanted.  He hasn't

5  told you anything about his age or health conditions or

6  anything.  You haven't seen any documents from Mr. Arner in the

7  case.  You haven't seen any, other than ones that were in 2004

8  or earlier.

9      Okay.  We're going to go through the evidence.  Then we'll

10 explain the interpretation of the license agreement, show you

11 that Genentech cannot meet its burden of proof and that Biogen

12 paid all the monies that were due.

13     Tysabri, joint venture in 2000 between Biogen and Elan,

14 that's where it started, relates to natalizumab, which was

15 formulated into Tysabri and then became approved in 2004 and

16 has been administered to many, many patients.

17     You've seen the sales.  It's been an enormously successful

18 drug, and Biogen's very proud of it.  And Biogen and its

19 partner Genentech on Rituxan have worked together on and off in

20 the industry, sometimes Biogen sharing IP with Genentech and

21 sometimes Genentech sharing IP with Biogen.

22     The license agreement was entered into in 2004 after

23 negotiations that began with a term sheet in 2002.

24     Shortly after the Cabilly patent issued on December 18th,

25 2001, Biogen contacted Genentech to obtain terms for a license.

1   That was on August 7th, 2002.  The term sheet, which I'll show

2   you in a moment, was sent by Genentech's business development

3   department to Biogen.

4         Mr. Schwartz, although he didn't remember it, and

5   Mr. Johnston seemed to deny it, had the term sheet in his files

6   in April of 2003, shortly before the parties met on January 13,

7   2014, for a meeting at Genentech headquarters.

8         After that, there were a series of drafts that were

9   exchanged between Mr. Schwartz, as the lead negotiator for

10  Genentech, and Mr. Battle, as the lead negotiator for Elan and

11  Biogen as the licensees.

12        There was a draft on April 24th from Mr. Schwartz, which

13  is Exhibit 10, and then a final draft from Mr. Schwartz with

14  comments that was sent on July 30th, 2004, which was also the

15  effective date of the agreement when it was signed.

16        There were a series of back-and-forth negotiations.  The

17  words of those negotiations will matter, as I'll show you in a

18  moment.

19        So the first document in the negotiating history was the

20  Genentech term sheet.  That's Exhibit 202B.  It says Biogen

21  shall pay to Genentech a signing fee of 4 million, a $5 million

22  fee upon FDA approval, and then a running royalty provision.

23  And this, you'll see in a moment, tracks 3.01, 3.02, and 3.03

24  of the agreement.  And importantly, at the end, what was

25  proposed was that the payments would run until the last to

1

2                    **CERTIFICATE OF REPORTER**

3         I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Thursday, July 3, 2025

7

8

9

10                    _Ana Dub_

11    _____

12         Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

13         CSR No. 7445, Official United States Reporter

14

15

16

17

18

19

20

21

22

23

24

25

# ATTACHMENT A

## Transcript of Carl Battle Deposition Designations Played June 30, 2025 (with errata)

# Battle, Carl v2 PA DC

## Designation List Report

**Battle, Carl**                                          **2024-02-27**

| | |
|---|---|
| Genentech Designations | 00:11:36 |
| Biogen Counters | 00:03:50 |
| **TOTAL RUN TIME** | **00:15:26** |

Documents linked to video:

EX1

EX5

EX7



**ID: BC1e**

**BC1e - Battle, Carl v2 PA DC**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 5:17 - 5:25 | **Battle, Carl 2024-02-27** | 00:00:24 | **BC1e.1** |

    5:17   Q.  Sir, could you please state your full name for
    5:18       the record.
    5:19   A.  Carl W. Battle.
    5:20   Q.  Where do you reside, Mr. Battle?
    5:21   A.  In Sarasota, Florida, 3803 Founders Club
    5:22       Drive.
    5:23   Q.  Thank you.  I understand you're -- are you
    5:24       currently retired?
    5:25   A.  I am.

| 12:14 - 12:18 | **Battle, Carl 2024-02-27** | 00:00:13 | **BC1e.2** |

    12:14   You were involved, I gather, in the
    12:15   negotiation of the 2004 Cabilly license agreement
    12:16   between Genentech on the one hand and Elan Biogen on the
    12:17   other, right?
    12:18  A.  Yes, I was.

| 13:20 - 14:02 | **Battle, Carl 2024-02-27** | 00:00:18 | **BC1e.3** |

    13:20   In your prior employment with
    13:21   biopharmaceutical companies we mentioned --
    13:22  A.  Yes.
    13:23  Q.  -- was part of your job negotiating license
    13:24   agreements?
    13:25  A.  Yes.
    14:01  Q.  In all of those jobs?
    14:02  A.  Yes.

| 15:08 - 15:21 | **Battle, Carl 2024-02-27** | 00:01:00 | **BC1e.4** |

    15:08   Q.  About how many license agreements do you
    15:09   estimate you negotiated in your time at pharmaceutical
    15:10   companies?
    15:11  A.  I don't have an exact number.  I'd say
    15:12   50-plus.
    15:13  Q.  Dozens, not hundreds?
    15:14  A.  Yeah, dozens.
    15:15  Q.  Are you familiar with the term "freedom to
    15:16   operate license"?
    15:17  A.  Yes.
    15:18  Q.  What is your understanding of that term?
    15:19  A.  It's a license to allow someone to -- to
    15:20   practice under a patent without threat of litigation or

**BC1e - Battle, Carl v2 PA DC**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 15:21  infringement. | | |
| 16:05 - 16:07 | **Battle, Carl 2024-02-27** | 00:00:06 | **BC1e.5** |
| | 16:05  Would you characterize the Cabilly agreement | | |
| | 16:06  that you looked at yesterday as a freedom to operate | | |
| | 16:07  license? | | |
| 16:12 - 16:18 | **Battle, Carl 2024-02-27** | 00:00:19 | **BC1e.6** |
| | 16:12  THE WITNESS:  I would -- it was classified | | |
| | 16:13  as a freedom to operate, yes. | | |
| | 16:14  BY MR. GAFFNEY: | | |
| | 16:15  Q.  Genentech promised not to sue Elan and Biogen | | |
| | 16:16  for infringement in the manufacture, importation, or | | |
| | 16:17  sale of Tysabri as long as it made the payments required | | |
| | 16:18  by the license? | | |
| 16:20 - 16:20 | **Battle, Carl 2024-02-27** | 00:00:01 | **BC1e.7** |
| | 16:20  A.  That's correct. | | |
| 17:16 - 17:25 | **Battle, Carl 2024-02-27** | 00:00:37 | **BC1e.8** |
| | 17:16  Q.  So let me ask about your time at Elan.  Did -- | | |
| | 17:17  you started in 2003, I gather? | | |
| | 17:18  A.  Yeah.  It was toward the end of 2003. | | |
| | 17:19  November or December.  I don't have the exact date. | | |
| | 17:20  Q.  At some point did you become aware that the | | |
| | 17:21  company was developing the antibody natalizumab? | | |
| | 17:22  A.  Yes. | | |
| | 17:23  Q.  And that is -- went on to be commercialized | | |
| | 17:24  under the name Tysabri? | | |
| | 17:25  A.  Yes. | | |
| 18:15 - 18:20 | **Battle, Carl 2024-02-27** | 00:00:11 | **BC1e.9** |
| | 18:15  Q.  Now, natalizumab was a molecule that Elan | | |
| | 18:16  invented; is that right? | | |
| | 18:17  A.  That's correct. | | |
| | 18:18  Q.  And it was commercialized through a | | |
| | 18:19  collaboration with Biogen; is that correct? | | |
| | 18:20  A.  That's correct. | | |
| 21:21 - 21:22 | **Battle, Carl 2024-02-27** | 00:00:04 | **BC1e.10** |
| | 21:21  Q.  Mr. Battle, I'm going to hand you what's been | | |
| 🔗 EX1.1.1 | 21:22  marked as Exhibit 1.  (edited) | | |
| 21:22 - 21:23 | **Battle, Carl 2024-02-27** | 00:00:02 | **BC1e.11** |
| | 21:22  Are you familiar with this  (edited) | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 21:23    document? | | |
| 21:24 - 22:07 | **Battle, Carl 2024-02-27** | 00:00:20 | **BC1e.12** |
| | 21:24   A.   Yes.  I mean, I haven't read through the whole | | |
| | 21:25        thing, but it looks like the Cabilly license. | | |
| | 22:01   Q.   And you were involved in the negotiation of | | |
| | 22:02        this license? | | |
| | 22:03   A.   Yeah.  I was one of -- one of the parties | | |
| | 22:04        involved. | | |
| | 22:05   Q.   Who else was involved in this negotiation? | | |
| | 22:06   A.   Ray Arner, who was my counterpart at Biogen | | |
| | 22:07        Idec. | | |
| 24:18 - 24:19 | **Battle, Carl 2024-02-27** | 00:00:06 | **BC1e.13** |
| | 24:18   Q.   Whose idea was it to approach Genentech for | | |
| | 24:19        the license? | | |
| 24:22 - 24:23 | **Battle, Carl 2024-02-27** | 00:00:05 | **BC1e.14** |
| | 24:22   A.   That would have been Ray Arner at the Biogen | | |
| | 24:23        Idec. | | |
| 24:25 - 25:04 | **Battle, Carl 2024-02-27** | 00:00:21 | **BC1e.15** |
| | 24:25   Q.   Why do you say that?  Why wouldn't it have | | |
| | 25:01        been Elan? | | |
| | 25:02   A.   I think -- I remember Ray was -- was involved | | |
| | 25:03        in this, and he was the one who reached out to me to get | | |
| | 25:04        me involved in moving forward on the Cabilly license. | | |
| 27:24 - 28:02 | **Battle, Carl 2024-02-27** | 00:00:17 | **BC1e.16** |
| | 27:24   Q.   And did you understand that Tysabri was | | |
| | 27:25        manufactured using a process that could be challenged as | | |
| | 28:01        infringing by Genentech absent a license? | | |
| | 28:02   A.   That was my understanding. | | |
| 28:03 - 28:05 | **Battle, Carl 2024-02-27** | 00:00:10 | **BC1e.17** |
| | 28:03   Q.   So you were seeking a license, a Cabilly | | |
| | 28:04        license, so you could make, import, and sell Tysabri | | |
| | 28:05        without being sued by Genentech for infringement? | | |
| 28:08 - 28:13 | **Battle, Carl 2024-02-27** | 00:00:27 | **BC1e.18** |
| | 28:08   A.   Yes.  It was a patent that was out there, and | | |
| | 28:09        I knew it was involving a lot of litigation.  And so we | | |
| | 28:10        are preparing for the launch of Tysabri, and we wanted | | |
| | 28:11        to -- to make sure we had -- we had cleared the road for | | |
| | 28:12        us and would not have any problems in terms of freedom | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 28:13    to operate in launching the product. | | |
| 28:15 - 28:18 | **Battle, Carl 2024-02-27** | 00:00:09 | **BC1e.19** |

28:15   Q.   You -- you wanted to launch the product with
28:16     freedom to operate, and you secured this license to
28:17     accomplish that?
28:18   A.   That's correct.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 30:06 - 32:04 | **Battle, Carl 2024-02-27** | 00:02:40 | **BC1e.20** |

30:06     (Exhibit No. 3 marked for identification.)
30:07     BY MR. GAFFNEY:
30:08   Q.   I will hand you the next exhibit, Mr. Battle,

🔗 EX5.1.1    30:09     Exhibit 3. This is a January 20- -- 2004 email from
30:10     Mr. Schwartz at Genentech to you and Mr. Arner.
30:11     Do you see that?
30:12   A.   Yes.
30:13   Q.   Copying Mr. Johnston on that?
30:14   A.   Mm-hmm. Yes, I see it.
30:15   Q.   Do you remember receiving this?
30:16   A.   I don't remember receiving it per se, but I'm
30:17     sure I did because I -- I looked at whether it came from
30:18     Mr. Johnston or Ray Arner. I remember seeing a copy of
30:19     it.
30:20   Q.   In his email Mr. Schwartz references "license
30:21     agreement containing the terms we discussed." Do you
30:22     see that in the email?
30:23   A.   Yes.
30:24   Q.   Do you remember what terms were discussed
30:25     prior to this first draft?
31:01   A.   Yeah. At the meeting most of the discussion
31:02     was really around royalty rate, with the realization on
31:03     our side all we needed was freedom to operate, and we
31:04     were trying to get the lowest royalty rate that we
31:05     could.
31:06   Q.   Were there negotiations over the royalty rate?
31:07   A.   There was some discussions, yes, if I recall.
31:08   Q.   The rates in the license, Exhibit 1 -- I don't

🔗 EX1.8.1    31:09     know if you remember this -- are four and a half percent
31:10     domestic sales and three and a half percent --
31:11   A.   Three and a half, yes.
31:12   Q.   -- for ex-U.S. sales?
31:13   A.   Yeah. Three and a half.

**BC1e - Battle, Carl v2 PA DC**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

31:14 Q. Were those numbers actually negotiated?

31:15 A. There was negotiation and discussion around

31:16 the royalty rate, so -- but what we ultimately ended up

31:17 with I would say is something ultimately negotiated,

31:18 even though they may not have been the terms we ideally

31:19 wanted.

31:20 Q. Did Genentech ask for a higher rate -- higher

31:21 rates than that at the December -- I'm sorry -- the

31:22 January meeting?

31:23 A. That I don't recall, but I recall we asked for

31:24 a lower -- a lower rate than we --

31:25 Q. You wanted a rate that was lower than that,

32:01 correct?

32:02 A. Yes.

32:03 Q. And they didn't give it to you?

32:04 A. No.

| 32:05 - 32:07 | **Battle, Carl 2024-02-27** | 00:00:06 | **BC1e.21** |
|---|---|---|---|

<span style="color:orange">32:05 Q. How low did you want the rate? Do you</span>

<span style="color:orange">32:06 remember?</span>

🗙 Clear    <span style="color:orange">32:07 A. I think 3 percent is what I recall.</span>

| 32:14 - 32:18 | **Battle, Carl 2024-02-27** | 00:00:23 | **BC1e.22** |
|---|---|---|---|

32:14 Q. Was there any communication from the Genentech

32:15 side that because the product, Tysabri, was so close to

32:16 commercialization, you already had client data, the

32:17 application was going in soon, that that hurt your

32:18 negotiating leverage?

| 32:21 - 33:06 | **Battle, Carl 2024-02-27** | 00:00:37 | **BC1e.23** |
|---|---|---|---|

32:21 A. I don't know whether that hurt -- you'll have

32:22 to ask the folks from Genentech. But we had a mission

32:23 to get a license to allow us to go forward.

32:24 BY MR. GAFFNEY:

32:25 Q. Did you believe that hurt your negotiation

33:01 leverage?

33:02 A. Well, we didn't get the rate that we initially

33:03 wanted, so -- but we -- we started out looking for

33:04 something that we thought was comfortable and we wanted,

33:05 and they had numbers that they wanted, and we ended up

33:06 with the numbers that are in the agreement.

| 35:03 - 35:05 | **Battle, Carl 2024-02-27** | 00:00:02 | **BC1e.24** |
|---|---|---|---|

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 35:03    (Exhibit No. 5 marked for identification.) | | **BC1e.24** |
| | 35:04    BY MR. GAFFNEY: | | |
| 🔗 EX7.1.1 | 35:05    Q.  I'm going to hand you Exhibit 5. (edited) | | |
| 35:05 - 35:06 | **Battle, Carl 2024-02-27** | 00:00:02 | **BC1e.25** |
| | 35:05    Q.  Can you (edited) | | |
| | 35:06         identify that document? | | |
| 35:07 - 35:10 | **Battle, Carl 2024-02-27** | 00:00:16 | **BC1e.26** |
| | 35:07    A.  Yes.  This was a -- it was my follow-up letter | | |
| | 35:08         to Tim Schwartz. | | |
| | 35:09    Q.  And it attaches a clean and red-line version | | |
| | 35:10         of the license; is that right? (edited) | | |
| 35:10 - 35:12 | **Battle, Carl 2024-02-27** | 00:00:03 | **BC1e.27** |
| | 35:10         Or at least attaches the (edited) | | |
| | 35:11         red-line one. | | |
| | 35:12    A.  It had the red-line version. | | |
| 41:07 - 41:15 | **Battle, Carl 2024-02-27** | 00:00:27 | **BC1e.28** |
| | 41:07    Q.  Okay.  Why don't we go back one exhibit to | | |
| | 41:08         your -- the red-line you sent Mr. Schwartz in February | | |
| | 41:09         of 2024. | | |
| | 41:10    A.  What exhibit was that?  5? | | |
| | 41:11    Q.  Yes, I believe so.  It's got that patent | | |
| | 41:12         attached to the back of it.  Am I correct these are | | |
| | 41:13         edits that -- or red-lines that you and/or Mr. Arner | | |
| | 41:14         made? | | |
| | 41:15    A.  That is correct. | | |
| 43:18 - 43:21 | **Battle, Carl 2024-02-27** | 00:00:16 | **BC1e.29** |
| | 43:18    Q.  Do you recall any discussions with anyone at | | |
| 🔗 EX7.14 | 43:19         Genentech about the changes to 13 and 14? | | |
| 🔗 EX7.15 | | | |
| 🔗 EX7.16 | | | |
| | 43:20    A.  Pages 13 and 14? | | |
| | 43:21    Q.  Yes.  I guess I meant 15.  It goes on to 15. | | |
| 43:22 - 43:23 | **Battle, Carl 2024-02-27** | 00:00:06 | **BC1e.30** |
| | 43:22    A.  Page 15 also? | | |
| | 43:23    Q.  Yeah.  Just the end of 7.05. | | |
| 43:24 - 45:05 | **Battle, Carl 2024-02-27** | 00:02:20 | **BC1e.31** |
| | 43:24    A.  Whether this was discussion or follow-up | | |
| 🔗 EX7.14.1 | 43:25         emails, 7.0- -- 7.01, "the obligation to pay | | |

**BC1e - Battle, Carl v2 PA DC**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 44:01 | royalties...shall commence" and -- and the language | | |
| | 44:02 | after -- following that, where the -- that obligation | | |
| | 44:03 | would terminate upon the expiration on the last patents, | | |
| | 44:04 | I do remember that being raised as an issue. | | |
| | 44:05 | Q. Who raised it? | | |
| | 44:06 | A. I don't know whether it was me or Ray Arner. | | |
| | 44:07 | Q. And what did -- what did Genentech say in | | |
| | 44:08 | response? | | |
| | 44:09 | A. Well, I believe they agreed to it, obviously. | | |
| | 44:10 | Q. Well, what did you raise? | | |
| | 44:11 | A. We wanted certainty around when we were | | |
| | 44:12 | obligated to pay royalties when, certainly given | | |
| | 44:13 | the -- all of the litigation and questions around the | | |
| | 44:14 | Cabilly patent, "patent" or "patents." | | |
| | 44:15 | Q. So if a patent was rendered invalid, you | | |
| | 44:16 | wouldn't have to pay anymore? | | |
| | 44:17 | A. Yeah, exactly. | | |
| | 44:18 | Q. Do you recall anything else about that | | |
| | 44:19 | conversation? | | |
| | 44:20 | A. No, I don't. In fact, I think -- well, | | |
| | 44:21 | Genentech accepted that, and it gave us certainty on | | |
| | 44:22 | what I believed the royalties were. | | |
| | 44:23 | Q. So you knew that there had been some | | |
| | 44:24 | litigation over Cabilly? | | |
| | 44:25 | A. Oh, yeah. | | |
| | 45:01 | Q. And you wanted assurances that if the -- if | | |
| | 45:02 | that litigation went badly for Genentech and the patent | | |
| ✗ Clear | 45:03 | weren't validated, that your payment obligation would | | |
| | 45:04 | come to an end? | | |
| | 45:05 | A. That's correct. | | |

| 46:01 - 46:08 | **Battle, Carl 2024-02-27** | 00:00:14 | **BC1e.32** |
| | 46:01 | Q. So you wanted freedom to operate, and you | | |
| | 46:02 | didn't want to have to keep paying if Cabilly weren't | | |
| | 46:03 | valid? | | |
| | 46:04 | A. That is correct. | | |
| | 46:05 | Q. Those were two of the big issues for you? | | |
| | 46:06 | A. (Nods head.) | | |
| | 46:07 | Q. Can you think of any other big issue that was | | |
| | 46:08 | on your plate at the time? | | |

| 46:09 - 46:20 | **Battle, Carl 2024-02-27** | 00:00:44 | **BC1e.33** |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 46:09   A.   Regarding the Cabilly patent, no. I mean, as<br>46:10        long as we got a -- a freedom to operate license with<br>46:11        clear terms on obligation to -- to pay royalty, and the<br>46:12        amount of the royalty, that's -- that's basically all we<br>46:13        needed.<br>46:14        We -- as I say, there was no technology, no<br>46:15        knowhow exchanged or anything. This is a straight<br>46:16        freedom to operate license.<br>46:17   Q.   Do you see anything -- in the remaining pages<br>46:18        of the license, there's some minor edits. Do you see<br>46:19        any changes that you recall discussing with<br>46:20        Mr. Schwartz? | | BC1e.33 |
| 46:21 - 46:22 | **Battle, Carl 2024-02-27**<br>46:21   A.   In the remainder of the agreement?<br>46:22   Q.   Yeah. | 00:00:02 | BC1e.34 |
| 46:23 - 46:24 | **Battle, Carl 2024-02-27**<br>46:23   A.   No, I don't recall anything else that we<br>46:24        discussed specifically that's red-lined in here. | 00:00:06 | BC1e.35 |
| 46:25 - 47:06 | **Battle, Carl 2024-02-27**<br>46:25   Q.   With respect to that provision we looked at<br>47:01        about the obligation to pay, do you recall any<br>47:02        discussion with Mr. Schwartz other than about your<br>47:03        desire to avoid owing money if Cabilly suffered defeat<br>47:04        in litigation?<br>47:05   A.   No. It was to get certainty on the<br>47:06        termination of our obligation to pay royalties. | 00:00:28 | BC1e.36 |
| 63:09 - 64:03 | **Battle, Carl 2024-02-27**<br>63:09   Q.   Are you familiar with the concept of tail<br>63:10        royalties?<br>63:11   A.   I am.<br>63:12   Q.   What is a tail royalty?<br>63:13   A.   Royalties on products that are -- that are<br>63:14        sold after a license expired or after the license<br>63:15        agreement -- or after patent expires after the license<br>63:16        agreement expires.<br>63:17   Q.   If I refer to products that are manufactured<br>63:18        before patent expiration but sold after royalties for<br>63:19        those products, would you understand that to mean tail<br>63:20        royalties? | 00:01:07 | BC1e.37 |

**BC1e - Battle, Carl v2 PA DC**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 63:21    A.    I mean, tail royalties are any product -- sold | | |
| | 63:22          after the patent but manufactured during the term of the | | |
| | 63:23          patent. | | |
| | 63:24    Q.    During the negotiations for the 2004 Cabilly | | |
| | 63:25          license agreement, do you recall any discussions with | | |
| | 64:01          Genentech relating to tail royalties? | | |
| | 64:02    A.    We had no discussions, from my recollection, | | |
| | 64:03          on tail royalties. | | |
| 64:04 - 64:07 | **Battle, Carl 2024-02-27** | 00:00:09 | **BC1e.38** |
| | 64:04    Q.    Do you remember Genentech ever bringing up | | |
| | 64:05          tail royalties during the negotiations, either orally or | | |
| | 64:06          in writing? | | |
| | 64:07    A.    I do not. | | |
| 76:22 - 76:25 | **Battle, Carl 2024-02-27** | 00:00:12 | **BC1e.39** |
| | 76:22    Q.    Now, you said as well that you and | | |
| | 76:23          Mr. Schwartz had no discussion about tail royalties, | | |
| | 76:24          correct?  Did I understand that correctly? | | |
| | 76:25    A.    That's correct. | | |

| | |
|---|---|
| Genentech Designations | 00:11:36 |
| Biogen Counters | 00:03:50 |
| **TOTAL RUN TIME** | **00:15:26** |

Documents linked to video:
EX1
EX5
EX7

1  DECHERT LLP
   Nisha Patel (SBN 281628)
2  nisha.patelgupta@dechert.com
   US Bank Tower, 633 West 5th St., Ste 4900
3  Los Angeles, CA 90071
   (213) 808-5700
4
   Michael Joshi (SBN 302184)
5  Charles Hsu (SBN 328798)
   michael.joshi@dechert.com
6  charles.hsu@dechert.com
   45 Fremont St 26th Floor
7  San Francisco, CA 94105
   (650) 813-4800
8  Martin J. Black (*pro hac vice*)
   martin.black@dechert.com
9  Cira Centre, 2929 Arch Street
   Philadelphia, PA 19104
10 (215) 994-2664

11 Katherine A. Helm (*pro hac vice*)
   khelm@dechert.com
12 Three Bryant Park, 1095 Ave. of the Americas
   New York, New York 10036-6797
13 (212) 698-3500

14 Steven A. Engel (*pro hac vice*)
   steven.engel@dechert.com
15 1900 K St NW
   Washington DC 20006
16 (202) 261-3369

   *Attorneys for Defendant*
17 *Biogen MA Inc*.

Paul B. Gaffney (State Bar No. 345431)
Charles L. McCloud (pro hac vice)
Ricardo Leyva (State Bar No. 319939)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Tel: (202) 434-5000
Fax: (202) 434-5029

Jeffrey E. Faucette (State Bar No. 193066)
SKAGGS FAUCETTE LLP
Four Embarcadero Center
Suite 1400 PMB #72
San Francisco, CA 94111
Tel: (415) 295-1197
Fax: (888) 980-6547

*Attorneys for Plaintiff*
*Genentech, Inc.*

18              **UNITED STATES DISTRICT COURT**

19             **NORTHERN DISTRICT OF CALIFORNIA**

20                    **OAKLAND DIVISION**

21  GENENTECH, INC.,                    | Case No. 4:23-cv-00909-YGR (LB)

22              Plaintiff,

23  v.                                   **ERRATA TO CARL BATTLE**
                                         **TRANSCRIPT PLAYED JUNE 30, 2025**
24  BIOGEN MA INC.,

25

26              Defendant.

27

28

**CARL BATTLE TRANSCRIPT PORTIONS – PLAYED JUNE 30, 2025**

| Page | Line(s) | Change | Reason |
|------|---------|--------|--------|
| 12 | 16 | Change "between Genentech on the one hand and Elan Biogen on the" to "between Genentech on the one hand and Elan and Biogen on the" | Transcription error |
| 32 | 16 | Change "commercialization, you already had client data, the" to "commercialization, you already had clinical data, the" | Transcription error |
| 44 | 22 | Change "what I believed the royalties were." to "what our obligations to pay royalties were." | Transcription error |
| 45 | 3 | Change "weren't validated?" to "were invalidated?" | Transcription error |
| 46 | 2-3 | Change "didn't want to have to keep paying if Cabilly weren't valid" to "didn't want to have to keep paying if Cabilly were invalidated" | Transcription error |

1    Dated: June 30, 2025                    Respectfully Submitted,

2

3    By:  /s/ *Paul B. Gaffney*              By:  /s/ *Michael Joshi*

4

5    WILLIAMS & CONNOLLY LLP               DECHERT LLP
     Paul B. Gaffney (SBN 345431)          Nisha Patel (SBN 281628)
6    Charles L. McCloud (pro hac vice)     nisha.patelgupta@dechert.com
     Ricardo Leyva (SBN 319939)            US Bank Tower
7    pgaffney@wc.com                       633 West 5th Street, Suite 4900
     lmccloud@wc.com                       Los Angeles, CA 90071
8    rleyva@wc.com                         (213) 808-5700

9    SKAGGS FAUCETTE LLP                   Michael Joshi (SBN 302184)
10   Jeffrey E. Faucette                   Charles Hsu (SBN 328798)
     jeff@skaggsfaucette.com               michael.joshi@dechert.com
11                                         charles.hsu@dechert.com
                                           45 Fremont St. 26th Floor
12   *Attorneys for Plaintiff*             San Francisco, CA 94105
     *Genentech, Inc.*                     (650) 813-4800

13

14                                         Martin J. Black (*pro hac vice*)
                                           martin.black@dechert.com
15                                         Cira Centre
                                           2929 Arch Street
16                                         Philadelphia, PA 19104
                                           (215) 994-2664
17

18                                         Katherine A. Helm (*pro hac vice*)
                                           khelm@dechert.com
19                                         Three Bryant Park
                                           1095 Avenue of the Americas
20                                         New York, New York 10036-6797
                                           (212) 698-3500
21

22                                         Steven A. Engel (*pro hac vice*)
                                           steven.engel@dechert.com
23                                         1900 K St NW
                                           Washington DC 20006
24                                         (202) 261-3369

25                                         *Attorneys for Defendant*
26                                         *Biogen MA Inc.*

27

28
                                                CASE NO. 4:23-CV-00909-YGR (LB)
                                           ERRATA TO VIDEO DEPOSITION PLAYED
                                                              JUNE 30. 2025

# ATTACHMENT B

## Transcript of Kristina Dickerson Deposition Designations Played June 30, 2025

# Dickerson, Kristina v5 PA DC

## Designation List Report

**Dickerson, Kristina**                     **2024-04-30**

| | |
|---|---|
| Genentech Designations | 00:30:43 |
| Biogen Counters | 00:06:53 |
| Biogen Conditional Counters | 00:00:26 |
| **TOTAL RUN TIME** | **00:38:02** |

Documents linked to video:
EX26
EX27
EX29
EX30
EX31
EX32
EX37
EX39
EX41
EX42
EX43
EX46
EX47
EX48



**ID: DK1e**

**DK1e - Dickerson, Kristina v5 PA DC**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 8:19 - 8:25 | **Dickerson, Kristina 2024-04-30** | 00:00:12 | **DK1e.1** |

| | | |
|---|---|---|
| 8:19 | Q. | Good morning, ma'am. |
| 8:20 | | Could you please state your name for the |
| 8:21 | | record. |
| 8:22 | A. | Kristina Dickerson. |
| 8:23 | Q. | Do you prefer to be called Ms. Dickerson |
| 8:24 | | or Mrs. Dickerson? |
| 8:25 | A. | Mrs. Dickerson is fine. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 13:16 - 14:17 | **Dickerson, Kristina 2024-04-30** | 00:01:26 | **DK1e.2** |

| | | |
|---|---|---|
| 13:16 | Q. | If you could turn to Topic 4 of the |
| 13:17 | | notice. |
| 13:18 | | Do you see that, Topic 4? |
| 13:19 | A. | Topic 4 on Page 4? |
| 13:20 | Q. | Yep. |
| 13:21 | A. | Yes. |
| 13:22 | Q. | "Your communications with Genentech, if |
| 13:23 | | any, about your understanding of your |
| 13:24 | | royalty obligations to Genentech on sales |
| 13:25 | | of Tysabri manufactured and/or imported in |
| 14:01 | | the United States but sold after patent |
| 14:02 | | expiry." |
| 14:03 | | Do you see that? |
| 14:04 | A. | Yes. |
| 14:05 | Q. | All right. |
| 14:06 | | Did Biogen have any communications with |
| 14:07 | | Genentech about your understanding of those royalty |
| 14:08 | | obligations? |
| 14:09 | A. | As part of our Q4 2018 royalty statement, |
| 14:10 | | we sent a final notice letter -- |
| 14:11 | Q. | Uh-huh. |
| 14:12 | A. | -- to Genentech stating this was the end |
| 14:13 | | of the royalty obligation. |
| 14:14 | Q. | Besides that letter, are you aware of any |
| 14:15 | | other communications conveying to Genentech Biogen's |
| 14:16 | | understanding of its royalty obligations? |
| 14:17 | A. | Not to my knowledge. |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 16:20 - 17:05 | **Dickerson, Kristina 2024-04-30** | 00:00:28 | **DK1e.3** |

| | | |
|---|---|---|
| 16:20 | Q. | Are you an accountant? |
| 16:21 | A. | Yes. |
| 16:22 | Q. | When did you graduate from college? |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 16:23   A.   2006 with my master's degree. | | |
| | 16:24   Q.   Did you start working right away? | | |
| | 16:25   A.   Yes. | | |
| | 17:01   Q.   Did you start at Pricewaterhouse? | | |
| | 17:02   A.   Yes. | | |
| | 17:03   Q.   So you worked at Pricewaterhouse and then | | |
| | 17:04        in 2012 you came to work at Biogen? | | |
| | 17:05   A.   Yes. | | |
| 17:08 - 17:10 | **Dickerson, Kristina 2024-04-30** | 00:00:06 | **DK1e.4** |
| | 17:08   Q.   What's your current position at Biogen? | | |
| | 17:09   A.   I'm a senior director within the corporate | | |
| | 17:10        accounting team. | | |
| 17:13 - 17:17 | **Dickerson, Kristina 2024-04-30** | 00:00:15 | **DK1e.5** |
| | 17:13        How many other positions have you held | | |
| | 17:14        over the last 12 years? | | |
| | 17:15   A.   I started at Biogen as a manager, was | | |
| | 17:16        promoted to senior manager, to associate director, | | |
| | 17:17        to director, to senior director. | | |
| 17:20 - 18:07 | **Dickerson, Kristina 2024-04-30** | 00:00:34 | **DK1e.6** |
| | 17:20   Q.   And is this all within the corporate | | |
| | 17:21        accounting -- | | |
| | 17:22   A.   Yes. | | |
| | 17:23   Q.   -- department or division of the company? | | |
| | 17:24   A.   Yes. | | |
| | 17:25   Q.   In any of these positions have you had | | |
| | 18:01        responsibilities with respect to outgoing royalties | | |
| | 18:02        to licensors? | | |
| | 18:03   A.   Yes. | | |
| | 18:04   Q.   And what -- for what period of time was | | |
| | 18:05        that within your area of responsibility? | | |
| | 18:06   A.   Beginning in 2013 through -- through | | |
| | 18:07        today. | | |
| 18:08 - 18:10 | **Dickerson, Kristina 2024-04-30** | 00:00:05 | **DK1e.7** |
| | 18:08   Q.   Does that work involve calculating royalty | | |
| | 18:09        payments? | | |
| | 18:10   A.   Yes. | | |
| 18:24 - 19:02 | **Dickerson, Kristina 2024-04-30** | 00:00:09 | **DK1e.8** |
| | 18:24   Q.   Okay.  Who makes a determination about | | |
| | 18:25        whether royalties are owed under an agreement? | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 19:01   A.   The accounting team consults with our | | |
| | 19:02        legal department. | | |
| 19:03 - 19:06 | **Dickerson, Kristina 2024-04-30** | 00:00:12 | **DK1e.9** |
| | 19:03   Q.   Do you -- in any of these positions have | | |
| | 19:04        you had responsibilities for receiving and | | |
| | 19:05        accounting for incoming royalty payments? | | |
| | 19:06   A.   Yes. | | |
| 19:07 - 19:10 | **Dickerson, Kristina 2024-04-30** | 00:00:10 | **DK1e.10** |
| | 19:07   Q.   Do you have -- have you had responsibility | | |
| | 19:08        for preparing projections of future royalty | | |
| | 19:09        obligations? | | |
| | 19:10   A.   Yes. | | |
| 20:03 - 20:18 | **Dickerson, Kristina 2024-04-30** | 00:00:41 | **DK1e.11** |
| | 20:03        We're going to talk about a lawsuit that | | |
| | 20:04        was filed by -- started by The Medicines Company in | | |
| | 20:05        New Jersey. | | |
| | 20:06        Are you aware of any other case besides | | |
| | 20:07        that one between Biogen and The Medicines Company? | | |
| | 20:08   A.   I -- I don't remember. | | |
| | 20:09   Q.   You remember one case between the | | |
| | 20:10        companies? | | |
| | 20:11   A.   Yes. | | |
| | 20:12   Q.   Have you ever heard the term "tail | | |
| | 20:13        royalties"? | | |
| | 20:14   A.   Yes. | | |
| | 20:15   Q.   What is your understanding of what that | | |
| | 20:16        term means? | | |
| | 20:17   A.   Tail royalties are -- it's a term used for | | |
| | 20:18        royalties paid after patent expiration. | | |
| 20:19 - 21:01 | **Dickerson, Kristina 2024-04-30** | 00:00:29 | **DK1e.12** |
| | 20:19   Q.   Now, I'm going to make reference to the | | |
| | 20:20        term "tail royalties" in the course of my | | |
| | 20:21        questioning, and I just want to make sure we're on | | |
| | 20:22        the same page about -- about what the term means. | | |
| | 20:23        So I'm going to propose to define it as | | |
| | 20:24        royalties on a product made in or imported into a | | |
| | 20:25        country where there was a patent covering it and | | |
| | 21:01        sold after the patent expired. | | |
| 21:03 - 21:11 | **Dickerson, Kristina 2024-04-30** | 00:00:25 | **DK1e.13** |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 21:03  BY MR. GAFFNEY: | | **DK1e.13** |
| | 21:04  Q.  Is that consistent with your understanding | | |
| | 21:05      of what a tail royalty is? | | |
| | 21:06  A.  That is how I've heard the term described | | |
| | 21:07      before. | | |
| | 21:08  Q.  Okay.  Are you -- is that -- that | | |
| | 21:09      definition consistent with your understanding of | | |
| | 21:10      what a tail royalty is? | | |
| | 21:11  A.  Yes. | | |
| 21:18 - 21:24 | Dickerson, Kristina 2024-04-30 | 00:00:27 | **DK1e.14** |
| | 21:18  Q.  Okay.  Has Biogen collected tail royalties | | |
| | 21:19      from any of its licensees? | | |
| | 21:20  A.  Yes. | | |
| | 21:21  Q.  From whom have you collected tail | | |
| | 21:22      royalties? | | |
| | 21:23  A.  The outcome of the TMC lawsuit included a | | |
| | 21:24      settlement for a partial payment. | | |
| 22:08 - 22:15 | Dickerson, Kristina 2024-04-30 | 00:00:33 | **DK1e.15** |
| | 22:08  Q.  We're going to talk in a bit about the | | |
| | 22:09      licensees on -- to whom you paid tail royalties on | | |
| | 22:10      Tysabri, and -- but other than the tail royalties | | |
| | 22:11      you paid on that product, are you aware of any | | |
| | 22:12      instance where Biogen paid tail royalties to any | | |
| | 22:13      licensee with respect to sales of a different | | |
| | 22:14      product? | | |
| | 22:15  A.  No. | | |
| 22:18 - 22:24 | Dickerson, Kristina 2024-04-30 | 00:00:21 | **DK1e.16** |
| | 22:18  Q.  Mrs. Dickerson, I've seen some documents | | |
| | 22:19      with the name -- e-mail with a "to" or a "from" | | |
| | 22:20      Kristina Ramos. | | |
| | 22:21      Is that you? | | |
| | 22:22  A.  Yes. | | |
| | 22:23  Q.  So at what point did your name change? | | |
| | 22:24  A.  I married in 2017. | | |
| 22:25 - 22:25 | Dickerson, Kristina 2024-04-30 | 00:00:03 | **DK1e.17** |
| 🔗 EX26.1.1 | 22:25      MR. GAFFNEY:  Let me hand you Exhibit 3. | | |
| 23:01 - 23:04 | Dickerson, Kristina 2024-04-30 | 00:00:02 | **DK1e.18** |
| | 23:01      (Document marked as Dickerson | | |
| | 23:02      Exhibit 3 for identification) | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 23:03    BY MR. GAFFNEY: | | |
| | 23:04    Q.  Can you identify that document for me? | | |
| 23:05 - 24:04 | **Dickerson, Kristina 2024-04-30** | 00:01:08 | **DK1e.19** |
| | 23:05    Well, let me ask you -- I'll make it | | |
| | 23:06    easier on you, I hope. | | |
| | 23:07    Is this an e-mail string you were on in | | |
| | 23:08    January of 2015? | | |
| | 23:09    A.  Yes. | | |
| | 23:10    Q.  And attached to it is a spreadsheet? | | |
| | 23:11    A.  Yes. | | |
| | 23:12    Q.  Okay.  The subject of this e-mail is -- it | | |
| | 23:13    says "2015 AOP Retrieve with Rate Summary." | | |
| | 23:14    And then there's an attachment referencing | | |
| | 23:15    an Excel spreadsheet, correct? | | |
| | 23:16    A.  Yes. | | |
| | 23:17    Q.  What does "AOP" refer to? | | |
| | 23:18    A.  AOP is our annual operating plan.  It's | | |
| | 23:19    our annual budget. | | |
| | 23:20    Q.  At this period of time, 2015, were you | | |
| | 23:21    involved in helping the company prepare its AOP? | | |
| | 23:22    A.  Yes. | | |
| | 23:23    Q.  And one of the things that went into the | | |
| | 23:24    budget was third-party royalties paid out by the | | |
| | 23:25    company? | | |
| | 24:01    A.  Yes. | | |
| | 24:02    Q.  That would be an expense, on the expense | | |
| | 24:03    side of the budget? | | |
| | 24:04    A.  Yes. | | |
| 24:20 - 24:21 | **Dickerson, Kristina 2024-04-30** | 00:00:04 | **DK1e.20** |
| | 24:20    So let's look at the spreadsheet | | |
| | 24:21    attachment. (edited) | | |
| 24:21 - 25:03 | **Dickerson, Kristina 2024-04-30** | 00:00:17 | **DK1e.21** |
| | 24:21    So this is the document starting with (edited) | | |
| 🔗 EX26.3.1 | 24:22    the Bates number at the bottom right ending in 383. | | |
| | 24:23    Do you see that? | | |
| | 24:24    A.  Yes. | | |
| | 24:25    Q.  Are you familiar with this spreadsheet? | | |
| | 25:01    A.  Yes. | | |
| | 25:02    Q.  Did you prepare it? | | |
| | 25:03    A.  Yes. | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 28:16 - 29:07 | **Dickerson, Kristina 2024-04-30** | 00:01:10 | **DK1e.22** |

|  | 28:16 | Q. | In preparing the -- this spreadsheet, did |
|  | 28:17 |  | you confer with counsel? |
|  | 28:18 | A. | Yes. |
|  | 28:19 | Q. | Because counsel's input is relevant to the |
|  | 28:20 |  | projection of Tysabri third-party royalties, is that |
|  | 28:21 |  | why you spoke to them? |
|  | 28:22 | A. | Can you repeat? |
|  | 28:23 | Q. | Did you speak to -- did you confer with |
|  | 28:24 |  | counsel on this spreadsheet because the -- because |
|  | 28:25 |  | legal advice is an input on determining third-party |
|  | 29:01 |  | royalties on Tysabri? |
|  | 29:02 | A. | Yes. |
|  | 29:03 | Q. | Let's look at the -- on US, the block that |
| 🔗 EX26.3.2 | 29:04 |  | is under the heading "US." |
|  | 29:05 |  | There are eight licensees; is that |
|  | 29:06 |  | correct? |
|  | 29:07 | A. | Yes. |

| 29:08 - 30:08 | **Dickerson, Kristina 2024-04-30** | 00:01:38 | **DK1e.23** |

|  | 29:08 | Q. | And those are all companies to whom Biogen |
|  | 29:09 |  | paid royalties on Tysabri at one time or another? |
|  | 29:10 | A. | Yes. |
|  | 29:11 | Q. | And the columns starting at D, there are |
| 🔗 EX26.3.3 | 29:12 |  | some percentage numbers listed just for Genentech, |
|  | 29:13 |  | correct? |
|  | 29:14 | A. | Yes. |
|  | 29:15 | Q. | The others are redacted -- |
|  | 29:16 | A. | Yes. |
|  | 29:17 | Q. | -- correct? |
|  | 29:18 |  | So let me ask you about the Genentech |
|  | 29:19 |  | numbers. |
| 🔗 EX26.3.4 | 29:20 |  | It says, "Contract Rate, 5.8 percent." |
|  | 29:21 |  | What does that refer to? |
|  | 29:22 | A. | That number was the effective rate for the |
|  | 29:23 |  | royalty. |
|  | 29:24 | Q. | You understand that agreement has a |
|  | 29:25 |  | royalty rate for US sales of 4 1/2 percent? |
|  | 30:01 | A. | Yes. |
|  | 30:02 | Q. | Why does it say 5.8 percent here? |
|  | 30:03 | A. | The -- in this case, this is the effective |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 30:04    rate of the royalty off of our net sales. | | |
| | 30:05    So in applying the 4.5 percent, because | | |
| | 30:06    the allowable deductions under the contract were | | |
| | 30:07    limited, the effective rate was -- to us on our net | | |
| | 30:08    sales was greater than the 4.5. | | |
| 30:09 - 30:12 | **Dickerson, Kristina 2024-04-30** | 00:00:17 | **DK1e.24** |
| | 30:09   Q.   So your -- Biogen's internal net sales | | |
| | 30:10      number was lower than the net sales number under the | | |
| | 30:11      contract? | | |
| | 30:12   A.   Correct. | | |
| 30:13 - 31:01 | **Dickerson, Kristina 2024-04-30** | 00:00:58 | **DK1e.25** |
| | 30:13   Q.   Now, you -- is this correct that you | | |
| | 30:14      project that effective rate through 2022 in this | | |
| | 30:15      spreadsheet? | | |
| | 30:16   A.   Yes. | | |
| 🔗 EX26.3.5 | 30:17   Q.   In 2022, the number drops to 1.9 percent, | | |
| | 30:18      right? | | |
| | 30:19   A.   Yes. | | |
| | 30:20   Q.   Why does it drop from 5.8 percent to | | |
| | 30:21      1.9 percent? | | |
| | 30:22   A.   Without a -- without a calculator, I | | |
| | 30:23      believe the 1.9 percent is one-third of 5.8. | | |
| | 30:24   Q.   And why -- why does it drop by two-thirds? | | |
| | 30:25   A.   The royalty obligation was projected to | | |
| | 31:01      end four months into 2022. | | |
| 31:02 - 31:25 | **Dickerson, Kristina 2024-04-30** | 00:01:50 | **DK1e.26** |
| | 31:02   Q.   And that is a projection informed by the | | |
| | 31:03      advice of counsel that you've redacted from this, | | |
| | 31:04      correct? | | |
| | 31:05   A.   Can you repeat, please. | | |
| | 31:06   Q.   Yeah. | | |
| | 31:07      That projection you referenced is informed | | |
| | 31:08      by the advice of counsel that you referenced having | | |
| | 31:09      as an input but have redacted from this document? | | |
| | 31:10   A.   It was a calculation derived from advice. | | |
| 🗶 Clear | 31:11   Q.   What -- is the advice you received, was it | | |
| | 31:12      from an in-house attorney or someone outside of | | |
| | 31:13      Biogen on this particular issue? | | |
| | 31:14   A.   An in-house attorney. | | |
| | 31:15   Q.   Okay. Who was the in-house lawyer who you | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 31:16    consulted in connection with these projections? | | |
| | 31:17  A.  Over -- over time we consulted with a | | |
| | 31:18    number of Biogen legal counterparts, so I may not | | |
| | 31:19    have everyone's name. | | |
| | 31:20  Q.  Okay. | | |
| | 31:21  A.  Nathan Edwards, Stephen Vander Stoep, Jen | | |
| | 31:22    Sieczkiewicz, Dan Curto, Suzanne Murray, Martha | | |
| | 31:23    Born. | | |
| | 31:24  Q.  I'm sorry? | | |
| | 31:25  A.  Martha Born. | | |
| 32:09 - 32:13 | **Dickerson, Kristina 2024-04-30** | 00:00:14 | **DK1e.27** |
| | 32:09  Q.  Okay.  Do you know who you would have | | |
| | 32:10    consulted with in connection with this 2015 | | |
| | 32:11    spreadsheet? | | |
| | 32:12  A.  My -- my initial contact was Nathan | | |
| | 32:13    Edwards. | | |
| 32:14 - 33:03 | **Dickerson, Kristina 2024-04-30** | 00:00:50 | **DK1e.28** |
| | 32:14  Q.  In connection with your work on | | |
| | 32:15    projections, would you review the actual license | | |
| | 32:16    agreements? | | |
| | 32:17  A.  Yes. | | |
| | 32:18  Q.  So did the corporate accounting department | | |
| | 32:19    have copies of the license agreements? | | |
| | 32:20  A.  Yes. | | |
| | 32:21  Q.  And you had read all of them that were | | |
| | 32:22    relevant to Tysabri? | | |
| | 32:23  A.  Yes. | | |
| | 32:24  Q.  Did you ever draw a conclusion about tail | | |
| | 32:25    royalties, whether they were owed under, for | | |
| | 33:01    example, the Genentech agreement that was not | | |
| | 33:02    informed by counsel? | | |
| | 33:03  A.  No. | | |
| 36:10 - 36:16 | **Dickerson, Kristina 2024-04-30** | 00:00:30 | **DK1e.29** |
| | 36:10  Q.  So with respect to 2019 through 2022, you | | |
| | 36:11    were projecting a royalty obligation on sales on | | |
| | 36:12    Tysabri occurring after the patent expired, correct? | | |
| | 36:13  A.  Yes. | | |
| | 36:14  Q.  You understand that the Cabilly patent | | |
| | 36:15    expired December 18th, 2018 | | |
| | 36:16  A.  Yes. | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 41:20 - 42:01 | **Dickerson, Kristina 2024-04-30** | 00:00:11 | **DK1e.30** |
| 🔗 EX27.1.1 | 41:20    MR. GAFFNEY:  Mrs. Dickerson, I'm going to | | |
| | 41:21    hand you Exhibit 5. | | |
| | 41:22    (Document marked as Dickerson | | |
| | 41:23    Exhibit 5 for identification) | | |
| | 41:24    BY MR. GAFFNEY: | | |
| | 41:25 Q.  I would ask if you could take a look at | | |
| | 42:01    that and identify it for me, if you can. | | |
| 42:02 - 42:06 | **Dickerson, Kristina 2024-04-30** | 00:00:27 | **DK1e.31** |
| | 42:02 A.  This is an e-mail exchange between me and | | |
| | 42:03    Donald and some other members of Biogen finance. | | |
| | 42:04 Q.  John O'Donnell? | | |
| | 42:05 A.  John O'Donnell, and earlier in the chain | | |
| | 42:06    Anabel Chan. | | |
| 42:12 - 42:22 | **Dickerson, Kristina 2024-04-30** | 00:00:40 | **DK1e.32** |
| | 42:12 Q.  And attached is a spreadsheet, correct? | | |
| | 42:13 A.  Yes. | | |
| | 42:14 Q.  And this is the spreadsheet of projections | | |
| | 42:15    of third-party royalties owed on Tysabri? | | |
| | 42:16 A.  Yes. | | |
| | 42:17 Q.  The heading of this one -- this is 2017, | | |
| | 42:18    so two years after the prior one we looked at.  The | | |
| | 42:19    heading is, "2017 LRP Draft Royalty Rates." | | |
| | 42:20    What does "LRP" stand for? | | |
| | 42:21 A.  "LRP" is our long range plan.  It would | | |
| | 42:22    have been our multiyear forecast into the future. | | |
| 43:23 - 44:05 | **Dickerson, Kristina 2024-04-30** | 00:00:14 | **DK1e.33** |
| 🔗 EX27.2.1 | 43:23 Q.  It has an "inventory turnover | | |
| | 43:24    assumptions." | | |
| | 43:25    Do you see that, US, 28 months; rest of | | |
| | 44:01    world, 34 months? | | |
| | 44:02 A.  Yes. | | |
| | 44:03 Q.  Is that "inventory," is that referring to | | |
| | 44:04    drug substance? | | |
| | 44:05 A.  I believe so. | | |
| 44:17 - 44:17 | **Dickerson, Kristina 2024-04-30** | 00:00:04 | **DK1e.34** |
| | 44:17 Q.  Going back to Exhibit 5, (edited) | | |
| 44:17 - 44:19 | **Dickerson, Kristina 2024-04-30** | 00:00:15 | **DK1e.35** |
| | 44:17 Q.  Going back to Exhibit 5, you have -- here | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 🔗 EX27.2.2 | 44:18   the Genentech US royalty projected out to 2021. | | |
| | 44:19   A.  Yes. | | |
| 49:08 - 49:09 | **Dickerson, Kristina 2024-04-30** | 00:00:02 | **DK1e.36** |
| | 49:08   MR. GAFFNEY:  I'm going to hand you | | |
| 🔗 EX29.1.1 | 49:09   Exhibit 7. | | |
| 49:10 - 50:09 | **Dickerson, Kristina 2024-04-30** | 00:00:57 | **DK1e.37** |
| | 49:10   (Document marked as Dickerson | | |
| | 49:11   Exhibit 7 for identification) | | |
| | 49:12   BY MR. GAFFNEY: | | |
| | 49:13   Q.  It appears to be an e-mail from Mr. Poole | | |
| | 49:14   to someone named Brycen Blane with a copy to Sean | | |
| | 49:15   Godbout. | | |
| | 49:16   Did I pronounce that correctly? | | |
| | 49:17   A.  Yes. | | |
| | 49:18   Q.  Do you know him? | | |
| | 49:19   A.  Which "him"? | | |
| | 49:20   Q.  Sean. | | |
| | 49:21   A.  Yes. | | |
| | 49:22   Q.  Who is he? | | |
| | 49:23   A.  Sean is my manager.  He is currently our | | |
| | 49:24   corporate controller. | | |
| | 49:25   Q.  How long has he been your manager? | | |
| | 50:01   A.  For ten years. | | |
| | 50:02   Q.  So almost your entire time at Biogen he | | |
| | 50:03   has been your manager? | | |
| | 50:04   A.  Yes. | | |
| | 50:05   Q.  You've reported to him? | | |
| | 50:06   A.  Yes. | | |
| | 50:07   Q.  Who's Mr. Blaine? | | |
| | 50:08   A.  Brycen Blaine is currently a director | | |
| | 50:09   leading our inventory accounting team. | | |
| 50:17 - 50:20 | **Dickerson, Kristina 2024-04-30** | 00:00:11 | **DK1e.38** |
| | 50:17   Q.  The subject is "Tysabri DS." | | |
| | 50:18   Is "DS" a common shorthand for drug | | |
| | 50:19   substance? | | |
| | 50:20   A.  Yes. | | |
| 50:21 - 51:17 | **Dickerson, Kristina 2024-04-30** | 00:01:20 | **DK1e.39** |
| 🔗 EX29.1.2 | 50:21   Q.  So Mr. Poole asks Mr. Blaine for help | | |
| | 50:22   determining how much drug substance would be on hand | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

50:23    as of December 2018.
50:24    Do you see that?
50:25  A.  Yes.
51:01  Q.  And then he also asks for an estimate of
51:02    when he believes all of the drug substance produced
51:03    prior to December 18th, 2018, would sell through?
51:04  A.  Yes.
51:05  Q.  Are you familiar with the inquiry that
51:06    Mr. Poole made to Mr. Blaine on this subject?  Did
51:07    you know he was looking for this information?
51:08  A.  We -- we queried Brycen for this
51:09    information for inventory turns on a periodic basis.
51:10  Q.  Right.
51:11    But this one is referring to the date
51:12    Cabilly expired, right?
51:13  A.  Yes.
51:14  Q.  So he wants to know how much -- how long
51:15    it would take to sell through the drug substance
51:16    produced prior to expiry?
51:17  A.  Yes.

| 53:04 - 53:13 | **Dickerson, Kristina 2024-04-30** | 00:00:44 | **DK1e.40** |

53:04  Q.  In August of 2018, was the Biogen
53:05    accounting department trying to figure out how much
53:06    drug substance, Tysabri drug substance, the company
53:07    would have on hand when Cabilly expired?
53:08  A.  Yes.
53:09  Q.  And was that -- was the reason for that
53:10    inquiry to determine -- to project how much of a --
53:11    would be owed in tail royalties on that product?
53:12  A.  The inventory on hand is a -- is used for
53:13    that calculation.

| 53:15 - 53:18 | **Dickerson, Kristina 2024-04-30** | 00:00:08 | **DK1e.41** |

53:15    well, you mentioned at some point  (edited)
53:16    that you stopped projecting a tail royalty
53:17    obligation on the Cabilly license, correct?
☒ Clear    53:18  A.  Yes.

| 61:01 - 61:02 | **Dickerson, Kristina 2024-04-30** | 00:00:13 | **DK1e.42** |

61:01  Q.  And going to Exhibit 5, which is the
61:02    2000 -- the projections from June of 2017  (edited)

DK1e - Dickerson, Kristina v5 PA DC

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 61:02 - 61:06 | **Dickerson, Kristina 2024-04-30** | 00:00:15 | **DK1e.43** |

61:02　　2000 -- the projections from June of 2017, just so
61:03　　we're clear on this, as of this date, the company
61:04　　was still projecting a tail royalty obligation to
61:05　　Genentech; is that correct?
61:06　A.　Yes.

| 61:07 - 61:10 | **Dickerson, Kristina 2024-04-30** | 00:00:09 | **DK1e.44** |

61:07　Q.　And sometime in 2018 the company stopped
61:08　　projecting a tail royalty obligation to Genentech;
61:09　　is that correct?
61:10　A.　Yes.

| 61:11 - 61:13 | **Dickerson, Kristina 2024-04-30** | 00:00:12 | **DK1e.45** |

61:11　Q.　And you revised the projection spreadsheet
61:12　　after speaking with Ms. Murray?
61:13　A.　Yes.

| 61:18 - 61:18 | **Dickerson, Kristina 2024-04-30** | 00:00:02 | **DK1e.46** |
| 🔗 EX30.1.1 | | | |

61:18　　I'm going to hand you Exhibit 8.

| 61:19 - 61:21 | **Dickerson, Kristina 2024-04-30** | 00:00:01 | **DK1e.47** |

61:19　　(Document marked as Dickerson
61:20　　Exhibit 8 for identification)
61:21　　THE WITNESS:  Thanks.

| 61:22 - 61:23 | **Dickerson, Kristina 2024-04-30** | 00:00:02 | **DK1e.48** |

61:22　　BY MR. GAFFNEY:
61:23　Q.　Do you recognize Exhibit 8?

| 61:24 - 62:14 | **Dickerson, Kristina 2024-04-30** | 00:00:43 | **DK1e.49** |

61:24　A.　Yes.
61:25　Q.　What is it?
62:01　A.　It is the license agreement between
62:02　　Biogen, Inc., and The Medicines Company.
62:03　Q.　And this concerns a product called -- I'm
62:04　　going to probably mispronounce it -- bivalirudin?
62:05　A.　Yes.
62:06　Q.　Is that how you pronounce it?
62:07　A.　I don't know how to pronounce it actually.
62:08　Q.　You have a -- what do you refer to the
62:09　　product as?
62:10　A.　The ending product was Angiomax.
62:11　Q.　Angiomax?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 62:12 A. I believe, yeah. | | |
| | 62:13 Q. I'll call it Angiomax; much less of a | | |
| | 62:14 mouthful. | | |
| 62:20 - 63:07 | **Dickerson, Kristina 2024-04-30** | 00:00:38 | **DK1e.50** |
| | 62:20 This is an agreement under which Biogen | | |
| | 62:21 provided The Medicines Company with rights to the | | |
| | 62:22 product in exchange for certain payments? | | |
| | 62:23 A. Yes. | | |
| | 62:24 Q. Including royalties on net sales? | | |
| | 62:25 A. Yes. | | |
| | 63:01 Q. And you had responsibility for tracking | | |
| | 63:02 the royalties coming in; is that right? | | |
| | 63:03 A. I was a reviewer of that information, yes. | | |
| | 63:04 Q. Biogen at some point discovered that The | | |
| | 63:05 Medicines Company had not paid tail royalties, | | |
| ⌧ Clear | 63:06 correct? | | |
| | 63:07 A. Yes. | | |
| 63:08 - 63:25 | **Dickerson, Kristina 2024-04-30** | 00:00:57 | **DK1e.51** |
| | 63:08 Q. How was that discovered? | | |
| | 63:09 A. Through the royalty statements sent to us. | | |
| | 63:10 Q. Did you -- are you the one who noticed | | |
| | 63:11 there were no tail royalties being paid? | | |
| | 63:12 A. I don't remember. | | |
| | 63:13 Q. Biogen conducted a royalty audit; is that | | |
| | 63:14 right? | | |
| | 63:15 A. Yes. | | |
| | 63:16 Q. Did you have any involvement in that? | | |
| | 63:17 A. Yes. | | |
| | 63:18 Q. What was your role -- what role did you | | |
| | 63:19 play in connection with that royalty audit? | | |
| | 63:20 A. I interacted with the -- with the audit | | |
| | 63:21 team that we hired to do that work. | | |
| | 63:22 Q. You hired KPMG? | | |
| | 63:23 A. Yes. | | |
| | 63:24 Q. Did you ever see the audit report? | | |
| | 63:25 A. Yes. | | |
| 64:10 - 64:11 | **Dickerson, Kristina 2024-04-30** | 00:00:02 | **DK1e.52** |
| | 64:10 MR. GAFFNEY: I'm going to hand you | | |
| 🔗 EX37.1.1 | 64:11 Exhibit 9. | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 64:12 - 64:20 | **Dickerson, Kristina 2024-04-30** | 00:00:20 | **DK1e.53** |
| | 64:12    (Document marked as Dickerson | | |
| | 64:13    Exhibit 9 for identification) | | |
| | 64:14    BY MR. GAFFNEY: | | |
| | 64:15  Q.  This is a letter produced in discovery. | | |
| | 64:16    The ending Bates numbers are 885 through 887.  It's | | |
| | 64:17    from Foley Hoag to Stephen Rodin at The Medicines | | |
| | 64:18    Company. | | |
| | 64:19    You've seen this letter before? | | |
| | 64:20  A.  Yes. | | |
| 65:02 - 65:05 | **Dickerson, Kristina 2024-04-30** | 00:00:17 | **DK1e.54** |
| 🔗 EX37.2.1 | 65:02  Q.  So the -- the letter states that | | |
| | 65:03    $17.7 million in tail royalties are owed. | | |
| | 65:04    That's at the top of the second page.  But | | |
| | 65:05    take your time to read it all if you would like. | | |
| 65:06 - 65:10 | **Dickerson, Kristina 2024-04-30** | 00:00:16 | **DK1e.55** |
| | 65:06  A.  The letter says that 17.7 million in | | |
| | 65:07    royalties are due, but it does not specifically | | |
| | 65:08    say -- reference tail royalties -- | | |
| | 65:09  Q.  Do you remember -- | | |
| | 65:10  A.  -- in that sentence. | | |
| 66:05 - 66:05 | **Dickerson, Kristina 2024-04-30** | 00:00:02 | **DK1e.56** |
| 🔗 EX31.1.1 | 66:05    MR. GAFFNEY:  I'll hand you Exhibit 10. | | |
| 66:06 - 66:10 | **Dickerson, Kristina 2024-04-30** | 00:00:05 | **DK1e.57** |
| | 66:06    (Document marked as Dickerson | | |
| | 66:07    Exhibit 10 for identification) | | |
| | 66:08    BY MR. GAFFNEY: | | |
| | 66:09  Q.  Do you recognize this as a copy of the | | |
| | 66:10    lawsuit that The Medicines Company filed? | | |
| 66:11 - 66:11 | **Dickerson, Kristina 2024-04-30** | 00:00:01 | **DK1e.58** |
| | 66:11  A.  Yes. | | |
| 66:12 - 66:15 | **Dickerson, Kristina 2024-04-30** | 00:00:13 | **DK1e.59** |
| 🔗 EX32.1.1 | 66:12    MR. GAFFNEY:  I'm going to hand you | | |
| | 66:13    Exhibit 11 and ask whether you recognize this as the | | |
| | 66:14    answer and counterclaim that Biogen filed against | | |
| | 66:15    The Medicines Company. | | |
| 66:16 - 66:18 | **Dickerson, Kristina 2024-04-30** | 00:00:01 | **DK1e.60** |
| | 66:16    (Document marked as Dickerson | | |

**DK1e - Dickerson, Kristina v5 PA DC**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

| | 66:17 | Exhibit 11 for identification) | | |
| | 66:18 | THE WITNESS:  Yes. | | |
| 67:02 - 67:05 | **Dickerson, Kristina 2024-04-30** | 00:00:09 | **DK1e.61** |
| | 67:02 Q. Biogen took the position in the litigation | | |
| | 67:03    that the license with TMC required the payment of | | |
| | 67:04    tail royalties, correct? | | |
| | 67:05 A. I believe so. | | |
| 71:21 - 71:25 | **Dickerson, Kristina 2024-04-30** | 00:00:07 | **DK1e.62** |
| 🔗 EX39.1.1 | 71:21    I'm handing you Exhibit 12. | | |
| | 71:22    (Document marked as Dickerson | | |
| | 71:23    Exhibit 12 for identification) | | |
| | 71:24    BY MR. GAFFNEY: | | |
| | 71:25 Q. Can you identify this document? | | |
| 72:01 - 72:02 | **Dickerson, Kristina 2024-04-30** | 00:00:08 | **DK1e.63** |
| | 72:01 A. This is a settlement agreement between The | | |
| | 72:02    Medicines Company and Biogen MA, Inc. | | |
| 72:03 - 72:09 | **Dickerson, Kristina 2024-04-30** | 00:00:26 | **DK1e.64** |
| | 72:03 Q. And in connection with the settlement | | |
| | 72:04    Biogen received the payment reflected on -- in | | |
| 🔗 EX39.2.1 | 72:05    Paragraph 6 on Page 2, correct? | | |
| | 72:06 A. That is correct. | | |
| | 72:07 Q. It was -- $5.2 million is what you | | |
| | 72:08    received from The Medicines Company? | | |
| | 72:09 A. 5.2, yes. | | |
| 72:17 - 72:23 | **Dickerson, Kristina 2024-04-30** | 00:00:23 | **DK1e.65** |
| | 72:17 Q. Is this amount, 5.2 million, less than | | |
| | 72:18    what Biogen thought it was owed in tail royalties | | |
| | 72:19    from The Medicines Company? | | |
| | 72:20 A. I don't remember what Biogen thought it | | |
| | 72:21    was owed. | | |
| | 72:22    It is less than the 17.7 on the previous | | |
| | 72:23    document. | | |
| 73:04 - 73:09 | **Dickerson, Kristina 2024-04-30** | 00:00:20 | **DK1e.66** |
| | 73:04    Let's go back to -- for a moment to the | | |
| 🔗 EX26.3.6 | 73:05    projections we looked at earlier, Exhibits 3 and 5, | | |
| | 73:06    which are the -- one's 2015, one's 2017, and you | | |
| | 73:07    said that both of them projected a tail royalty | | |
| | 73:08    obligation to Genentech. | | |
| | 73:09 A. Yes. | | |

**DK1e - Dickerson, Kristina v5 PA DC**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 73:21 - 74:08 | **Dickerson, Kristina 2024-04-30** | 00:00:50 | **DK1e.67** |

73:21    Q.  Sure.
73:22        Prior to completing the projections we
73:23        just discussed, did anyone at Biogen take the
73:24        position that the company did not owe tail royalties
73:25        to Genentech?
74:01    A.  I don't -- I don't know.
74:02    Q.  You're not aware of anyone -- again
74:03        besides -- exclude counsel from the -- from the
74:04        question.
74:05        You're not aware of anyone contesting
74:06        within the company that the agreement required tail
74:07        royalties?
74:08    A.  I don't remember that.

| 74:09 - 74:10 | **Dickerson, Kristina 2024-04-30** | 00:00:02 | **DK1e.68** |

74:09        MR. GAFFNEY:  I'm going to hand you
🔗 EX48.1.1    74:10        Exhibit 13.

| 74:11 - 74:15 | **Dickerson, Kristina 2024-04-30** | 00:00:08 | **DK1e.69** |

74:11        (Document marked as Dickerson
74:12        Exhibit 13 for identification)
74:13        BY MR. GAFFNEY:
74:14    Q.  Do you recognize this as the license
74:15        between Elan and PDL?

| 74:16 - 74:21 | **Dickerson, Kristina 2024-04-30** | 00:00:10 | **DK1e.70** |

74:16    A.  Yes.
74:17    Q.  Are you familiar with the Queen patent?
74:18        Ever hear of that?
74:19    A.  Yes.
74:20    Q.  This was a license to the Queen patent; is
74:21        that correct?

| 74:22 - 75:04 | **Dickerson, Kristina 2024-04-30** | 00:00:22 | **DK1e.71** |

74:22    A.  I don't -- I don't know for certain.
74:23        Does it say in the agreement?
74:24    Q.  Biogen paid PDL royalties on sales of
74:25        Tysabri under this agreement, correct?
75:01    A.  Yes.
75:02    Q.  And Biogen paid PDL tail royalties on
75:03        Tysabri under this agreement, correct?
75:04    A.  I believe so.

**DK1e - Dickerson, Kristina v5 PA DC**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 75:17 - 75:19 | **Dickerson, Kristina 2024-04-30** | 00:00:05 | **DK1e.72** |
| | 75:17  Q.  And did Biogen ever dispute its obligation | | |
| | 75:18       to pay tail royalties under this agreement? | | |
| | 75:19  A.  No. | | |
| 76:16 - 76:18 | **Dickerson, Kristina 2024-04-30** | 00:00:06 | **DK1e.73** |
| | 76:16  Q.  Did Biogen ever ask PDL for a refund of | | |
| | 76:17       tail royalties? | | |
| | 76:18  A.  No. | | |
| 77:07 - 77:17 | **Dickerson, Kristina 2024-04-30** | 00:00:37 | **DK1e.74** |
| | 77:07  Q.  Did you consult any lawyers about whether | | |
| | 77:08       there was a tail royalty obligation under the PDL | | |
| | 77:09       agreement? | | |
| | 77:10       It's a "yes" or "no" question. | | |
| | 77:11  A.  Yes. | | |
| | 77:12  Q.  Who did you consult? | | |
| | 77:13  A.  I don't remember which lawyer in | | |
| | 77:14       particular, but in that list I previously provided. | | |
| | 77:15  Q.  Did you know when the patent expired? | | |
| | 77:16  A.  That would have been a date provided to | | |
| | 77:17       us. | | |
| 78:04 - 78:05 | **Dickerson, Kristina 2024-04-30** | 00:00:02 | **DK1e.75** |
| | 78:04       MR. GAFFNEY:  I'm going to hand you | | |
| 🔗 EX46.1.1 | 78:05       Exhibit 15. | | |
| 78:06 - 78:10 | **Dickerson, Kristina 2024-04-30** | 00:00:03 | **DK1e.76** |
| | 78:06       (Document marked as Dickerson | | |
| | 78:07       Exhibit 15 for identification) | | |
| | 78:08       BY MR. GAFFNEY: | | |
| | 78:09  Q.  Can you identify this document for me, | | |
| | 78:10       please. | | |
| 78:14 - 79:01 | **Dickerson, Kristina 2024-04-30** | 00:00:30 | **DK1e.77** |
| | 78:14       THE WITNESS:  This is the license | | |
| | 78:15       agreement between Lonza Biologics, PLC and Biogen, | | |
| | 78:16       Inc. | | |
| | 78:17       BY MR. GAFFNEY: | | |
| | 78:18  Q.  This is one of two license agreements with | | |
| | 78:19       Lonza, correct? | | |
| | 78:20  A.  Yes. | | |
| | 78:21  Q.  Did Biogen pay royalties under both | | |
| | 78:22       license agreements? | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 78:23   A.  Yes. | | |
| | 78:24   Q.  But it paid tail royalties only under this | | |
| | 78:25        one, correct? | | |
| | 79:01   A.  Correct. | | |
| 79:12 - 79:22 | **Dickerson, Kristina 2024-04-30** | 00:00:38 | **DK1e.78** |
| | 79:12   Q.  Okay.  Is this another agreement, like the | | |
| | 79:13        PDL agreement, where you paid tail royalties after | | |
| | 79:14        consulting with a Biogen lawyer? | | |
| | 79:15   A.  Yes. | | |
| | 79:16   Q.  Did Biogen ever request a refund of | | |
| | 79:17        royalties from Lonza? | | |
| | 79:18   A.  No. | | |
| | 79:19   Q.  Did it have any dispute with Lonza of | | |
| | 79:20        whether or not the agreement triggered a tail | | |
| | 79:21        royalty obligation? | | |
| | 79:22   A.  No. | | |
| 80:06 - 80:06 | **Dickerson, Kristina 2024-04-30** | 00:00:01 | **DK1e.79** |
| 🔗 EX41.1.1 | 80:06        MR. GAFFNEY:  I'll hand you Exhibit 16. | | |
| 80:07 - 80:10 | **Dickerson, Kristina 2024-04-30** | 00:00:02 | **DK1e.80** |
| | 80:07        (Document marked as Dickerson | | |
| | 80:08        Exhibit 16 for identification) | | |
| | 80:09        BY MR. GAFFNEY: | | |
| | 80:10   Q.  Can you identify this document? | | |
| 80:11 - 80:19 | **Dickerson, Kristina 2024-04-30** | 00:00:30 | **DK1e.81** |
| | 80:11   A.  This is a sublicense agreement between | | |
| | 80:12        Centocor, Inc.; Elan Pharma International, Limited; | | |
| | 80:13        and Biogen Idec MA, Inc. | | |
| | 80:14   Q.  And Biogen paid royalties to Centocor | | |
| | 80:15        under this agreement, correct? | | |
| | 80:16   A.  Correct. | | |
| | 80:17   Q.  And it paid tail royalties to Centocor | | |
| | 80:18        under this agreement? | | |
| | 80:19   A.  It did. | | |
| 80:20 - 80:21 | **Dickerson, Kristina 2024-04-30** | 00:00:03 | **DK1e.82** |
| | 80:20        MR. GAFFNEY:  I'm going to hand you | | |
| 🔗 EX43.1.1 | 80:21        Exhibit 17.  Sorry for the delay. | | |
| 80:22 - 80:25 | **Dickerson, Kristina 2024-04-30** | 00:00:02 | **DK1e.83** |
| | 80:22        (Document marked as Dickerson | | |
| | 80:23        Exhibit 17 for identification) | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 80:24　BY MR. GAFFNEY: | | |
| | 80:25　Q.　Can you identify this document? | | |
| 81:01 - 82:14 | **Dickerson, Kristina 2024-04-30** | 00:02:11 | **DK1e.84** |
| | 81:01　A.　This is an e-mail from an employee at | | |
| | 81:02　　Janssen to Donald and me and Sean. | | |
| | 81:03　Q.　Okay.  So on the first page ending in | | |
| 🔗 EX43.1.2 | 81:04　　Bates 26986, there's an e-mail from Mr. Poole to | | |
| | 81:05　　Ashley Chang at Centocor, right, attaching the Q2 | | |
| | 81:06　　2016 royalty report? | | |
| | 81:07　A.　Yes. | | |
| 🔗 EX43.1.3 | 81:08　Q.　And then her response, she thanks them and | | |
| | 81:09　　she makes -- then makes reference to an attached | | |
| | 81:10　　e-mail. | | |
| | 81:11　　Do you see that? | | |
| | 81:12　A.　Yes. | | |
| | 81:13　Q.　Okay.  And then the attached e-mail is an | | |
| 🔗 EX42.1.1 | 81:14　　e-mail from 2015 -- e-mail chain from 2015 that | | |
| | 81:15　　you're on and that Mr. Godbout's on and Mr. Poole's | | |
| | 81:16　　on, right? | | |
| | 81:17　A.　Yes. | | |
| 🔗 EX42.1.2 | 81:18　Q.　And that one, Ms. Chang asks for an | | |
| | 81:19　　estimate of when the royalty will expire, right? | | |
| | 81:20　A.　Yes. | | |
| | 81:21　Q.　And that she originally directed that to | | |
| | 81:22　　Mr. Poole, and then she -- she went up the chain, I | | |
| | 81:23　　guess, and directed it later that day to | | |
| 🔗 EX42.1.3 | 81:24　　Mr. Godbout. | | |
| | 81:25　A.　Yes. | | |
| | 82:01　Q.　Okay.  And then in the top e-mail he | | |
| 🔗 EX42.1.4 | 82:02　　responds: | | |
| | 82:03　　"According to my records, Janssen's US | | |
| | 82:04　　patent expires on September 15th, 2015. | | |
| | 82:05　　It is my understanding, the IP license | | |
| | 82:06　　agreement covers manufacturing/existing | | |
| | 82:07　　product inventory, so we will continue to | | |
| | 82:08　　pay until the inventory has been sold." | | |
| | 82:09　　In 2015, it was the view of the company | | |
| | 82:10　　that it owed a tail royalty to Centocor, correct? | | |
| | 82:11　A.　Yes. | | |
| | 82:12　Q.　And it paid tail royalties to Centocor, | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 82:13       correct? | | |
| | 82:14   A.  Yes. | | |
| 82:15 - 82:22 | **Dickerson, Kristina 2024-04-30** | 00:00:20 | **DK1e.85** |
| | 82:15   Q.  And then at some point later, Biogen | | |
| | 82:16       changed its mind, right? | | |
| | 82:17   A.  Yes. | | |
| | 82:18   Q.  And were you involved in the decision to | | |
| | 82:19       take a different position with respect to tail | | |
| | 82:20       royalties? | | |
| | 82:21   A.  It was communicated to me, but I was not a | | |
| ⌧ Clear | 82:22       decision-maker. | | |
| 85:21 - 86:01 | **Dickerson, Kristina 2024-04-30** | 00:00:25 | **DK1e.86** |
| | 85:21   Q.  Now, Centocor and Biogen resolved its | | |
| | 85:22       differences on this, correct, reached a settlement? | | |
| | 85:23   A.  Yes. | | |
| | 85:24   Q.  And that was negotiated between two | | |
| | 85:25       executives at the companies? | | |
| | 86:01   A.  To my knowledge, yes. | | |
| 93:12 - 94:12 | **Dickerson, Kristina 2024-04-30** | 00:01:15 | **DK1e.87** |
| | 93:12   Q.  This is a e-mail chain.  It starts with an | | |
| | 93:13       e-mail from GSK to Mr. Godbout and then an e-mail | | |
| | 93:14       from Mr. Godbout to Nathan Edwards, right? | | |
| | 93:15   A.  Yes. | | |
| | 93:16   Q.  And you're copied on the second e-mail, | | |
| | 93:17       right? | | |
| | 93:18   A.  Yes. | | |
| | 93:19   Q.  So GSK was a -- a licensee of Biogen on | | |
| | 93:20       Tysabri, correct? | | |
| | 93:21   A.  Yes.  We had a license agreement from GSK. | | |
| | 93:22   Q.  There was a license agreement. | | |
| | 93:23       And Biogen paid GSK royalties under that | | |
| | 93:24       agreement, correct? | | |
| | 93:25   A.  Yes. | | |
| | 94:01   Q.  And Biogen paid GSK tail royalties under | | |
| | 94:02       that agreement? | | |
| | 94:03   A.  Yes. | | |
| | 94:04   Q.  And you did so based on your understanding | | |
| | 94:05       from whatever source that they were owed, correct? | | |
| | 94:06   A.  Our legal counsel gave us that | | |
| | 94:07       information, yes. | | |

**DK1e - Dickerson, Kristina v5 PA DC**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 94:08    Q.  And then Biogen -- I'm sorry, then GSK, am | | |
| | 94:09         I correct, refunded the royalties? | | |
| | 94:10    A.  They did. | | |
| | 94:11    Q.  Were you surprised? | | |
| | 94:12    A.  Yes. | | |
| 94:20 - 94:23 | **Dickerson, Kristina 2024-04-30** | 00:00:23 | **DK1e.88** |
| | 94:20    Q.  Were there any further communications with | | |
| | 94:21         GSK on this subject that you're aware of? | | |
| | 94:22    A.  Not -- not to my knowledge.  Other than | | |
| | 94:23         maybe procedural, "How do we pay?" | | |
| 94:24 - 95:04 | **Dickerson, Kristina 2024-04-30** | 00:00:20 | **DK1e.89** |
| | 94:24    Q.  Did this prompt Biogen to look at its | | |
| | 94:25         other license agreements to determine whether -- to | | |
| | 95:01         make a fresh assessment as to whether tail royalties | | |
| | 95:02         were owed? | | |
| | 95:03    A.  I don't remember the exact timing, but we | | |
| | 95:04         did do refreshes. | | |
| 95:10 - 95:17 | **Dickerson, Kristina 2024-04-30** | 00:00:18 | **DK1e.90** |
| | 95:10    Q.  Now, you had a licensee on Tysabri named | | |
| | 95:11         the Fred Hutchinson, is it Cancer Center? | | |
| | 95:12    A.  Yes. | | |
| | 95:13    Q.  Is that what it is? | | |
| | 95:14         And you did not pay -- you paid royalties | | |
| | 95:15         under that agreement, but not tail royalties; is | | |
| | 95:16         that correct? | | |
| | 95:17    A.  Correct. | | |
| 98:12 - 98:16 | **Dickerson, Kristina 2024-04-30** | 00:00:18 | **DK1e.91** |
| | 98:12    Q.  You paid -- of the -- of the Tysabri | | |
| | 98:13         licenses other than the Genentech license, you paid | | |
| | 98:14         tail royalties on five and did not pay tail | | |
| | 98:15         royalties on two; is that correct? | | |
| | 98:16    A.  Correct. | | |
| 98:17 - 98:18 | **Dickerson, Kristina 2024-04-30** | 00:00:03 | **DK1e.92** |
| | 98:17         MR. GAFFNEY:  I'm going to hand you | | |
| 🔗 EX47.1.1 | 98:18         Exhibit 24. | | |
| 98:19 - 98:22 | **Dickerson, Kristina 2024-04-30** | 00:00:02 | **DK1e.93** |
| | 98:19         (Document marked as Dickerson | | |
| | 98:20         Exhibit 24 for identification.) | | |
| | 98:21         BY MR. GAFFNEY: | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 98:22   Q. Can you identify this agreement? | | |
| 98:23 - 99:08 | **Dickerson, Kristina 2024-04-30** | 00:00:38 | **DK1e.94** |
| | 98:23   A. This is a license agreement between | | |
| | 98:24      Medical Research Council -- MRC -- and Athena | | |
| | 98:25      Neurosciences, which eventually was assumed by Elan | | |
| | 99:01      and Biogen. | | |
| | 99:02   Q. So Elan assumed an agreement from Athena, | | |
| | 99:03      and Biogen assumed it from Elan when the companies | | |
| | 99:04      separated on the Tysabri deal? | | |
| | 99:05   A. Yes. | | |
| | 99:06   Q. And this is -- is this a license of the | | |
| | 99:07      Winter patents? | | |
| | 99:08   A. I believe so. | | |
| 99:09 - 99:11 | **Dickerson, Kristina 2024-04-30** | 00:00:05 | **DK1e.95** |
| | 99:09   Q. And you initially paid tail royalties on | | |
| | 99:10      this license, correct? | | |
| | 99:11   A. Correct. | | |
| 99:12 - 99:18 | **Dickerson, Kristina 2024-04-30** | 00:00:17 | **DK1e.96** |
| | 99:12   Q. And then you asked for a refund, correct? | | |
| | 99:13   A. We did not ask for a refund. | | |
| | 99:14   Q. Did you get some of the royalties refunded | | |
| | 99:15      to you? | | |
| | 99:16   A. We did. | | |
| | 99:17   Q. But you didn't ask for it? | | |
| ⌧ Clear | 99:18   A. We did not. | | |
| 100:21 - 101:02 | **Dickerson, Kristina 2024-04-30** | 00:00:13 | **DK1e.97** |
| | 100:21  Q. So is it -- are you telling me that MRC | | |
| | 100:22      raised the issue of an overpayment? | | |
| | 100:23  A. Yes. | | |
| | 100:24  Q. So they said, "You paid us on" -- "you | | |
| | 100:25      paid us tail royalties, and you don't actually owe | | |
| | 101:01      them"? | | |
| | 101:02  A. Yes. | | |
| 101:03 - 101:05 | **Dickerson, Kristina 2024-04-30** | 00:00:16 | **DK1e.98** |
| | 101:03  Q. And is the $17.79 million, is that what | | |
| | 101:04      the amount of the overpayment was? | | |
| | 101:05  A. Yes. | | |

| Genentech Designations | 00:30:43 |
|---|---|
| Biogen Counters | 00:06:53 |
| Biogen Conditional Counters | 00:00:26 |
| **TOTAL RUN TIME** | **00:38:02** |

Documents linked to video:

EX26

EX27

EX29

EX30

EX31

EX32

EX37

EX39

EX41

EX42

EX43

EX46

EX47

EX48