1

2

3            **UNITED STATES DISTRICT COURT**

4          **NORTHERN DISTRICT OF CALIFORNIA**

5

6    **GENENTECH, INC.,**                        CASE NO.  23-cv-00909-YGR

7                    Plaintiff**,**

8            vs.                                 **RULE 52 ORDER**
                                                 Re: Dkt. Nos. 219, 224
9    **BIOGEN MA, INC.,**

10                   Defendant**.**

11           This action raises the question of whether a 2004 Non-Exclusive Cabilly Patent License

12   Agreement (the "Agreement") required payment of royalties for product manufactured *before* the

13   expiration of patent but not sold until *after* the expiration ("Product At-Issue").  Plaintiff

14   Genentech, Inc. ("Genentech") argues that it does.  Defendant Biogen MA, Inc. ("Biogen")

15   disagrees.  After a trial on the merits, and for the reasons set forth below, the Court finds in favor

16   of Genentech.[1]

17   **I.    LEGAL FRAMEWORK**

18           In California, "the elements for a cause of action for breach of contract are (1) the

19   existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3)

20   defendant's breach, and (4) the resulting damages to plaintiff."  *Potovsky v. Lincoln Benefit Life*

21   *Co.*, No. 23-4130, 2024 WL 5289187, at *2 (9th Cir. Jan. 7, 2025) (quoting *Oasis W. Realty, LLC*

22   *v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011)).

23

24

25           [1] This case was tried to a jury from June 30, 2025 to July 3, 2025.  (Dkt. No. 219 at 2.)
     The jury was unable to reach a unanimous verdict, and a mistrial was declared on July 3, 2025.
26   (*Id.*)  The parties subsequently stipulated to submit the case for resolution by the Court pursuant to
     Federal Rule of Civil Procedure 52.  (*Id.* ¶ 2.)  The parties have submitted post-trial briefs which
27   contain record citations.  (Dkt. Nos. 219, 221, 222.)  The record is not materially in dispute.
     Citations are provided for clarity or where a material dispute exists.
28

United States District Court
Northern District of California

"A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."  Cal. Civ. Code § 1636.  Thus:

> [t]he fundamental goal of contract interpretation is to give effect to the mutual intention of the parties as it existed at the time they entered into the contract. That intent is interpreted according to objective, rather than subjective, criteria. When the contract is clear and explicit, the parties' intent is determined solely by reference to the language of the agreement. The words are to be understood "in their ordinary and popular sense"; and the "whole of [the] contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."

*Gilkyson v. Disney Enterprises, Inc.*, 66 Cal.App.5th 900, 916 (2021) (citations omitted).

"The interpretation of a contract involves a two-step process: First the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party." *Wolf v. Superior Ct.*, 114 Cal.App.4th 1343, 1351 (2004), *as modified on denial of reh'g* (Feb. 19, 2004) (quotations and citation omitted).  "If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step – interpreting the contract."  *Id.* (citation omitted).  "The trial court's determination of whether an ambiguity exists is a question of law, subject to independent review on appeal."  *Id.*

With respect to step two, "[w]hen two equally plausible interpretations of the language of a contract may be made . . . parol evidence is admissible to aid in interpreting the agreement, thereby presenting a question of fact . . . if the evidence is contradictory." *Walter E. Heller W., Inc. v. Tecrim Corp.*, 196 Cal.App.3d 149, 158 (Ct. App. 1987).

"When there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law." *Brown v. Goldstein*, 34 Cal.App.5th 418, 433 (2019).  "This is true even when conflicting inferences may be drawn from the undisputed extrinsic evidence or that extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation."  *Id.*  "If, however, there is a conflict in the extrinsic evidence, the factual conflict is to be resolved by the jury"*(id.*) or fact-finder.

2

## II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

In July 2004, Genentech, Biogen, and Elan Pharmaceuticals ("Elan") executed the Agreement, under which Genentech licensed U.S. Patent No. 6,331,415 (the "Cabilly Patent") to Biogen and Elan.[2]  (Ex. 1.)  Genentech and City of Hope co-owned the Cabilly Patent, which claimed a process of manufacturing therapeutic antibodies.  (Ex. 2.)  Biogen used the Cabilly process to manufacture the active ingredient in Tysabri.  (Trial Tr. at 211:8–10.)  The Cabilly Patent expired on December 18, 2018.  (Ex. 2.)

On March 1, 2019, Biogen made its final royalty payment under the Agreement to Genentech.  (Ex. 74.097.)  This payment reflected sales of Tysabri during the fourth quarter of 2018, up to December 18, 2018.  (Trial Tr. at 181:22–25.)  Biogen did not pay Genentech royalties on the Product At-Issue (i.e., Tysabri manufactured before December 18, 2018 but sold after December 18, 2018).  (Trial Tr. at 207:6–8.)  Genentech argues that Biogen breached the Agreement by failing to pay royalties on the Product At-Issue.  Biogen disagrees and argues that the Agreement did not provide for tail royalties, i.e., its obligation to pay royalties ended on December 18, 2018.[3]

### A.    Terms of the Agreement

The parties identify Articles II, III, VI, and VII as the relevant provisions of the Agreement.  (Dkt. No. 219 ¶ 3; Dkt. No. 221 ¶¶ 9–13.)

#### 1.    Section 2.01

In general, Article II, titled "Grant," outlines the licensing rights Genentech granted to Biogen under the Agreement.  Section 2.01 therein, titled "License," granted Biogen "a non-exclusive license under [the Cabilly Patent] "during the Term to make (and have made), use, sell, offer for sale, and import Licensed Product . . . ."  (Ex. 1 § 2.01.)

---

[2] Biogen and Elan collaborated to develop the prescription medication Tysabri—a treatment for multiple sclerosis and Crohn's disease.  (Trial Transcript ("Trial Tr.") at 211:6–17.) Elan was initially a licensee to the Agreement, but in 2013 it sold its rights to Tysabri to Biogen. (*Id.* at 33:8–13.)

[3] As used by the parties, tail royalties refer to royalties paid on product manufactured before patent expiration but sold after patent expiration.

United States District Court
Northern District of California

1

        2.      *Section 3.03*

2

      In general, Article III, titled "Fees, Milestones and Royalties," outlines Biogen's fee and

3

royalty obligations under the Agreement.  Section 3.03 therein, titled "Earned Royalties,"

4

provided that Biogen would pay Genentech two different royalty rates depending on the location

5

of the sale.  Section 3.03(i) provided that Biogen would pay royalties on "all Net Sales of all

6

***Licensed Product*** sold in the United States."  (Ex. 1 § 3.03 (emphasis supplied).)  Section 3.03(ii)

7

provided that Biogen would pay royalites on Licensed Product sold outside of the United States,

8

even when sold in countries without a foreign counterpart to the Cabilly Patent, so long as the

9

Licensed Product was "manufactured in a country where such manufacture would, but for the

10

license granted herein, infringe" the Cabilly Patent.  (*Id.*)  The language of § 3.03 was not

11

temporally qualified.[4]

12

      The Court next turns to the definition of "Licensed Product," bolded above.  "Licensed

13

Product," defined in § 1.12, is defined by its relationship to Tysabri.[5]  In pertinent part, the

14

Agreement defines "Licensed Product" as "any antibody that binds specifically to Alpha4, [i.e.

15

Tysabri], the making (or have made), using, selling, offering for sale ***or*** importing of which, but

16

for the license . . . would infringe" the Cabilly Patent.  (*Id.* § 1.12 (emphasis supplied).)  While

17

"Licensed Product" is defined to include Tysabri sold or offered for sale, the definition uses the

18

word "or," not the conjunctive "and."  As such, the sale of Tysabri does not control whether

19

20

    4

        3.03.  <u>Earned Royalties</u>.

21

            (i) Licensee shall pay to Genentech a royalty of four and one-half percent (4.5%) of all

Net Sales of all Licensed Product sold in the United States.

22

            (ii) Licensee shall pay to Genentech a royalty of three and one-half percent (3.5%) of all

23

Net Sales of all Licensed Product sold in the Territory outside the United States.  Without

limiting the generality of the foregoing, Licensee shall pay to Genentech a royalty under this

24

Section 3.03(ii) in each country of the Territory where there is no Valid Claim covering the

manufacture, use, or sale of Licensed Product, if such Licensed Product sold in such country was

25

manufactured in a country where such manufacture would, but for the license granted herein,

infringe a Valid Claim.

26

27

    5

        1.12.  "Licensed Product" shall mean any antibody that binds specifically to Alpha4, the

28

making (or having made), using, selling, offering for sale or importing of which, but for the

license granted under this Agreement, would infringe a Valid Claim of a patent included in

Licensed Patents.

United States District Court
Northern District of California

product was considered "Licensed Product." Stated differently, the Court finds that the terms of the Agreement unambiguously provide that Tysabri manufactured using the Cabilly process before December 18, 2018 would be considered "Licensed Product," irrespective of sale.

As discussed above, § 3.03(i) provides that Biogen is to pay royalties on "all Net Sales of all Licensed Product sold in the United States." Having made the finding that Licensed Product attaches irrespective of sale, the Court next turns to the definition of "Net Sales." That term is defined in § 1.13 to "mean the gross invoice or contract price to Third Party customers for Finished Product."[6] (*Id.* § 1.13.) The definition of "Net Sales" does not include a temporal component; that is, it does not state "Net Sales" are sales occurring before the expiration of the Cabilly Patent.

Genentech argues that "[t]ogether, §§ 2.01 and 3.03 set the basic terms of the parties' bargain . . . Biogen received the permission it needed to manufacture Tysabri using Genentech's technology, and Genentech received a [] fraction of what Biogen earned from selling Tysabri manufactured using the Cabilly process." (Dkt. No. 219 ¶ 28.) Genentech argues that "if [the parties] intended to require royalties on something *less* than "*all* Net Sales of *all* Licensed Product"—one would expect to find clear language to that effect in Article III . . . ." (*Id.* ¶ 31 (emphasis in original).) Given the lack of temporality in §§ 3.03, 1.12, and 1.13, the Agreement is consistent with Genentech's interpretation that Biogen is obligated to pay royalties on "Licensed Product," regardless of the date of sale.[7]

---

[6]

> 1.13. "Net Sales" shall mean the gross invoice or contract price to Third Party customers for Finished Product. Finished Product used or consumed by Licensee or its Affiliates or Designees as part of the delivery of services to customers for which Licensee derives compensation shall be considered Net Sales at the gross invoice or contract price of like Finished Product which are sold to customers. If Licensed Product is sold in combination with one or more active ingredients, Net Sales shall be calculated by multiplying Net Sales of the

[7] The parties have stipulated that the royalty amount on the "Net Sales" of the Product At-Issue is $88,348,123. (Dkt. No. 196.) The Court accepts that stipulation as fact. Although the parties have stipulated to the unpaid royalty amount ($88,348,123), they have not stipulated to the amount of interest owed on the unpaid royalty. The parties have stipulated that "in the event of a judgment in favor of Genentech, they will jointly submit to the Court . . . a calculation of the amount of interest that should be added to the damages award." (Dkt. No. 219 at 34.)

United States District Court
Northern District of California

To counter this argument, Biogen urges that Genentech "improperly reads" § 3.03 "in a vacuum . . . ." (Dkt. No. 221 at ¶ 45.)  Biogen argues that § 3.03 should be read with § 7.01, and when read together, these provisions "show[] that the triggering event for the royalty obligation is a sale . . . ."  (*Id*.)  The Court therefore turns to § 7.01.

       3.     Section 7.01

In general, Article VII, titled "Term and Termination," defines the term of the Agreement and the effects of termination.  Section 7.01 therein, titled "Term," provides that the Biogen's "obligation to pay royalties to Genentech under this Agreement . . . shall continue, on a country-by-country basis, until expiration of the last patent within the Licensed Patents . . . ."[8] (Ex. 1 § 7.01.)

The parties disagree as to the import of this section.

Genentech argues that § 7.01 "relieved Biogen from any new royalty obligations once Cabilly expired" but did not "excuse Biogen's obligations arising from its use of Genentech's patented technology before that date to manufacture its Tysabri stockpile."  (Dkt. No. 219 ¶ 34.)  Further, this interpretation is consistent with, and "mirrors the license grant in § 2.01," which reads:

> License. Genentech hereby grants to Licensee and Licensee hereby accepts a nonexclusive license under Licensed Patents during the Term to make (and have made), use, sell, offer for sale, and import Licensed Product in the Territory in the Field of Use. Licensee shall have a limited right to grant sublicenses as provided in Section 2.02.

In fact, these are the sole references in the Agreement to the defined word "Term" other than Article VII.  Thus, Genentech argues that the language "confirms that absent early termination . . . Biogen's license to use Cabilly remains in effect for as long as the patent remains

---

[8]     7.01.  Term.  The term of this Agreement will commence on the Effective Date and remain in full force and effect until the expiration of the last patent within the Licensed Patents (the "Term"), unless earlier terminated in accordance with this Article VII.  Licensee's obligation to pay royalties to Genentech under this Agreement shall commence, on a country-by-country basis (i) on the date of First Commercial Sale of Licensed Product, and (ii) shall continue, on a country-by-country basis, until expiration of the last patent within the Licensed Patents containing a Valid Claim that would be infringed by the manufacture, use, sale, offer for sale or importation of Licensed Product.

unexpired." (*Id.* ¶ 35.)  In short, the second sentence of § 7.01 "make[s] clear that Tysabri 'manufacture[d]' or 'import[ed]' *after* there are no longer any 'Valid Claim[s]' is not subject to an obligation to pay royalties" but "does not excuse Biogen's obligation to pay royalties on Licensed Product manufactured before Cabilly expired, using a process that was, at the time, covered by at least one 'Valid Claim' of the patent." (*Id.* ¶ 36.)  The Agreement does not reference any "extinguishment" of an existing obligation.

Biogen counters that "[c]onstruing [§§] 3.03 and 7.01 together shows that the triggering event for the royalty obligation is a sale." (Dkt. No 221 ¶ 45.)  Biogen argues that Genentech's interpretation of § 7.01 "would render the [second sentence] surplusage, since as Genentech acknowledges, 'the definition of "Licensed Product" already excluded Tysabri whose manufacture or importation did not practice a "Valid Claim."'" (*Id.* ¶ 40.)  The second sentence of § 7.01 reads:

> Licensee's obligation to pay royalties to Genentech under this Agreement shall commence . . . (i) on the date of First Commercial Sale of Licensed Product, and (ii) shall continue . . . until expiration of the last patent within the Licensed Patents containing a Valid Claim that would be infringed by the manufacture, use, sale, offer for sale or importation of Licensed Product.

Notably, this provision references the First Commercial Sale of Licensed Product in defining the point at which Biogen's royalty obligation would commence but does not reference a corresponding "last commercial sale" in defining the end of Biogen's royalty obligation.  This undermines Genentech's interpretation.  If Genentech intended for Biogen's royalty obligation to end upon the last sale of Licensed Product, it could have so specified.

Biogen argues that its interpretation its further supported by §§ 4.02 and 7.05. (*Id.* ¶¶ 45–47.)  The Court reviews each.

### a.    Section 4.02

Generally, Article IV, titled "Records, Reports and Payments," sets forth Biogen's record-keeping, reporting, and payment obligations under the Agreement.  Under § 4.02, "[w]ithin sixty (60) days after the end of each Calendar Quarter[,]" Biogen was required to "furnish to Genentech a written report of all sales of all Licensed Product subject to royalty under Article III during such Calendar Quarter." (Ex. 1 § 4.02.)  Section 4.02 further required Biogen to provide its royalty

7

1    payments concurrently with each report.[9]

2         As defined in § 1.03, "Calendar Quarter" means "each three month period commencing

3    January 1, April 1, July 1, and October 1 of each year during the term of this Agreement."  (*Id.*

4    § 1.03.)  Biogen argues that §§ 7.01, 4.02, and 1.03, when read together, make clear that the term

5    of the Agreement ended on December 18, 2018—the day the Cabilly Patent expired—and Biogen

6    was therefore only required to report and pay royalties for sales made until December 18, 2018.

7    (Dkt. No. 221 ¶¶ 42, 46.)  Genentech counters that § 4.02 "did not set Biogen's payment

8    obligation, but simply imposed logistical requirements on Biogen for payments 'then due,' § 4.02,

9    under other [] provisions" of the Agreement.  (Dkt. No. 222 at 9.)  While the Court agrees such a

10   provision should not be viewed as defining the royalty obligation, it is consistent with Biogen's

11   reading of Section 7.02, albeit the word "term" in that sentence is not capitalized, and thus it is

12   arguable whether one should interpret the sentence using the defined word "Term."

13                    *b.    Section 7.05*

14        Biogen also argues that Genentech's interpretation of the Agreement contradicts the 90-

15   day limitation on sell-off royalties in § 7.05.[10]  (Dkt. No. 221 ¶ 47.)  Section 7.05 provided, first,

16   that termination of the Agreement would not "relieve [Biogen] of its obligations to pay all fees

[9]

> 4.02.  Reports.  Within sixty (60) days after the end of each Calendar Quarter following the First Commercial Sale of Licensed Product, Licensee shall furnish to Genentech a written report of all sales of all Licensed Product subject to royalty under Article III during such Calendar Quarter.  Such report shall include, without limitation, (i) the determination of Net Sales as specified in Section 1.13, setting forth the amount of gross receipts, Net Sales, and any deduction taken from gross receipts to arrive at Net Sales, for each of Finished Product and Bulk Product separately; and (ii) the royalty payment then due.  Concurrently with each report pursuant to this Section 4.02, Licensee shall make the royalty payment then due.

[10]

> 7.05.  Effect of Termination.  Termination of this Agreement in whole or in part for any reason shall not relieve Licensee of its obligations to pay all fees and royalties that shall have accrued hereunder prior to the effective date of termination.  Termination of this Agreement by or as to Licensee shall result in the termination of the licenses granted to Licensee and to all sublicensees of Licensee pursuant to this Agreement; provided, however, that upon termination the licenses granted to Licensee and to sublicensees shall continue for a period of ninety (90) days for the disposition of any existing inventory of Licensed Product and Licensee shall pay royalties in accordance with Section 3.03 on all such Licensed Product sold during such period.  The provisions of Article IV, Article V, Article VI, Article VIII, this Section 7.05 and Section 7.06 shall survive termination of this Agreement for any reason.

United States District Court
Northern District of California

8

1    and royalties that . . . accrued [] *prior* to the effective date of termination." (Ex. 1 § 7.05

2    (emphasis supplied).) Second, it further provides that "upon termination[,] the licenses granted

3    . . . shall continue for a period of ninety (90) days for the disposition of any existing inventory of

4    Licensed Product and Licensee shall pay royalties in accordance with Section 3.03 on all such

5    Licensed Product sold during such period." (*Id*.)

6        Biogen argues that if it were required to pay royalties on *all* Net Sales of *all* Licensed

7    Product, no matter when sold, Genentech would not have needed to specify an obligation to pay

8    royalties during the 90-day sell off period.[11] (Dkt. No. 221 ¶ 62.) Biogen further argues that

9    § 7.05 demonstrates that Genentech "knew how to draft language requiring tail royalties after a

10   license ended" and the lack of a parallel provision governing inventory already manufactured

11   when the license ended upon expiration of the Cabilly Patent at expiration of the term of the

12   Agreement demonstrates that the parties did not intend to include one. (*Id*. ¶ 47.)

13       Genentech counters that this provision "has nothing to do with tail royalties[,]" as it

14   "addresses the parties' rights and obligations upon an 'early termination' of the [Agreement]

15   *before* Cabilly expires." (Dkt. No. 222 at 9.) Genentech argues that the first sentence of § 7.05

16   merely clarified that "Cabilly's expiration brought the Term of the Agreement to an end, such that

17   no *new* obligations to pay royalties would accrue after that point" but that "existing obligations

18   triggered by [Biogen's] manufacture of Tysabri before that date remained." (Dkt. No. 219 ¶ 46.)

19   Genentech further argues that the second sentence of § 7.05 "irrelevant to the present dispute

20   because it addresses what happens in the in the case of . . . voluntary termination by Biogen, or

21   termination by Genentech for cause." (*Id*. ¶ 48.)

22       The plain language of the Agreement does not support Genentech's reading. Section 7.05

23   relates to "[t]ermination of this Agreement in whole or in part for any reason . . . ." (Ex. 1 § 7.05.)

24   It does not indicate that it relates only to "early" termination. To the contrary, it states any reason

25   which could naturally include completion of the term.

26

27

28   [11] However, this argument is undercut by the fact that the record does not reflect Biogen
     paid royalties on product sold during the 90 days following the expiration of the Cabilly Patent.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Based on the Court's review of the foregoing provisions, the Court finds the Agreement is

2   "reasonably susceptible" to the interpretation offered by both Genentech and Biogen.  *Cedars-*

3   *Sinai Med. Ctr. v. Shewry*, 137 Cal. App. 4th 964, 979–80 (2006).  Biogen's reliance on

4   *Pacesetter Inc. v. SurModics, Inc.*, 2011 WL 5075611, at *1 (C.D. Cal. Oct. 25, 2011), and *AM*

5   *Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.*, 44 F.3d 572, 576 (7th Cir. 1995), is unavailing.  In

6   *Pacesetter*, the "disputed royalty provision provide[d] . . . that '[f]or each license granted herein,

7   [St. Jude] shall pay to SurModics a royalty for each quarter of each calendar year ***during the term***

8   ***of this Agreement***.'"  *Pacesetter*, 2011 WL 5075611 at *2 (citation omitted) (emphasis supplied).

9   The agreement defined the "term" "as ending when SurModic's patents expire[d]."  *Id*. at *3

10  (citation omitted).  The Court accordingly found that "St. Jude's obligation to pay royalties ended

11  with the expiration of SurModics's patents."  *Id*.  Here, however, the royalty provision of the

12  Agreement, § 3.03, is not so temporally limited.  Section 3.03 does not limit Biogen's royalty

13  obligation to "each quarter of each calendar year during the term of th[e] Agreement," and no such

14  language is contained in any other provision of Article III.  Additionally, in *AM Int'l*, the plaintiff

15  "presented no objective evidence that the contract mean[t] something different from what it

16  seem[ed] to mean."  *AM Int'l, Inc.*, 44 F.3d at 576.  Here, as discussed below, Genentech provided

17  evidence supporting its interpretation in the form of the parties' negotiation history, Biogen's post-

18  Agreement conduct, and industry custom and practice.  *See infra* Section II.B–D.  *Pacesetter* and

19  *AM Int'l* are therefore distinguishable from the present case.[12]

20    Having found the Agreement is "reasonably susceptible" to both parties' interpretation,

21  extrinsic evidence is admissible to assist in the interpretation of the Agreement.  *See Cedars-Sinai*

22  *Med. Ctr.*, 137 Cal. App. 4th at 979 ("When a dispute arises over the meaning of contract

23  language, the first question to be decided is whether the language is 'reasonably susceptible' to the

24  interpretation urged by the party. If it is not, the case is over. If the court decides the language is

25  reasonably susceptible to the interpretation urged, the court moves to the second question: what

26

27    [12] Further distinguishing *Pacesetter* and *AM Int'l* is the fact that *Pacesetter* construed the
disputed contract under Minnesota law, *Pacesetter*, 2011 WL 5075611 at *2, and *AM Int'l*
28  construed the disputed contract under Illinois law, *AM Int'l*, 44 F.3d at 574.

1    did the parties intend the language to mean?"); *Morey v. Vannucci*, 64 Cal. App. 4th 904, 912

2    (1998) ("Where the meaning of the words used in a contract is disputed, the trial court must

3    provisionally receive any proffered extrinsic evidence which is relevant to show whether the

4    contract is reasonably susceptible of a particular meaning.").

5         **B.**     **Negotiation History**

6         Under California law, unexpressed subjective intent during negotiations is not admissible.

7    *Cedars-Sinai Med. Ctr.*, 137 Cal.App.4th at 980 ("The parties' undisclosed intent or understanding

8    is irrelevant to contract interpretation.") (citation omitted); *Vaillette v. Fireman's Fund Ins. Co.*,

9    18 Cal.App.4th 680, 686 (1993) ("[T]he parties' expressed objective intent, not their unexpressed

10   subjective intent, governs.").  However, the circumstances surrounding the negotiation is

11   admissible.  *Cedars-Sinai Med. Ctr.*, 137 Cal.App.4th at 980 ("Extrinsic evidence can include the

12   surrounding circumstances under which the parties negotiated or entered into the contract . . . .").

13        Here, the lawyers who negotiated the Agreement included (1) Timothy Schwartz from

14   Genentech, with Sean Johnston in the background advising, (2) Carl Battle from Elan, and (3) Ray

15   Arner from Biogen.  All but Arner testified either live or by deposition.[13]  It is undisputed that

16   Schwartz, Johnston, Battle, and Arner did not discuss tail royalties during their negotiations.

17   (Trial Tr. 261:10–13, 338:12–18; Battle Dep. Tr. 63:24–64:3.)

18              *1.*    *August 7, 2002 Non-Binding Term Sheet*

19        In 2002, Arner reached out to Genentech to request a license to the Cabilly Patent.  In

20   August 2002, Jim Adair, a Genentech business development employee, e-mailed Arner a non-

21   binding term sheet dated August 7, 2002.  (Ex. 202-A.)  The August 7, 2002 term sheet contained

22   a "Financial Payments" section, which provided that Biogen would pay (1) a signing fee of $4

23   million upon execution of a "definite license agreement," (2) a $5 million development milestone

24   fee upon FDA approval in the United States, and (3) royalties on net annual sales both within and

25   outside the United States "until the last to expire patent."  (Ex. 202-B.)  This section further

26   provided that "[u]pon such date [of the last to expire patent], Biogen shall have a fully paid up

27   ────────────────

28       [13] The Court draws no inferences from Arner's absence.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    license." (*Id.*) On April 25, 2023, Adair forwarded the term sheet to Schwartz. (*Id.*)

2         The record does not reflect any subsequent discussion between Genentech, Biogen, or Elan

3    centered on the August 7, 2002 term sheet.

4              **2.    *January 20, 2004 Draft Agreement and Subsequent Negotiations***

5         Around January 2004, Schwartz and Johnston met with Arner and Battle to discuss the

6    terms of a Cabilly license. (Trial Tr. 237:21–240:3.) Following the meeting, Schwartz e-mailed a

7    draft license agreement to Arner and Battle dated January 20, 2004. (Ex. 5.) Notably, the draft

8    agreement, like the August 7, 2002 term sheet, provided that Biogen would pay a license fee of $4

9    million upon execution of the license and a $5 million development milestone fee upon FDA

10   approval in the United States. (Ex. 5.007.) However, the January 20, 2004 draft did not carry

11   over the language stating that Biogen would "have a fully paid up license" upon the last to expire

12   patent. (Ex. 5.)

13        The parties continued to negotiate the terms of the license over the following months.

14   (Exs. 7, 10, 11, 20.) On February 21, 2004, Battle sent Schwartz (copying Arner and Johnston), a

15   revised draft of the license agreement with proposed edits from Biogen and Elan. (Ex. 7.) The

16   revisions from Battle included the following revision to § 7.01:

> 7.01.  Term.  The term of this Agreement will commence on the Effective Date and remain in full force and effect until the expiration of the last patent within the Licensed Patents (the "Term"), unless earlier terminated in accordance with this Article VII. Licensee's obligation to pay royalties to Genentech under this Agreement shall commence, on a country-by-country basis, (i) on the date of First Commercial Sale of Licensed Product for which a royalty is owed in accordance with Article III, and (ii) shall continue, on a country-by-country basis, until expiration of the last patent within the Licensed Patents containing a Valid Claim that would be infringed by the manufacture, use, sale, offer for sale, distribution, marketing, importation or exportation of Licensed Product.

(Ex. 7.014–15.) Battle testified that he proposed this revision to gain "certainty around when

[Biogen and Elan] were obligated to pay royalties to [Genentech]." (Battle Dep. Tr. 43:24–45:05.)

Battle specifically stated he wanted assurance that if the Cabilly Patent were invalidated, Elan and

Biogen's "payment obligation[] would come to an end[.]" (*Id.*) Genentech largely accepted

Battle's proposed revisions to § 7.01. (Ex. 1.)

1    Battle also proposed the following revisions to § 7.05:

> 7.05. <u>Effect of Termination</u>. Termination of this Agreement in whole or in part for any reason shall not relieve Licensee of its obligations to pay all fees and royalties that shall have accrued hereunder prior to the effective date of termination. Termination of this Agreement by or as to Licensee shall result in the termination of the licenses granted to Licensee and to all sublicensees of Licensee pursuant to this Agreement<u>, provided, however, that upon termination the licenses granted to Licensee and to sublicensees shall continue for a period of ninety (90) days for the disposition of any existing inventory of Licensed Product</u>. The provisions of Article IV, Article V, Article VI, Article VIII and this Section 7.05 shall survive termination of the Agreement for any reason.

(Ex. 7.016.)  Genentech accepted Battle's revision but added language requiring Biogen "pay royalties in accordance with Section 3.03" on all Licensed Product sold during the 90-day disposition period.

> 7.05. <u>Effect of Termination</u>. Termination of this Agreement in whole or in part for any reason shall not relieve Licensee of its obligations to pay all fees and royalties that shall have accrued hereunder prior to the effective date of termination. Termination of this Agreement by or as to Licensee shall result in the termination of the licenses granted to Licensee and to all sublicensees of Licensee pursuant to this Agreement; provided, however, that upon termination the licenses granted to Licensee and to sublicensees shall continue for a period of ninety (90) days for the disposition of any existing inventory of Licensed Product <u>and Licensee shall pay royalties in accordance with Section 3.03 on all such Licensed Product sold during such period.</u> The provisions of Article IV, Article V, Article VI, Article VIII, this Section 7.05 and Section 7.06 shall survive termination of this Agreement for any reason.

(Ex. 20.016.)

Biogen and Elan also proposed revisions to certain financial terms.  For example, Biogen and Elan requested "a change in the definition of net sales[,]" which would allow them to "take even more deductions from gross sales . . . ."  (Trial Tr. 253:6–10; *see also* 337:9–25, 339:12–340:1.)  Genentech did not agree to these revisions.  (*Id.*)

Genentech argues that its rejection of Biogen's requested financial concessions, which Genentech contends were "far less significant than excusing tail royalties," is evidence that Genentech would not have agreed to forego tail royalties.  (Dkt. No. 219 ¶ 10.)  Genentech further argues that "[a]t no point during the negotiations did [] Battle or [] Arner tell Genentech they intended or understood their edits to § 7.01—or for that matter, any language or provision of the agreement—to excuse royalties on the Tysabri Inventory that Biogen sold after Cabilly expired."

1    (*Id.*)

2          Biogen contends that the negotiation history supports its interpretation.  (Dkt. No. 221

3    ¶ 58.)  First, although Biogen relies heavily on the August 7, 2002 term sheet, Biogen did not offer

4    testimony as to its significance.[14]  Second, the parties dispute whether the language stating Biogen

5    would have a "fully paid up license" upon Cabilly's expiration would necessarily have terminated

6    Biogen's obligation to pay tail royalties.  (Dkt. No. 222 at 17.)  Importantly, the language

7    suggesting Biogen would have a "fully paid up license" was not carried over to any of the draft

8    agreements.  (Exs. 202-B, 5, 7, 10, 11, 20.)  This is particularly notable, as the draft agreements

9    did carry over the language from the August 7, 2002 term sheet requiring Biogen to pay a signing

10   fee of $4 million upon execution of the license agreement and a $5 million development milestone

11   fee upon FDA approval in the United States.  (Exs. 202-B, 5, 7, 10, 11, 20.)  If anything, the

12   omission the "fully paid up license" language indicates that Genentech did not intend to disclaim

13   its right to tail royalties under the Agreement.

14         Next, Biogen focuses on the parties' revisions to §§ 7.01 and 7.05.  First, Biogen argues

15   that Battle's edits to § 7.01 "expressly stated that the 'obligation to pay royalties' cease with the

16   'expiration of the last patent[,]'" thus "confirm[ing] that the parties intended for the royalty

17   obligation to cease as patent expiration."  (Dkt. No. 221 ¶ 59.)  Biogen combines this language

18   with Battle's testimony that Biogen and Elan raised this revision because they "wanted certainty

19   around when [they] were obligated to pay royalties to [Genentech] . . . ."  (Battle Dep. Tr. 43:24–

20   44:14; *see also* Dkt. No. 221 ¶¶ 59–61.)  Finally, Biogen urges that Genentech's edits to § 7.05 "to

21   add an explicit royalty obligation for sales of Licensed Product inventory during the agreed 90-day

22   sell-off period following early termination" "show[] both that Genentech understood that [§] 3.03

23

24         [14] In any event, under § 8.06 of the Agreement, the terms of the August 7, 2002 term sheet
     cannot be incorporated.  As stated in Section 8.06, titled "Entire Agreement," "[t]his Agreement

25   constitutes and contains the entire understanding and agreement of the Parties with respect to the
     subject matter hereof, and cancels and supersedes any and all prior negotiations, correspondence,

26   understandings and agreements, whether verbal or written, between the Parties respecting the
     subject matter hereof. No waiver, modification, or amendment of any provision of this Agreement

27   shall be valid or effective unless made in writing and signed by a duly authorized representative of
     each of the Parties."  (Ex. 1 § 8.06.)

28

United States District Court
Northern District of California

did not impose royalties on 'all Net Sales of all Licensed Product' whenever they occurred and also that Genentech knew how to draft a tail royalty provision when it chose to do so."  (*Id.* ¶ 62.)

The Court is not convinced.  Section 7.01 could easily be read to mean that Biogen would incur a royalty obligation on Tysabri manufactured using the Cabilly process if manufactured during the lifetime of the Cabilly Patent, but Biogen would not incur a royalty obligation on Tysabri manufactured after the Cabilly Patent's expiration.  Battle's testimony does not change this conclusion.  In fact, Battle suggests he was specifically concerned about the possible invalidation of the Cabilly Patent and the effect that would have on Biogen's royalty obligations. (Battle Dep. Tr. 44:10–45:05.)  He does not suggest he revised § 7.01 to address Biogen's obligation to pay tail royalties.[15]

The parties' revisions to § 7.05 further support Genentech's interpretation.  Although the plain language of the Agreement does not limit § 7.05 to early termination, Genentech's revision to this section merely clarified that Biogen was still obligated to pay royalties on Licensed Product sold within the 90-day sell-off period.  That revision in no way suggests that Genentech intended to disclaim tail royalties.  In fact, Genentech's insistence that Biogen pay royalties on Licensed Product sold during the 90-day sell-off period suggests that Genentech would not have agreed to forego royalties on Tysabri manufactured before, but sold after, December 18, 2018.  The Court therefore finds that the negotiation history supports Genentech's interpretation.

### C.    Post-Agreement Conduct In Conformity with Genentech's Interpretation

Where an ambiguity exists, a trier of fact can consider acts in conformity.  *See Cedars-Sinai Med. Ctr.*, 137 Cal. App. 4th at 980 ("Extrinsic evidence can include . . . the subsequent conduct of the parties."); *S. Pac. Transportation Co. v. Santa Fe Pac. Pipelines, Inc.*, 74 Cal. App. 4th 1232, 1242 (1999) ("In construing contract terms, the construction given the contract by the

---

[15] Biogen notes that "the Court excluded testimony from [] Battle that contradicts Genentech's position here, including his testimony that his 'intent was if the patent expired or was invalidated, then [Biogen's] obligation to pay royalties would cease.'"  (Dkt. No. 221 ¶ 61 n.7 (quoting Dkt. No. 139-3 at 67:8–13).)  It is undisputed that Battle did not express his intent to any individual at Genentech.  Therefore, this testimony is irrelevant.  *See Cedars-Sinai Med. Ctr.*, 137 Cal. App. 4th at 980 ("The parties' undisclosed intent or understanding is irrelevant to contract interpretation.").

United States District Court
Northern District of California

United States District Court
Northern District of California

1    acts and conduct of the parties with knowledge of its terms, and before any controversy arises as to

2    its meaning, is relevant on the issue of the parties' intent.").

3        Here, Genentech offered evidence that Biogen itself believed that it was required to pay

4    royalties on the Product At-Issue, namely by way of spreadsheets documenting Biogen's expected

5    payment stream to Genentech and the testimony of Kristina Dickerson.  (Exs. 24, 26, 27.)

6    Genentech introduced "[t]hree sets of projections Biogen prepared in the years immediately

7    preceding Cabilly's expiration [that] establish Biogen's understanding that the [Agreement]

8    required tail royalties on Tysabri sales through as long as 2022."  (Dkt. No. 219 ¶ 57.)  These

9    projections were prepared by Dickerson, a senior director within the corporate accounting team at

10   Biogen, whose responsibilities included "preparing projections of future royalty obligations."

11   (Dickerson Dep. Tr. 17:20–19:10.)

12       These projections clearly reflect that Biogen intended to pay royalties to Genentech past

13   the expiration date of the Cabilly Patent.  For example, in March 2014, Biogen projected that it

14   would continue to pay royalties to Genentech through at least 2019.  (Ex. 24.003.)



20   In January 2015, Biogen projected that it would continue to pay royalties to Genentech

21   through at least 2022.  (Ex. 26.003; *see also* Dickerson Dep. Tr. 24:21–31:25.)

26   In June 2017, Biogen projected that it would continue to pay royalties to Genentech

27   through at least 2021.[16]  (Ex. 27.002; *see also* Dickerson Dep. Tr. at 44:17–19.)

28   ────────────────

    [16] The January 2015 projections assumed an inventory turnover of 40 months (Ex. 26.003),

| US | Expiration Date | | Contract Rate | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lonza (GS) | | | | | | | | | | | | |
| Lonza (Tropolone) | | Redacted | | | | | Redacted | | | Redacted | | |
| Centocor (Janssen Biotech) | | | | | | | | | | | | |
| Genentech | | | 6.6% | 6.6% | 6.6% | 6.6% | 6.6% | 6.6% | 2.2% | - | - | - |
| GSK | | | | | | | | | | | | |
| FHRC | | | | Redacted | | | Redacted | | | | |
| PDL | | | | | | | | | | | | |
| MRC | | | | | | | | | | | | |

Additionally, according to internal Biogen communications, in August 2018 Biogen sought to estimate "how much completed Tysabri drug substance [Biogen] w[ould] have on hand as of December 2018" and "when . . . [Tysabri produced before December 18, 2018] would sell through . . . ." (Ex. 29.) Biogen specifically sought to "determine when the last of the pre-patent inventory w[ould] be depleted." (*Id.*)

Biogen argues that "these documents shed no light on the parties' intentions in 2004" (Dkt. No. 221 ¶ 64), but Biogen misses the larger point. Biogen's internal projections and the accompanying testimony from Dickerson are compelling evidence that Biogen expected, under the Agreement, to pay royalties after December 18, 2018. Biogen offers little to rebut this evidence other than to indicate that it only began preparing internal forecasts in 2013 after acquiring Elan's rights. (*Id*. ¶ 64.) Biogen suggests these projections should be given little weight, as (1) they were never communicated to Genentech and (2) the negotiators of the Agreement were not involved in drafting the projections. (*Id*. ¶¶ 64, 70.) These arguments do not persuade. That these projections were never shared with Genentech is irrelevant. Rather, they clearly reflect ***Biogen's own understanding*** that the Agreement required tail royalties. Additionally, that the negotiators were not involved in drafting the internal projections does not change the Court's analysis, as Genentech offered evidence that the accounting team consulted with Biogen's legal department in preparing the projections. (Dickerson Dep. Tr. at 18:24–19:02.)

The parties' negotiation history and Biogen's post-Agreement conduct are compelling evidence that Biogen was required to pay royalties on the Product At-Issue under the Agreement. Nevertheless, the Court continues to consider Genentech's evidence of custom and practice.

---

and the June 2017 projections assumed an inventory turnover of 28 months (Ex. 27.002).

United States District Court
Northern District of California

United States District Court
Northern District of California

### D.    Custom and Practice

Genentech offered evidence that at the time the Agreement was executed, it was standard custom and practice for licensees to pay tail royalties.  Obviously, if an agreement expressly provided otherwise, this custom and practice would not control.  Biogen argues that Genentech's evidence of custom and practice should not be considered, because Genentech failed to establish a factual predicate for this evidence.  (Dkt. No. 221 ¶¶ 72–74.)

The Court disagrees.  Genentech provided testimony from Johnston, one of Genentech's negotiators, testifying as to his practice in this regard.  Johnston specifically testified that it was "customary among licensing professionals in 2004 for a patent license to require royalties on inventory sold after the patent expires[.]"[17]  (Trial Tr. 251:10–20, 279:15–24.)  He further testified that any exception to this custom would generally be set forth with "very express language in the agreement[,]" but Biogen and Elan never proposed such language.  (*Id*. at 251:14–22.)  The Court therefore finds Genentech has laid a factual predicate for the Court to consider evidence of custom and practice but will only consider the evidence to determine the intent of the parties circa 2004.

Genentech's expert, Christopher Seaton, testified to the industry custom and practice of paying royalties on product manufactured before but sold after a licensed patent's expiration. (Trial Tr. 456:2–458:12.)  Genentech also introduced evidence of agreements similar to the one at issue, under which Biogen acted in conformity with the industry custom and practice of paying tail royalties.

#### 1.    Biogen's License Agreement with Centocor

For example, Biogen and Elan entered into a license agreement with Centocor, Inc. effective June 30, 2004, which granted Biogen licensing rights to Centocor's Morrison patent. (Ex. 41.)  The Centocor License contained provisions substantially similar to those found in the

---

[17] The Court recognizes that Johnston later testified on cross-examination that in 2004 he "was personally unaware of a custom or practice in the industry regarding the payment of tail royalties."  (Trial Tr. 352:24–353:4.)  The Court still finds that Genentech sufficiently laid a factual predicate to introduce evidence of custom and practice.  However, even if the Court were not to consider this evidence, the parties' negotiation history and Biogen's post-Agreement conduct would be sufficient to find that the parties intended for Biogen to pay royalties on the Product At-Issue under the Agreement.

Agreement.  For example, the Centocor License contained the following provisions:

> 1.08. "Licensed Products" shall mean any and all products listed on Schedule A the manufacture, use, offer for sale, sale or importing of which: but for the license granted herein, would infringe one or more claims of a Licensed Patent . . . .
>
> 3.03. <u>Earned Royalties</u>. Licensee shall pay to Centocor a royalty of [redacted] of total Net Sales of Licensed Products.
>
> 7.01. <u>Term</u>. This Agreement shall come into force as of its effective date and shall continue in full force and effect, unless earlier terminated as provided herein until the expiration of the last to expire of the Licensed Patents.

(Ex. 41 §§ 1.08, 3.03, 7.01.)  These provisions are nearly identical to §§ 1.12, 3.03, and 7.01 of the Agreement.  It is undisputed that Biogen paid tail royalties under the Centocor License. (Dickerson Dep. Tr. 80:11–19.)  In fact, when Centocor asked Biogen to "provide [an] estimated time of when [Biogen's] Tysabri royalty to [Centocor] would expire[,]" Biogen responded that its understanding was that "the IP license agreement covers manufacturing/existing product inventory" and Biogen would "continue to pay until that inventory ha[d] been sold."  (Ex. 42.)

### 2.    Biogen's License Agreement with PDL

In April 1998, Elan entered into an agreement with Protein Design Labs, Inc. ("PDL"), which granted Elan rights to PDL's "Queen patents."  The PDL License contained provisions substantially similar to the Agreement.[18]  For example, under § 3.02 of the PDL License, Elan was required to pay a royalty "of the Net Sales of all Licensed Product" Elan sold "until the last date on which there is a Valid Claim that, but for the licenses granted . . . would be infringed by the making, using, having made or sale of that Licensed Product . . . ."

> **3.02  Royalties to PDL.**  Subject to reduction for any offset as provided in Section 3.05, in further consideration of the rights and licenses granted under Article 2, ELAN shall pay to PDL a royalty of Three Percent (3%) of the Net Sales of all Licensed Products sold by ELAN or its Affiliates or sublicensees in each country <u>until the last date on which there is a Valid Claim</u> that, but for the licenses granted to ELAN under this Agreement, would be infringed by the making, using, having made or sale of that Licensed Product in such country or by the manufacture of Licensed Product in the country of manufacture.

(Ex. 48 § 3.02 (emphasis supplied).)  This provision is nearly identical to §§ 3.03 and 7.01 of the

---

[18] Biogen later subsumed Elan's obligations under the Agreement.

United States District Court
Northern District of California

1    Agreement.  The Queen patents expired in December 2014, but Biogen continued to pay royalties

2    on product manufactured before but sold after the Queen patents expired.  (Trial Tr. 434:9–14.)

3              *3.*        *Biogen's License Agreement with Medical Research Council*

4         Under an April 1992 agreement with Medical Research Council ("MRC"), in which MRC

5    licensed its Winter patent to Biogen for the manufacture of Tysabri, Biogen continued to pay

6    royalties on Tysabri manufactured before but sold after the Winter patent's expiration.[19]  In

7    pertinent part, the MRC License provided that the "obligation to pay . . . royalties shall terminate

8    on the earlier of the expiration of Valid Claims, or . . . twelve (12) years after Commercial

9    Introduction . . . ."

> 4.2    In consideration of the rights, privileges and license granted herein, Athena shall pay to MRC an earned royalty of ▓▓▓▓▓▓ of Athena's, its Affiliates and/or sublicensees' Net Sales as herein defined.  Athena's obligation to pay such earned royalties shall terminate on the earlier of the expiration of Valid Claims or, if no MRC Patent Rights are issued or granted in a country, then twelve (12) years after Commercial Introduction in that country.  Thereafter, Athena shall have a fully paid-up licence to make or have made, use and/or sell Licensed Products in said country.

10   (Ex. 47 § 4.2 (emphasis supplied).)  This provision is substantially similar to § 7.01 of the

11   Agreement.

12             *4.*        *Biogen's License Agreement with Glaxo Group Limited*

13        In June 2006, Biogen entered into an agreement with Glaxo Group Limited ("GSK"),

14   under which GSK licensed its Shadle patent to Biogen for the manufacture of Tysabri.  (Ex. 40.)

15   The GSK License contained provisions substantially similar to those found in the Agreement.  For

16   example, the GSK License contained the following provisions:

> 3.2. <u>Royalties</u>. In further consideration for the license rights granted by Licensor to Licensee hereunder, for the Term of this Agreement Elan shall pay Licensor a royalty of [redacted] on Net Sales of Product (other than Combination Products) in the Territory in each calendar year. Royalties are payable on Net Sales of the Product within the Territory where there is a Valid Claim.

> 5.1. <u>Term</u>. This Agreement shall commence on the Effective Date and shall continue in full force and effect, unless earlier terminated as provided herein, ***until the date of expiration of the last to expire Valid Claim*** reciting the manufacture, use or sale of a Product in a

---

[19] Biogen is the successor to the original licensee, Athena Neurosciences, Inc.

particular country in the Territory. The period from the Effective Date to the expiration of the entire Agreement pursuant to this Section 5.l shall be the "Term." Except in the event of termination of this Agreement pursuant to Section 5.2 for breach by Licensee, or Section 5.3, Section 5.4 or Section 5.5, upon expiration of the Term, the license granted to Licensee under this Agreement shall become perpetual, fully-paid and royalty-free.

(Ex. 40 §§ 3.2, 5.1 (emphasis supplied).)  These provisions are functionally identical to §§ 3.03 and 7.01 of the Agreement.  It is undisputed that Biogen paid tail royalties under the GSK License. (Dickerson Dep. Tr. 93:12–94:12.)

Biogen argues that these agreements should be afforded little weight, because MRC and GSK fully refunded Biogen's payment of tail royalties and Centocor partially refunded Biogen's payment of tail royalties.  (Ex. 293.)  That Centocor, GSK, and MRC ultimately refunded, at least in part, Biogen's payment of tail royalties does not negate the fact that Biogen paid these royalties in the first place.  (Ex. 293.)  Clearly, if Biogen paid these royalties, it believed they were due.[20]

     5.    *Biogen's License Agreement with The Medicines Company[21]*

Genentech also introduced evidence of Biogen's expectation of tail royalties as the licensor.  In March 1997, Biogen executed a license agreement with The Medicines Company ("TMC"), under which Biogen licensed certain patent rights to TMC.  (Ex. 30.)  In pertinent part, the TMC Agreement provided, under the "Royalties" provision of § 6.3, that TMC's "obligation to pay royalties shall continue . . . until the later of (i) [redacted] after the date of the First Commercial Sale of such Product in such country or (ii) the date on which the Product or its manufacture, use or sale is no longer covered by a Valid Claim . . . ."  (Ex. 30 § 6.3(d).)

---

[20] At trial, Biogen's expert, Dr. Edward Buthusiem, testified to his belief that that Biogen mistakenly paid tail royalties to Centocor, GSK, and MRC.  (Trial Tr. 538:12–17, 545:23–548:2.) The Court does not find Dr. Buthusiem credible.  The suggestion that Biogen would repeatedly pay millions of dollars in tail royalties due to "mistake" is dubious at best.

[21] On reply, Genentech sought to introduce evidence of the report Biogen's expert submitted in the TMC Litigation.  Biogen objects to the introduction of this evidence, arguing that the Court already found "the pretrial opinions of Biogen's expert in the TMC litigation were inadmissible hearsay and did not qualify for any exception that would permit its introduction at trial."  (Dkt. No. 223 at 2.)  Genentech counters that Biogen opened the door to this evidence by "den[ying] there was any evidence it 'knew' of a custom and practice presuming tail royalties were required absent unambiguous language excluding them."  (Dkt. No. 224-1.)  The Court agrees with Biogen.  The arguments made in Biogen's brief did not open the door to the introduction of the Milgrim expert report.  Biogen's objections are sustained.

Biogen attempts to distinguish the TMC License, arguing that § 2.1 "granted TMC a 'royalty bearing right . . . to make, have made, import, use, offer to sell and sell Product.'" (Dkt. No. 221 ¶ 93.)  Biogen argues that the "royalty bearing right" language distinguishes the TMC License from the Agreement in this case.

The Court is not persuaded.  Section 6.3(d) set out TMC's royalty obligations under the TMC License.

> (d)    The obligation to pay royalties and a percentage of  Sublicense Royalty Income (as defined in Section 6.5) shall continue, on a country-by-country basis, from the date of the First Commercial Sale of Product in a country until the later of (i) ▮▮▮ ▮▮▮ after the date of the First Commercial Sale of such Product in such country or (ii) the date on which the Product or its manufacture, use or sale is no longer covered by a Valid Claim of any Biogen Patent Rights in such country.

Read together, §§ 2.1 and 6.3(d) are functionally identical to § 7.01 of the Agreement. Ultimately, TMC failed to pay Biogen tail royalties, and Biogen took the position that tail royalties were owed under the TMC License.  Biogen's actions with respect to the TMC License suggest that Biogen adhered to the custom and practice of paying, or expecting to receive payment of, tail royalties.

### 6.    *Genentech's Third Party License Agreements*

Biogen contends that "the evidence from the Cabilly licensing program itself . . . undermines" Genentech's interpretation.  (Dkt. No. 221 ¶ 74.)  Biogen argues that "Genentech licensed its Cabilly patents to more than 50 companies, under which roughly two dozen paid royalties[,]" but "Genentech received tail royalties from only five, despite the evidence at trial that numerous companies continued to sell licensed products after Cabilly expired."  (*Id*.)  Biogen argues that "at least eight other Cabilly licensees continued to sell licensed product after the licensed patents expired but did not pay tail royalties, despite having agreements containing 'Earned Royalties' provisions materially identical to that in the Agreement here."  (*Id*. ¶ 77.)

Biogen's attempt to use Genentech's licenses for the contrary opposition does not persuade.  As Biogen acknowledges, agreements must be read as a whole.  In fact, Biogen itself

United States District Court
Northern District of California

1    argues that § 3.03, the "Earned Royalties" provision of the Agreement, cannot be read in isolation.

2    (Dkt. No. 221 ¶ 45.)  Yet, Biogen relies solely on the "Earned Royalties" provisions of eight

3    Cabilly agreements between Genentech and third parties to dispute that there is no industry

4    custom of tail royalties.[22]  (*Id.* ¶ 77 (citing Exs. 297–304).)  Biogen has failed to show that these

5    Cabilly agreements are sufficiently similar to the Agreement in this case to rebut Genentech's

6    evidence of industry custom and practice.[23]

7         The Court finds that the evidence of custom and practice bolsters its finding that tail

8    royalties are due under the Agreement.

9    **III.    CONCLUSION**

10        Accordingly, the Court finds that judgment should be entered in favor of Genentech in the

11   amount of $88,348,123 plus interest.  The parties shall jointly file a calculation of the amount of

12   interest that should be added to the damages award within three business (3) days of this Order

13   (Dkt. No. 219 at 34).  Genentech shall also file a proposed form of judgment, approved as to form

14   by Biogen, within seven (7) days of this Order.

15        This Order terminates Docket Number 224.

16        **IT IS SO ORDERED.**

17   Dated:  9/30/25

18                                          YVONNE GONZALEZ ROGERS
                                            UNITED STATES DISTRICT COURT JUDGE

19

20

21        [22] These include Genentech's agreements with Seattle Genetics (Ex. 297), TailMed (Ex.
22   298), Boehringer Ingelheim (Ex. 299), Celltech (Ex. 300), Elusys (Ex. 301), Rinat (Ex. 302),
     Chiron (Ex. 303), and Millenium (Ex. 304).

23        [23] Genentech previously moved to exclude evidence of sixty-nine (69) third party Cabilly
24   agreements.  (Dkt. No. 125.)  The motion was granted in part and denied in part.  (Dkt. No. 177 at
     2.)  The Court granted the motion as to the forty-seven licenses (47) Genentech identified in
25   Docket Number 139-9.  (*Id.*)  However, the Court "allow[ed] evidence of the Centocor [] and
     Bristol Myers Squibb [] Cabilly licenses," finding "Biogen ha[d] shown that these licenses
26   'contain[ed] explicit language requiring tail royalties . . . demonstrating that Genentech kn[e]w[]
     how to write a tail royalty provision . . . ."  *Id.*  With respect to the remaining twenty (20) licenses,
27   which included Exhibits 297–304, the Court instructed that such evidence would be admissible
     "(1) upon a showing of relevance based on similarities in language, or (2) to rebut evidence,
28   testimony, or argument regarding the industry custom and practice of requiring tail royalties."
     (*Id.*)  No such showing was made.